VERBATIM TRANSCRIPT OF THE

PRESS CONFERENCE VIDEO

REGARDING THE OFFICER-INVOLVED SHOOTING

IN HARNEY COUNTY ON JANUARY 26, 2016


*   *   *


March 8, 2016


Deschutes County Sheriff's Office

63333 US-20

Bend, OR  97701


Amy E. Joyeux,
Court Reporter

2

BEND, OREGON; MARCH 8, 2016

*   *   *

PRESS CONFERENCE

SERGEANT GARIBAY:  Good morning.  I would like to welcome you to this press conference.  The scope of this press conference is to update the public --

UNIDENTIFIED SPEAKER:  You don't have any audio -- audio --

SERGEANT GARIBAY:  No audio?

UNIDENTIFIED SPEAKER:  No audio.

SERGEANT GARIBAY:  What's that?  Oh, unmute.  Sorry.  I apologize for that.  How's that?

UNIDENTIFIED SPEAKER:  [Indiscernible].

SERGEANT GARIBAY:  I hear it myself now. Okay.  I'd like to welcome you to this press conference.  The scope of this press conference is to update the public regarding the ongoing investigation into the officer-involved shooting which occurred on January 26 in Harney County.

Before we begin I would like to provide a few expectations.  First, due to the fact we are located within a secure law enforcement facility we cannot allow unescorted access.

Two, we would ask that you hold your questions to the end of the press conference.  There will be some time at the end of the press conference for a few questions.

Three, please restrain or refrain from disrupting any of the speakers or the press conference.  Any disruptions will receive one warning, and any further disruptions you'll be escorted out of the room and off the property. We don't anticipate any issues and we thank you for your cooperation.

During this press conference you will see quite a bit of information.  We will make this available and I will provide information at the conclusion of the press conference on how you can receive the information.

Again, we're very appreciative of your understanding and cooperation.  At this time I would like to now introduce Sheriff Nelson.

SHERIFF NELSON:  Can everyone hear this all right?

Good morning.  I'm Shane Nelson, the Deschutes County Sheriff.  With me are Harney County district attorney, Tim Colahan, and Malheur County's district attorney, Dan Norris,

who is leading the investigation of the

officer-involved shooting of Robert LaVoy

Finicum on January 26th, 2016, under Harney

County's plan addressing use of deadly force

enacted under ORS 181A.775.2815.

We are here to present the results of

the investigation as we know them today.  Also

here are United States Attorney Bill Williams,

Special Agent in Charge for Oregon FBI Greg

Bretzing, and Special Agent in Charge Michael

Tompkins of the United States Department of

Justice Office of the Inspector General.

We ask that you hold your questions

until the end of this presentation.  The

Deschutes County Sheriff's Office was contacted

by the Oregon State Police to conduct an

independent and impartial investigation of the

use of deadly force.  The Deschutes County

Sheriff's Office then reached out to members of

our Central Oregon Tri-County Major Incident

Team for investigative resources.  Detectives

responded from the City of Bend Police, City of

Redmond Police, Oregon State Police, and

forensic scientists from the Oregon State Police

Crime Lab.

5

What you will see today is the FBI video, which I'm sure most of you have already seen.  You will also hear the events of January 26th, which were recorded on the camera of Shawna Cox, an occupant in Mr. Finicum's truck at the time of the shooting.

The Deschutes County Sheriff's Office has synchronized the FBI video and the Cox audio video by matching significant visual cues in both videos.  We have considered this video footage along with statements given by the Oregon State Police Troopers and the FBI Hostage Rescue Team operators, the interviews given by Shawna Cox, Victoria Sharp, and Ryan Bundy, the physical evidence, and the crime scene reconstruction by the Major Incident Team investigators.

We have presented the investigation to Malheur County District Attorney Dan Norris so he could review the actions of the Oregon State Police Troopers under applicable Oregon law governing the use of deadly force.

We have determined that eight shots were fired on that day.  Six of which have been attributed to the Oregon State Police including

the three shots that resulted in the death of
Mr. Finicum, and two shots which were fired by
the FBI HRT operators.

You have heard a statement from Shawna
Cox that, quote, Hundreds of bullets, unquote,
were fired at the truck.  And from Victoria
Sharp, that quote, As many as a hundred bullets
were fired at the truck, unquote.

After Mr. Finicum was shot, numerous gas
projectiles and flashbangs were deployed to get
the remaining occupants of the truck, Ryan
Bundy, Shawna Cox, and Victoria Sharp to
surrender peacefully.  But again, only eight
shots were fired.

MR. NORRIS:  Good morning.  I'm Dan
Norris, the District Attorney for Malheur
County.

Of the eight shots, the six fired by the
Oregon State Police were justified and, in fact,
necessary.  My legal obligation under the Oregon
Law is to review the six shots fired by the
Oregon State Police.

The Inspector General of the United
States Department of Justice will review actions
taken by the HRT operators.

SHERIFF NELSON:  Throughout this presentation we will be stopping the audio video at specified points to supplement what you are seeing with information gathered during the course of the investigation and to give you the laws which apply to those actions.

Prior to Ms. Cox's recording, the two vehicles carrying members of the unlawful armed occupation of the Malheur National Wildlife Refuge were stopped to arrest those members for federal felony charges based on the criminal acts arising from that unlawful occupation.

The occupants of the first vehicle cooperated with the Oregon State Police and were arrested without incident.  The occupation leader, Mr. Ammon Bundy, as well as Brian Cavalier and Mark McConnell were in this vehicle.

Mr. Finicum was driving the second vehicle.  In Mr. Finicum's truck were Ryan Bundy, Ryan Payne, Shawna Cox, and Victoria Sharp.  None of them complied with commands from the Oregon State Police to cooperate with the arrest process.

The Oregon State Police fired one less

lethal OC round at the truck to gain compliance.
Mr. Payne then complied with commands from
Oregon State Police Troopers, got out of
Mr. Finicum's truck, and was arrested on federal
charges.  At that time Ms. Cox turned on her
camera and began recording.  This video footage
became valuable to the investigators of the
Major Incident Team.

I want to now direct your attention to
the monitor.

[Video played.]

MR. NORRIS:  The truck was stopped to
arrest Finicum, Payne, Bundy, and Cox for
federal felony charges based on criminal acts
arising from the armed occupation of the Malheur
County National Wildlife Refuge.  The occupants
of the truck knew that the Oregon State Police
had appropriately identified themselves and told
them to get out of the truck.  They had been
given both visible and audible commands to stop
by law enforcement personnel who were
appropriately attired and with appropriately
marked police vehicles.

At this point in the conversation the
video in the -- show that the occupants of the

truck had an agreement to elude the police in a vehicle. Eluding the police in a vehicle is a Class C Felony in the State of Oregon.

SHERIFF NELSON: In the video the truck now accelerates away from the initial stop. We have determined that Mr. Finicum was driving over 70 miles per hour as he approached the road block established by FBI HRT operators and the Oregon State Police at mile post 51, one and a half miles from the initial stop.

Please again direct your attention to the monitor.

[Video played.]

SHERIFF NELSON: As Mr. Finicum rounded the curve in the road, he would have been able to see the road block which was approximately 862 feet away, about the length of three football fields. Mr. Finicum continued driving over 70 miles per hour as he approached the road block. An Oregon State Police Special Weapons and Tactics van was following Mr. Finicum's truck at the same speed and was able to stop prior to the road block.

Mr. Finicum continued to travel at speeds in excess of 50 miles per hour as an

Oregon Police Trooper was standing at the roadblock fired three shots into the truck in an attempt to stop it.  This trooper was located by this law enforcement truck on the diagram.

Mr. Finicum continues to drive toward the roadblock and veers off the road and hits a 3 foot high snow bank and travels 105 feet before coming to a stop.  As you will see, Mr. Finicum almost struck an FBI HRT operator.

We are going to replay the first two shots as the second shot is difficult to hear. Two of the three shots, the first and third shots, are distinct.  The second shot is muffled due to the fact that it hit the engine compartment.

Before we play the video, I want to point out the three shots that were fired at the pickup from the Oregon State Police Trooper. The first shot is represented by this orange line and strikes the driver's side mirror.  The second shot represented by the red line strikes in the approximate area of the engine compartment.  The third shot, represented by the green line, strikes in the front area of the vehicle as well.

When we play this video we will loop the video here three times so you can hear the first and second shot.  The first and second shot are close together.

Please direct your attention to the monitor.

[Video played.]

DEPUTY NELSON:  As Mr. Finicum exit his -- exits his truck, two shots were fired which we have determined were fired by an FBI HRT operator.  Later in this conference we will discuss both the circumstances of those shots and how we discovered them.  Neither of these two shots hit Mr. Finicum.

MR. NORRIS:  Again, I am only dealing with shots fired by the Oregon State Troopers. Under Oregon Law, Mr. Finicum was using his truck as a dangerous weapon.  A dangerous weapon is defined as any weapon, device, instrument, material or substance which under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury.

An Oregon officer is justified in using

deadly physical force when it is necessary to defend the peace officer or another person from the use or threatened imminent use of deadly physical force.  Any person is justified in using deadly physical force when they reasonably believe that another person is using or about to use unlawful deadly physical force.

Deadly physical force means physical force that under the circumstance in which it is used is readily capable of causing death or serious physical injury.

When Mr. Finicum drove his truck at a high rate of speed toward a roadblock where law enforcement were present, the Oregon State Police Trooper was reasonable in believing that Mr. Finicum planned to crash through or otherwise evade the roadblock.  In doing so, he would do it in a manner that would injure or kill law enforcement at the roadblock.

In this case, after interviewing the Oregon State Police Trooper, that is, in fact, what the officer who fired three shots into the truck believed.  Under these circumstances, these three shots into Mr. Finicum's truck are justified.

SHERIFF NELSON:  Many of you have seen
the social media photos of Mr. Finicum carrying
a handgun on his left-hand side.  The Oregon
State Police Troopers had been briefed and were
aware that Mr. Finicum carried a handgun on his
left side.

During the investigation of the scene,
major incident team investigators found a loaded
9 mm handgun in the left-hand interior pocket of
Mr. Finicum's jacket, as seen here in this
orange circle and it's also on these side
monitors.

Detectives recovered the 9 mm loaded
handgun from that interior pocket and were able
to determine that the handgun was a gift from a
relative to Mr. Finicum.

We have selected this critical part of
the footage and we are now going to play it in
slow motion.  I will be pointing out key points
in this footage.  We're also going to show a
transcript on the screen, and that depicts
commands given by Oregon State Police as well as
statements made by Mr. Finicum.  This was during
the attempt to arrest Mr. Finicum.

I'll again refer you to the monitor and

we'll play the video.  When you see this footage
in realtime, you will see that Mr. Finicum
rapidly gets out of his truck.  He is commanded
to, Get on the ground.  He does not comply with
commands to get on the ground and continues
moving away from his truck.  He is commanded a
second time to get on the ground.  Again he does
not comply and continues moving away.

He reaches across his body with his
right hand into his jacket towards the area
where his gun was found.  The Oregon State
Police do not shoot.

He lifts his hands.  He looks down at
his jacket and again reaches across his body
with his right hand into his jacket towards the
area where his gun was found.  The Oregon State
Police do not shoot.

It is important to note that our
investigation has determined that at this point
Mr. Finicum has not been shot with any lethal
rounds or less lethal rounds.  Again he lifts
his hands.

Also note that the Oregon State Police
Trooper who you see at the left side of this
screen, right here in the photo, is armed with a

taser and closing in to deploy it.  He was

attempting to take Mr. Finicum into custody with

less lethal force after Mr. Finicum refused

orders to get on the ground.  Before that can

happen, Mr. Finicum is ordered a third time to

get on the ground.

        In the midst of that command,

Mr. Finicum grabs his jacket with his left hand

and again reaches with his right hand into the

area of his jacket where his gun was found, at

which time the two Oregon State Police Troopers

behind Mr. Finicum, only one of whom you can see

in the video, shoot a total of three shots

killing Mr. Finicum.

        Both of these Oregon State Police

Troopers stated to Major Incident Team

investigators that they shot Mr. Finicum because

they believed he was reaching for a handgun and

was about to use deadly force against them

and/or the trooper armed with the taser.

        We have spent hours analyzing this video

frame by frame.  I would like to direct your

attention to the monitor.  Now, here is the

footage in realtime.

        Excuse me.

[Video played.]

MR. NORRIS:  Again, an Oregon just --
officer is justified in using deadly physical
force when it is necessary to defend the peace
officer or another person from the use or
threatened imminent use of deadly physical
force.

Any person is justified in using deadly
physical force when they reasonably believe that
another person is using or about to use unlawful
deadly physical force against a person.

Two LSP [sic] troopers filed a total of
three rounds, all of which hit Mr. Finicum.  The
Oregon State Medical Examiner's Office conducted
the autopsy of Mr. Finicum and found that he was
struck by three bullets in the torso entering
his back.

The Major Incident Team has confirmed
that these three bullets were fired by OSP
Troopers.  The troopers knew that Mr. Finicum
carried a weapon in his left side.  Mr. Finicum
was reaching for that loaded 9 mm gun when the
troopers lawfully used deadly physical force to
protect themselves and others including the
trooper who was armed with the taser.

Under Harney County's plan addressing use of deadly physical force protocol, my legal obligation is to review the evidence as it relates to the use of deadly physical force by the Oregon State Police Troopers.  I have concluded that all six shires [phonetic] -- six shots fired by the Oregon State Police -- the three into the truck and the three that struck Mr. Finicum -- are justified.

SHERIFF NELSON:  As a part of the major incident team investigation, Oregon State Police Crime Lab forensic scientists examined the truck driven by Mr. Finicum and found four distinct bullet holes.  Three of which we have already gone over with you.  Going to refer you to this diagram.

[Diagram displayed on monitor.]

These are the three prior shots that we had discussed.  This is the fourth shot that they found into the roof of the truck.

In the early stages of the investigation, we could not explain the fourth shot into the roof of the truck or its trajectory given the placement of the Oregon State Police Troopers at the time.  We had

conclusive evidence that the Oregon State Police

Troopers fired six shots:  the three that hit

the truck and the three that hit Mr. Finicum.

During the course of our investigation,

we discovered evidence that an FBI HRT operator

fired two shots as Mr. Finicum exited the truck

and one shot hit the truck.  The footage from

Ms. Cox's camera confirms this.  Neither of

these two shots fired by FBI HRT operators

struck Mr. Finicum.

The HRT operators were interviewed on

the evening of January 26th and again on

February 5th and 6th during the investigation by

the Major Incident Team.  Of particular concern

to all of us is that the FBI HRT operators did

not disclose their shots to our investigators,

nor did they disclose specific actions they took

after the shooting.

The failure by HRT operators to disclose

that they fired shots during this contact and

actions they took after the shooting are the

subject of on ongoing investigation by both the

Deschutes County Sheriff's Office and the

Inspector General of the United States

Department of Justice.  The Inspector General is

a separate department of the Department of

Justice responsible for investigating misconduct

by Department of Justice personnel.

Immediately upon discovering evidence of

the HRT operator's actions, we contacted United

States attorney, Bill Williams, on

February 17th.  On February 18th in Bend we

thoroughly briefed Mr. Williams who reviewed the

evidence.  He then contacted FBI Special Agent

In Charge for the State of Oregon, Greg

Bretzing, who came to Bend and was thoroughly

briefed on the 19th.  The inspector general of

the U.S. Department of Justice was notified the

same day by the FBI.

The very next day, Saturday,

February 20th, a special agent of the Office of

Inspector General of the U.S. Department of

Justice and a team from the Inspections Division

of the FBI flew from Washington, D.C. to Bend

and were shown all of the evidence concerning

the actions of the FBI HRT operators including

the actions of some operators during and after

the shooting.

We, the Deschutes County Sheriff's

Office, the U.S. Attorney's Office, and the

Office of the Inspector General consider this

part of the incident an ongoing investigation.

          MR. NORRIS:  Given that we have an

ongoing investigation, we're going to try to be

as transparent as possible.  We are releasing

all of the evidence that you've seen here today

including extended footage from after the

shooting of Mr. Finicum until the truck's

occupants were taken into custody.

          We've also reviewed numerous police

reports and photos that -- that are not directly

related to the ongoing investigation which we

will release today.  We will not be releasing

the names of any law enforcement officers

involved in this matter due to concerns for

their safety and the safety of their families.

          We will not be releasing evidence that

being -- is being used in the continuing

investigation.

          We want to acknowledge the prompt

response of U.S. Attorney, Bill Williams, FBI

special agent in charge, Greg Bretzing, the

FBI's Inspection Division and the Office of

Inspector General.

          Additionally, I would like to publically

thank the Deschutes County Sheriff's Office and
the major incident team for their meticulous
work in following the evidence wherever it led
without fear or favor.

        MR. COLAHAN:  Good morning.  I'm Tim
Colahan, Harney County District Attorney.
Before we take any questions this morning, I
want to be clear where the process goes from
here.  The investigation remains open and in the
hands of the Deschute -- Deschutes County
Sheriff's Office.  The Inspector General of the
U.S. Department of Justice is now also
investigating.

        We deserve to know that our law
enforcement officers at the local, state, and
federal level act appropriately within the scope
of the law.  We know without a doubt that the
Oregon State Police Troopers who shot
Mr. Finicum did so as they moved to protect
themselves and their fellow officers from
imminent harm.

        Mr. Finicum repeatedly and knowingly
made choices that put him, Robert LaVoy Finicum,
in this situation.  It was not the outcome that
any of us wanted, but one that he alone is

responsible for.

MR. BRETZING:  Thank you, gentlemen, for the opportunity to speak today.

My name is Greg Bretzing and I am the Special Agent in Charge of the FBI in Oregon. On January 26, 2016, along Highway 395 in Harney County, Oregon State Police Troopers and FBI agents put themselves in harm's way as part of an effort to bring the situation at the refuge to an end peacefully.

I can assure you that no one, from the director of the FBI down to each and every employee who was working in Harney County, wanted this situation to end in violence or death.  However, Mr. Finicum chose to break the law.  Mr. Finicum chose to put other people's lives in danger, and, as the investigation shows, he chose to provoke a confrontation with law enforcement.

As the sheriff and DA have shown, the threat Mr. Finicum posed to OSP Troopers and agents along Highway 395 on that day was real and imminent and certainly justified the use of deadly force by law enforcement.

As you have heard today, the

investigation conducted by the Tri-County Major
Incident Team determined that OSP Troopers fired
three shots at Mr. Finicum's vehicle as it
approached the law enforcement barricade at a
high rate of speed, the vehicle nearly hitting a
law enforcement officer.

        The team also determined OSP Troopers
fired three additional shots that struck and
killed Mr. Finicum as he reached for his weapon
after exiting his vehicle.  The County
investigation further indicates that in between
the two series of shots fired by OSP troopers,
one and possibly two additional shots were fired
by law enforcement as Mr. Finicum was exiting
his vehicle immediately after hitting the snow
bank.  As autopsy results confirm, neither of
these shots struck Mr. Finicum.

        The question of who fired these shots
has not been resolved.  Upon learning this and
given the presence of FBI agents on scene, I
immediately contacted our Inspection Division
which in turn notified the United States
Department of Justice Office of Inspector
General, which is currently investigating the
matter.

Because this is an ongoing investigation, it would be inappropriate for me or anyone else to speculate or comment further, but I can assure you the FBI is cooperating fully with the Office of Inspector General.

Since January 2nd, the FBI has worked in partnership with Harney County and our law enforcement partners across the state to resolve the situation at the refuge. Since that time hundreds and hundreds of FBI employees travelled to Burns with the sole purpose of bringing this situation to a peaceful conclusion. Working together with our partners we have been able to do just that.

The refuge is clear and will be reopening soon. People who once feared for their lives have returned home. Those who chose to broke the -- to break the law will have their day in court. Life is not yet completely normal, but we are on a path to reconciliation and recovery.

Thank you.

MR. WILLIAMS: Good morning. My name is Bill Williams and I'm the U.S. attorney here in the District of Oregon.

A separate independent investigation is being conducted by the Office of Inspector General for the United States Department of Justice in consultation with my office. This is obviously regarding the actions of the FBI hostage rescue team personnel. We will continue to work with state and local law enforcement as we review this matter.

Because the investigation is ongoing, I do not want to prejudge or prejudice the outcome. Accordingly, I will not comment further until the investigation is fully concluded and then you will hear from us.

Thank you.

SHERIFF NELSON: We have time for a few brief questions.

Sir.

A REPORTER: Could you just clarify -- because I know you won't get into details, but what is the question you're trying to answer with the HRT operators?

SHERIFF NELSON: I've -- as Special Agent in Charge Bretzing mentioned, we don't -- we don't know the identity of -- of who fired those rounds, so it's an ongoing investigation.

Those are some of the questions that we'll be
answering during that investigation.

      A REPORTER:  So who fired and why?

      SHERIFF NELSON:  It's just to determine
all the facts that are surrounding those shots.

      A REPORTER:  Is there --

      SHERIFF NELSON:  Yes, ma'am.

      A REPORTER:  Is there any additional
video from Shawna Cox that was not shown here?

      SHERIFF NELSON:  I believe -- I -- I'd
have to defer, but I believe we showed most of
Shawna Cox's video and then that will be -- that
will be released later as well.  My partner,
Mr. Norris, mentioned that is the video, so --
and that will be released later.

      A REPORTER:  Do you have a timeline on
when this investigation will be included?

      MR. NORRIS:  It's difficult to tell as
investigations play out because you never know
how many interviews you're going to have to
conduct and you never know where the evidence
will lead you.

      Sir.

      A REPORTER:  Last [indiscernible] when
the FBI released its aerial footage we saw

critics online a lot -- a lot of them saying

that it was manipulated.  You are no doubt going

to hear the same kind of things today after the

video you just showed.  What do you say to

people who are going to no doubt or have in the

past accused law enforcement authorities of

manipulating images and video to serve, uh,

their own purpose?

          SHERIFF NELSON:  I absolutely don't

question any authenticity of any of these

videos.  On the initial FBI video there were

several videos that watched it play out live.

And in our case of the video, we matched it up

with Ms. Cox's video on several visual cues.

And that was the overlay that you saw, those

were -- were both the videos in raw form

overlay.

          Clair?

          A REPORTER:  Sheriff Nelson, two of your

agency's captains resigned or were arrested once

the investigation began.  Does that impact

resources from the investigation or cause a

distraction?

          SHERIFF NELSON:  No, absolutely not.  We

have never missed a beat in delivering superior

public safety and service, and this is no

exception.

     Sir.

     A REPORTER:  So you're not releasing the

names of any of the officers in part because of

concerns about your safety.  Can you tell us at

all if there have been general or specific

threats or what -- what is the reason in this

case you're not releasing information that

normally is released?

     MR. NORRIS:  Yeah, I believe in the

press package, Mr. Zites [phonetic], you will

see a collection of 70 or 80 very specific

threats including rewards offered by various

militant groups for information leading to the

killing of the police officers involved.  That's

our reason for not releasing it.

     A REPORTER:  And is that being

investigated separately, those threats?

     MR. NORRIS:  To the extent they can be

investigated, they are.

     A REPORTER:  The FBI agents who are in

question, do they remain on duty or what is

their status?

     MR. BRETZING:  Well, first, we would --

we don't comment on personnel matters and being

it's an ongoing investigation, we'll just have

to defer that.

      SHERIFF NELSON:  [Indiscernible.]

      A REPORTER:  Yeah, is there a timeline

of, uh, when names of those officers might be

released?

      SHERIFF NELSON:  I don't have a timeline

about that.  I'll tell you as sheriff of this

county, those officers have very real threats

against them.  I believe strongly that it is in

the public interest to know which agency fired

which shots, and I think that we have -- we have

laid that out very well today in the

investigation.  But I don't believe the

identities of law enforcement are in the

public's interest to the extent that their

safety is compromised.

      A REPORTER:  Going back --

      SHERIFF NELSON:  Go ahead, Les.

      Sorry, I'll get you in a minute, sir.

      A REPORTER:  Going back to the -- the

reports of hundreds of rounds being fired, do we

have any count on the number of non-lethal

rounds that were used?

SHERIFF NELSON:  I don't have an exact count at this time, Les.  I'm sure that information is available in the investigation.

Sir.

A REPORTER:  When it comes to the involvement of the FBI agents, is there a possibility when it comes to the cooperation piece and the shots fired that they need discipline or charges could be filed?

SHERIFF NELSON:  You always see where the investigation will take you.  It's very early on and we're not going to comment about any specifics about that investigation.

A REPORTER:  So in general, just kind of open ended, anything is on the table?

SHERIFF NELSON:  Again, we'll just see where the investigation leads us, sir.

Sir.

A REPORTER:  Just a clarification question.  Could you clarify where the two officers were who fired the fatal shots?  Was one of them the guy to the left that you said had the taser and then another one?

SHERIFF NELSON:  No fatal rounds came from the OSP Trooper that -- the Oregon State

Police Trooper that had the taser.  He had a
less lethal taser deployed.

          A REPORTER:  So there were two others we
couldn't see to the left?

          SHERIFF NELSON:  Yes.

          MR. NORRIS:  [Indiscernible].

          SHERIFF NELSON:  Yeah, we can show you.
This is an Oregon State Police Trooper that
fired, and then off video that you can't see,
was another Oregon State Police Trooper behind
Mr. Finicum.  And, um, I -- I can't tell you the
specified location where he is at.

          MR. NORRIS:  Point out [indiscernible].

          SHERIFF NELSON:  Oh, and this is the
Oregon State Police Trooper that had the less
lethal taser deployed.

          Ma'am?  Ma'am, you had a question -- you
had -- you had your hand raised?

          A REPORTER:  Um, how long did it take
for medical personnel to be called and to arrive
on the scene after the shooting?

          MR. NORRIS:  In reading the reports, it
appeared that -- you're going to see the video.
It took some minutes for the other occupants of
the truck to come out.  You're going to have

that video.  My understanding is immediately
after the last person who, I believe, was
Ms. Cox, surrendered, that at that point in time
medical aid was rendered to Mr. Finicum and an
ambulance was called.

     A REPORTER:  Just for clarification --

     MR. NORRIS:  Yes.

     A REPORTER:  -- where again was he hit?

     MR. NORRIS:  If you could put that video
up for us?  Those are the three shots where they
entered Mr. Finicum.

     A REPORTER:  [Indiscernible] regarding,
did the medical examiner have an opinion about
whether they would have been instantly fatal or
would he have lived for any period of time after
being shot?

     MR. NORRIS:  I don't know if the medical
examiner expressed an opinion.  There was
substantial damage and it does not appear
Mr. Finicum was moving for a -- for very long
after he was hit by those weapons.

     SHERIFF NELSON:  Sir.

     A REPORTER:  Sometimes we hear an
official declaration, Suicide by officer.  Did
the medical examiner make that cause?

MR. NORRIS:  The medical examiner did not have this information when they made their determination.  The medical examiner determined that it was a homicide.

SHERIFF NELSON:  Ma'am.

A REPORTER:  So the -- you said that the -- the third officer had a taser that was deployed, um, but did that taser come close to striking Finicum?  Did that [indiscernible].

SHERIFF NELSON:  No, he was --

A REPORTER:  -- at all?

SHERIFF NELSON:  He was out of range of the taser.  He was moving in to be in range to deploy the taser.  The taser was not deployed.

A REPORTER:  And what is the range of the taser?

SHERIFF NELSON:  Uh, I would have to get that information.  I don't have that specific information at this time.  It depends on the cartridge.

A REPORTER:  So this is obviously a sensitive operation.  At what levels of either local law enforcement or the FBI was there the green light to proceed with this tactical operation?

MR. BRETZING:  This -- this operation
obviously -- the intent was to arrest the
leadership of the, um, group that was occupying
the refuge.  And when that opportunity to arrest
that leadership presented itself, the FBI in
consultation with the Oregon State Police and
our partners developed a plan and an operation
in which to take them into custody.

So the, uh -- the concept of the
operation was approved by myself, but it was
a -- briefed both up through the Oregon State
chain and through the, um, federal government
FBI chain.  So, uh, they were aware of that at
the highest levels at the FBI and also within
the state of government -- State of Oregon
government.

A REPORTER:  How did the state police
know that Finicum had a weapon on the left side
of his coat?

MR. BRETZING:  Well, the bottom line is
through multiple, um, pictures and interviews.
As you guys know, they were not shy of -- of
cameras or -- or in talking with the press.  Nor
were they shy about hiding the arms which they
were carrying.

On multiple occasions Mr. Finicum was observed wearing a shoulder holster on the left side where he carried a side arm.  Um, that is obviously -- when you have that kind of information, that is briefed to the operators who will be effecting the arrest.  In this case, that was a brief both to the Oregon State Troopers and to the FBI operators.

Indeed as you see and through -- as the investigation determined, he did have a loaded handgun in the, uh, left side jack -- jacket pocket of his, uh -- of his jacket.

A REPORTER:  And that shoulder holster, was that the -- identified as the gun that was used?  Or was that a different gun that you identified?

MR. BRETZING:  I don't think we [indiscernible] at this point.

A REPORTER:  Because there's quite different pistols that we've seen Mr. Finicum wearing.

MR. BRETZING:  They -- they had a number of arms.

A REPORTER:  Were --

A REPORTER:  Were the officers in a

position to actually see under the jacket?  Or
was it the firing of the shot was based upon the
assumption of having prior knowledge of the --
the -- the placement of the gun on Mr. Finicum?

        MR. BRETZING:  I'm going to let the
people who conducted the investigation handle
it.

        MR. NORRIS:  The officers knew that
Mr. Finicum had carried a gun on the left side
of his body.  Obviously they don't have x-ray
vision.  They also are not required to allow
someone to pull a gun before they're allowed to
use deadly physical force.  The law says they
are allowed to respond to the imminent threat of
deadly physical force.  The officers when they
were interviewed said that they knew he carried
a gun on that side.  They believed he was
reaching for it, and they used deadly force.

        MR. NORRIS:  Wanda [phonetic].

        A REPORTER:  Was there a concern ever
about communicating with law enforcement
officials in Grant County just because of the
position of the sheriff there at some points
with the occupiers?

        SHERIFF NELSON:  I'm not sure I

understand your question.  Can you try and

rephrase it?

A REPORTER:  Yeah, sure.

So on that night of the arrest I know

that some law enforcement officials were called

in.  Was there ever a concern about sharing any

kind of sensitive information about this

operation with law enforcement officials in

Grant County?

SHERIFF NELSON:  Any time you have a

sensitive law enforcement operation like that

you try and keep the information just to those

that are taking action at the time.

Ma'am?

A REPORTER:  There are a lot of

questions about the vehicle itself and we see

the diagram here.  But do you have photos

available -- available of Finicum's truck?

MR. NORRIS:  I believe they are in the

press package that you should be getting.  If

not and there are specific questions, I believe

those could be answered at this point.

SHERIFF NELSON:  Sir?

A REPORTER:  Just one other thing that,

uh -- from the video, when we see the -- the

officer run to the side of the snow bank right

before the truck comes in --

       SHERIFF NELSON:  Yes.

       A REPORTER:  -- I've always wondered

what he was doing.  Are you able to explain?

       SHERIFF NELSON:  Can you --

       MR. BRETZING:  Yeah, [indiscernible]

yeah, let me handle that one.

       So as the investigation determined, as

that vehicle that was driven by Mr. Finicum came

into view, it was traveling in excess of

70 miles per hour.  The -- the investigation

also determined that when it hit the snow, it

was hitting the snow in excess of 50 miles an

hour.

       If you're standing behind a vehicle and

of -- you know, a multi-thousand pound object is

hurdling your direction, you do not want to be

behind the car when that hits.

       So as that is coming, and this is

happening in split second time frame, he is

flaring off to the right, so as not to be behind

that vehicle when it gets struck.  As you also

notice from the video that it's at the last

minute that Mr. Finicum swerves and hits the

snow bank.  So he's in the process of making the

decision to get out of the way when he is nearly

struck by the vehicle.

        SHERIFF NELSON:  Les?

        A REPORTER:  So in talking about the

investigation of the HRT operator, you said that

your office is continuing the investigation and

now we have the inspector general?  Or is it a

parallel or two -- are you looking at two

different sets of laws?  Can you help us

understand what -- what the -- who is doing

what?

        SHERIFF NELSON:  Right.  Our

investigation will deal with the local level, so

Oregon State laws.  And the Office of the

Inspector General's investigation is at the

federal level.

        A REPORTER:  Well, to clarify, does that

mean that you will as far as investigation

consider whether the FBI agent's actions

violated the [indiscernible] law?

        SHERIFF NELSON:  We will take a look at

the justification for use of deadly force just

like we did in the local issue.

        A REPORTER:  For those shots?

SHERIFF NELSON:  Yeah, for the Harney County [indiscernible].

Sir?

A REPORTER:  I think you said that when Mr. Finicum stepped out of the vehicle he was told to get on the ground.  I'm wondering how continuously was that message given?

SHERIFF NELSON:  Can you bring up that transcript again?

This is a transcript of those commands that were given and the statements made by Mr. Finicum.

A REPORTER:  [Indiscernible].

SHERIFF NELSON:  I -- that was one of the reasons we wanted you to -- to hear Ms. Cox's video.

Anyone else?  Ma'am?

A REPORTER:  Mr. Finicum's family has said that, um, they would like a -- an independent investigation into this.  Um, do -- do you have anything to say to Finicum's family or to others who may be questioning --

SHERIFF NELSON:  I --

A REPORTER:  -- this investigation?

SHERIFF NELSON:  Like with any --

anything, of course I'm saddened for their loss.

Anytime you lose a loved one, it's not easy

regardless of accountability or actions.  What I

would say is I have absolute faith in the -- in

the criminal justice system.  I have absolute

faith in the investigators and all of the public

officials that worked on this case.

      A REPORTER:  The office --

      SHERIFF NELSON:  Sir?

      A REPORTER:  The officer that was almost

hit by the vehicle, um, and jumped out of the

way, did he fire any shots?  Because it seemed

like he would have been in a position --

      SHERIFF NELSON:  I --

      A REPORTER:  -- in --

      SHERIFF NELSON:  You know, all we can

share is what we've already shared, sir, that

there were two rounds fired by the FBI HRT

members and that's what a continued

investigation will --

      A REPORTER:  But the two OSP office --

two OSP officers, was that a -- or was that an

FBI agent that was almost -- that was getting

out of the way?

      SHERIFF NELSON:  I'm sorry, I'm getting

a little bit lost in your question.

It was an FBI HRT officer that was getting out of the way.

Okay.  All right.  Thank you very much for being here today.  I'm going to have Sergeant Garibay, uh, give you some more, uh, administrative information.  Thank you.

SERGEANT GARIBAY:  All right.  Thank you.  Before we conclude or -- um, I just want to give you some information regarding how you can get access to the information we are able to release at this time.

We have approximately 25 DVDs with, uh, some of the information we've released, uh, during this presentation.  I ask that that is one per media outlet.  I know there is a few that are represented by, uh, more than one reporter.  I'd ask that you -- each outlet take one.  If we need to make more copies, we can make that available.

Also, please watch our website, sheriff.deschutes.org as well as flashalert.net for updates.  And if you have any, uh -- any needs for information that we can help you with, please e-mail us at sheriffpio@deschutes.org.

Thank you very much.


(The press conference concluded.)

Aufdermauer Pearce Court Reporting, Inc.
503-545-7365

C E R T I F I C A T E

STATE OF OREGON          )
                         )  ss.
COUNTY OF WASHINGTON     )


        I, Amy E. Joyeux, being a Notary Public

for Oregon, do hereby certify that, pursuant to

stipulation of counsel for the respective

parties hereinbefore set forth, after having

listened to an official audio recording of the

proceedings having occurred at the time and

place set forth in the caption hereof, that

thereafter my notes were reduced to typewriting

under my direction; and that the foregoing

transcript, pages 1 to 44, both inclusive,

constitutes a full, true and accurate record of

all such testimony adduced and oral proceedings

had, to the best of my ability, and of the whole

thereof.

        Witness my hand and Notarial seal at

Portland, Oregon, this 23rd day of August 2017.


_____
AMY E. JOYEUX
Notary Public for Oregon
Residing at Beaverton, OR
My Commission Expires:  3/2018