BILLY J. WILLIAMS, OSB #901366
United States Attorney
**PAMALA R. HOLSINGER, OSB #892638**
Assistant United States Attorney
Pamala.Holsinger@usdoj.gov
**GARY Y. SUSSMAN, OSB #873568**
Assistant United States Attorney
gary.sussman@usdoj.gov
**PAUL T. MALONEY, OSB #013366**
Assistant United States Attorney
Paul.Maloney@usdoj.gov
1000 SW Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:17-CR-00226-JO** |
| **v.** | |
| **W. JOSEPH ASTARITA,** | **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS** |
| **Defendant.** | |

The United States of America, by Billy J. Williams, United States Attorney for the

District of Oregon, and Pamala R. Holsinger, Gary Y. Sussman, and Paul T. Maloney,

Assistant United States Attorneys, responds to and opposes defendant's motion to dismiss.

Each count in the indictment properly charges a separate and distinct offense.  None are

multiplicitous.  Each adequately states an offense.  Defendant's motion should be denied.

# I. FACTUAL SUMMARY

This case stems from the armed occupation of the Malheur National Wildlife Refuge (MNWR) in Harney County, which began in early January 2016. A significant law enforcement presence gathered in Harney County in response to the armed occupation. That presence included members of the FBI's Hostage Rescue Team (HRT), and the Oregon State Police Special Weapons and Tactics team (OSP SWAT).[1]

On January 26, 2016, the FBI received information that certain leaders of the occupation would be traveling from the MNWR to John Day, Oregon, to meet with the Grant County sheriff. They traveled in two vehicles: a white Dodge pickup truck driven by Robert Lavoy Finicum and a copper colored Jeep. HRT devised a plan to intercept and arrest the leaders while they were en route to Grant County. HRT was in tactical command of the operation. OSP SWAT was there to support them. The occupation leaders were all considered armed and dangerous.

## A. The Traffic Stop and Roadblock

HRT and OSP SWAT deployed together. The operational plan called for one group of operators to stop the two vehicles, while a second group set up a roadblock in case either vehicle attempted to flee. The stop was to occur on Highway 395, north of Burns.

---

[1] Two units of HRT operators were deployed – HRT Blue and HRT Gold, supported by a few members of the HRT Grey team. The HRT teams are organized in a military-style chain of command. Each is commanded by a Unit Chief who is supported by a Senior Team Leader. The Senior Team Leader is responsible for three or four Team Leaders. Each Team Leader oversees a team of six to eight operators.

Defendant, three other FBI HRT operators, and two OSP SWAT troopers were assigned to the roadblock. The roadblock consisted of three trucks arranged in a blocking "V" formation facing south. The two front vehicles were angled across the north and southbound lanes of travel. The third truck was parked behind the first two positioned in the center of the roadway. Spike strips were placed in front of the roadblock.

FBI surveillance planes were flying overhead to monitor the movements of the occupiers' vehicles as they left the MNWR and travelled toward John Day. Finicum's truck was in front; the Jeep followed a short distance behind. Both vehicles were stopped about a mile south of the roadblock. The Jeep's occupants, including Ammon Bundy, surrendered and were arrested without incident. Finicum and his passengers were another matter.

Ryan Payne was in the front passenger seat of Finicum's truck. Ryan Bundy, Shawna Cox, and Victoria Sharp were in the back seat. Payne, who was armed, surrendered at the site of the initial stop. Thereafter, Cox began to video record the stop. On the recording, Finicum can be seen and heard refusing to comply with HRT/OSP commands. He told them that he was "going to meet the sheriff," and challenged them to either "back down or kill me now." He repeatedly told them, "Go ahead and shoot me." After several tense minutes, Finicum sped off from the stop toward the roadblock with Ryan Bundy, Cox, and Sharp in the back seat.

Cox continued to record as Finicum's truck approached the roadblock at an estimated speed of more than 70 miles per hour. Because it appeared that Finicum was going to ram the roadblock and endanger the lives of the agents and officers present, an OSP SWAT trooper fired three shots at Finicum's truck in an unsuccessful attempt to stop it. Those shots

struck the truck's front and the driver's side. The impacts of those shots can be heard on Cox's video.

Finicum barely slowed as he closed in on the roadblock. After telling his passengers to "hold on," he swerved off the road to the left and into a deep snowbank. In the process, he barely missed one of defendant's fellow HRT operators. The operator disappeared under a plume of snow displaced by Finicum's truck.

The truck was stuck in the snow. Finicum emerged, yelling, "Go ahead and shoot me!" Two quick shots were fired – the two shots that are at issue in this case. Those shots can be heard on Cox's video. It appears the first shot missed entirely; the second shot entered the truck from the roof, sending sparks into the cabin and blowing out the left rear passenger window next to Ryan Bundy. Witness testimony, as well as the trajectory, audio, and video evidence, yield one conclusion: defendant fired those two shots.

Meanwhile, additional HRT and OSP SWAT operators who were at the initial traffic stop arrived at the roadblock. An OSP SWAT trooper, armed with a taser, engaged Finicum from the tree line on the western side of the roadblock. Ignoring repeated commands to get on the ground, Finicum walked away from the truck and toward that trooper. Two other OSP SWAT troopers (one who had taken the first three shots, and another who had just arrived in a pursuing vehicle) approached Finicum from the south side of the roadblock. After ignoring repeated commands to get on the ground, and after reaching into his jacket (which contained a loaded handgun) three times, the two OSP SWAT troopers to the south fatally shot Finicum.

Bundy, Cox, and Sharp were still in Finicum's truck. HRT and OSP SWAT deployed flashbang grenades and fired gas rounds at the truck in order to gain their compliance. At various points during the encounter, Ryan Bundy can be seen in the video crouching in the back seat of Finicum's truck, holding a revolver. At one point, after the shots at issue in this case were fired, Bundy states, "I got hit too."

Bundy, Cox, and Sharp eventually surrendered and were taken into custody. Bundy was taken to a local hospital where he was treated and released to the FBI. Whatever struck him remains in his shoulder.

### B.    *Defendant's False Statements.*

#### 1.    *Defendant's Statements to Supervisory Special Agent I.M.*

Supervisory Special Agent I.M. was an HRT Gold Team Leader who responded to the roadblock shortly after the crash. HRT Deputy Commander Scott Ward directed I.M. to determine what happened and report back.

After the remaining passengers were removed from Finicum's truck, I.M. and another HRT operator cleared the truck to make sure nobody else was hiding inside. Thereafter, I.M. walked back through the group of HRT operators, asking each if he was okay, and if he shot. He asked those questions because if an HRT operator shot, the operator's weapon needed to be secured, and an FBI Shooting Incident Response Team (SIRT) would be called. *See* Exhibit A at 3-6.[2]

---

[2] All exhibits to this response are being submitted under seal, as they are either matters occurring before the grand jury, or concern matters subject to this Court's previously-entered protective order.

Defendant's response was markedly different from those of the other operators. Instead of just answering directly, ████████████████████████████████████ ██████████████ *Id.* at 4. C.S., another HRT operator who was present, recalled defendant ██████████████████████████████████████ *See* Exhibit B at 4. ██████████████████████████████████████ ██████████████████████████████████ *Id.* ██████████ ████████████████████████████████████ ██████████████████ *Id.* ██████████████████████ *Id.*

I.M.'s questions were a standard inquiry supervisors are required to make at the scene of a possible agent-involved shooting. The purpose of that inquiry is to 1) ensure operator safety; 2) determine what, if any, evidence needs to be preserved; and 3) determine if the FBI's agent-involved shooting protocol needs to be initiated. Defendant's statements clearly communicated to I.M. that he had not shot. Because each HRT operator denied shooting, the agent-involved shooting protocols were not initiated, and evidence that would otherwise have been gathered and preserved was not.

>    2.    *Statement to Supervisory Special Agent B.M.*

At the time of the shooting, Supervisory Special Agent B.M. was an HRT Blue Team Leader and defendant's immediate supervisor. Like I.M., B.M. asked the HRT operators on scene if they were okay, and if anyone shot. Defendant explicitly denied firing his weapon. *See* Exhibit C, at 7.

Had defendant admitted firing, B.M. would have secured defendant's weapon, counted his rounds, and called the SIRT. He could also have taken steps to locate and secure

defendant's spent casings. Because defendant denied shooting, however, B.M. simply reported – inaccurately, as it turns out – that no HRT operator shot. *Id.* at 8-9.

After the shooting, HRT operators can be seen on the FBI plane's video footage walking around the shooting scene, looking at the ground and the area under the trucks used to form the roadblock. Several operators later described looking for "sensitive items," such as flashbang bodies. The expended flashbang bodies were recovered at the scene by evidence technicians. All but two of the spent rifle casings, however – including some fired by the two OSP SWAT troopers – were never found.

### 3. *Defendant's First Interview with the OSP Detectives.*

The two OSP SWAT troopers who fired immediately admitted shooting. Standard officer-involved shooting protocols were implemented. Their weapons were seized and secured, the rounds in their magazines were counted, "buddy officers" were assigned, and the two troopers were escorted from the scene as soon as it was safe to do so. Head-to-toe photographs were taken to document how the troopers were equipped at the time of the shooting.[3]

Believing that no HRT operators had shot, FBI officials decided that the officer-involved shooting investigation would be conducted solely by local law enforcement. That investigation was conducted by a multi-agency major incident team led by the Deschutes County Sheriff's Office (DCSO).

---

[3] OSP SWAT troopers are ordinarily required to wear body cameras while deployed. However, they did not wear the cameras while deployed with HRT – at HRT's request.

Beginning at approximately 11:00 p.m. on January 26, 2016, two OSP detectives interviewed the HRT operators who were present at the shooting, including defendant. At the FBI's request, the interviews were not recorded. Before the interviews began, the two detectives were told that none of the HRT operators shot. Thus, they treated the HRT operators as witnesses, rather than as potential shooters.

During his interview, defendant described what happened at the roadblock. He described how Finicum's truck approached at approximately 70 miles per hour. How it appeared that Finicum was intent on running the roadblock, and how he drove into a snowbank in an attempt to do so. Defendant believed at the time that Finicum had struck the other HRT operator. He expressed concern for that operator's safety, since the operator was exposed to the people in the truck, all of whom were believed to be armed and dangerous. Defendant said he moved into position to rescue the fallen operator. Defendant was unsure of his own exact position, however, since he had been moving about as events unfolded.

Defendant reported hearing shots and seeing Finicum fall. He claimed it was difficult to hear during the event because Finicum's truck was still running and the engine was revving. Defendant was unsure which officer shot, or if additional shots were fired. Defendant said that the situation unfolded very quickly, and officers had little time to respond. *See* Exhibit E at 2-5. At no point in the interview did defendant disclose that he had fired, nor did he mention that evidence, such as shell casings, had been removed from the scene.

### 4. An Unaccounted-for Shot and Missing Evidence.

The major incident team (which included personnel from the OSP Forensic Laboratory) carefully processed the scene of the shooting and Finicum's truck. They found no spent rifle casings in the roadway, even though witnesses reported seeing them there. Using metal detectors, they found two spent casings buried in the snow. Those casings were later matched to a rifle belonging to an OSP SWAT trooper.

Investigators found a bullet hole in the top of Finicum's truck, in addition to the three shots that struck the truck as it approached the roadblock. The bullet that struck the top of the truck was fired from the right side and slightly to the rear of the truck.[4] That shot was not accounted for. Based on their investigation to that point, DCSO detectives determined that the shot was fired by an HRT operator.

### 5. Defendant's False Statements to Supervisory Special Agent T.S.

In the days following the shooting, Deschutes County investigators shared their concerns about the unaccounted-for shot and missing evidence with FBI personnel, including M.F., the HRT team leader in tactical command of the roadblock. In addition, I.M. expressed frustration to M.F. about defendant's responses when I.M. asked him routine questions at the shooting scene. M.F. relayed those concerns to defendant's team leader B.M. and to HRT Blue Team's unit chief, Supervisory Special Agent T.S.

T.S. initially spoke individually with defendant. ████████████████████████ ████████████████████████████████ *See* Exhibit D at 4.

---

[4] The Cox video from inside Finicum's truck shows exactly when that shot was taken.

T.S. described a second conversation he had later with defendant, team leader B.M., and the operator who was nearly run down by Finicum at the roadblock. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ *Id.* at 5. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ *Id.*

B.M. had a second conversation with defendant that was prompted by concerns over defendant's response to I.M. and the unattributed shots. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ *See* Exhibit C, at 12. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *Id.* at 12-13.

Had defendant reported to either of his supervisors at this time that he had fired his weapon, the FBI would have initiated its agent-involved shooting protocol. Defendant's weapon would have been secured, his rounds would have been counted, and the FBI SIRT would have been notified. The FBI would have told the major incident team that an HRT operator shot, and would not have ceded the investigation to local law enforcement agencies. Moreover, defendant and the other HRT operators who were at the roadblock could have been asked additional questions about the missing shell casings.

6. *Defendant's Misleading Conduct During His Second Interview with OSP Detectives.*

On February 6, 2016, two OSP detectives re-interviewed defendant, B.M., and the HRT operator who was nearly struck by Finicum's truck at the roadblock. By then, the detectives knew that there were unaccounted-for shots and missing shell casings. The HRT operators knew it as well.

The HRT operators set conditions for the interview. They were only willing to be interviewed if: 1) they were interviewed as a group, not individually; 2) the interview was not recorded; and 3) their lawyer could be present by speakerphone. In addition, they would not answer any questions previously asked without being able to reference statements from prior interviews. *See* Exhibit E at 9-10.[5] The OSP detectives found HRT's conditions – particularly an unrecorded group interview – odd and problematic, but reluctantly agreed to them, believing that the alternative would be no interview at all. *Id.* at 10-12.

B.M. was the "spokesman" for all three operators, and did most of the talking. *Id.* Detective S.H. described the interview as a "free talk" discussion, in which all of the HRT operators participated. *Id.* at 11. Defendant said less during the second interview than he did during the first one. *Id.* at 12.[6]

---

[5] Detective S.H. was one of the two OSP detectives who initially interviewed defendant on January 26, 2016.

[6] In his motion to dismiss, defendant cites one detective's recollection that defendant "did not speak" during the second interview (D. Motion at 14), but did not mention the other detective's recollection, which offers a different perspective.

Individually and through their spokesman, the three HRT operators communicated to the detectives that they did not shoot. At no time did defendant disclose that he had shot. He also did not correct any assertions communicated on his behalf.

### C.    *The Office of Inspector General's Investigation, and the Indictment.*

Based on trajectory measurements taken from the bullet hole in the roof of Finicum's truck, and after synchronizing the Shawna Cox video with video from the FBI surveillance plane, the Deschutes County Sheriff's Office was able to estimate the locations of the HRT operators and OSP SWAT troopers at the moment the bullet struck the roof of the truck, and a probable area where the shot came from. The DCSO investigators concluded that no OSP trooper was the source of the shot, based on the troopers' locations and/or round counts. The only potential sources for that shot were defendant and B.M.

The Deschutes County Sheriff brought his findings to the attention of federal authorities. The FBI dispatched a Shooting Incident Response Team to Oregon on February 19, 2016, to investigate the circumstances surrounding the conduct of the HRT operators at the roadblock. Within days, SIRT determined that the matter merited a full criminal investigation, at which point the investigation was referred to the U.S. Department of Justice Office of the Inspector General (OIG). SIRT closed its investigation at that point.

On June 20, 2017, a federal grand jury returned an indictment charging defendant with three counts of making false statements, in violation of 18 U.S.C. § 1001, and two counts of obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3). Counts 1-3 charge defendant with making false statements to I.M., B.M., and T.S., respectively. Count 4 charges defendant with obstruction of justice based on his misleading conduct during the first

OSP interview; Count 5 charges obstruction of justice based on his misleading conduct during the second OSP interview.

## II.    DISCUSSION

Defendant claims that the false statement charges in Counts 1-3 are multiplicative of each other, that the obstruction charges in Counts 4 and 5 are multiplicative of each other, and that the false statement charge in Count 1 is multiplicative of the obstruction charge in Count 5.  He also claims that Counts 2 and 5 fail to state an offense.  He is mistaken in each respect.

### A.    *Counts 1-3 Are Not Multiplicitous.*

An indictment is multiplicitous "when it charges multiple counts for a single offense, producing two penalties for one crime and thus raising double jeopardy questions." *United States v. Stewart*, 420 F.3d 1007, 1012 (9th Cir. 2005).  *See also United States v. Awad*, 551 F.3d 930, 937 (9th Cir. 2009) ("An indictment is multiplicitous if it charges a single offense in more than one count").  There is "no bright line dividing charges comprising a single offense from those comprising separate and distinct offenses." *United States v. Segall*, 833 F.2d 144, 146 (9th Cir. 1987) (ellipsis, internal quotation marks, and citation omitted).  Counts within an indictment are not multiplicitous if each requires proof of an additional fact the other does not.  *Stewart*, 420 F.3d at 1012.  *See also United States v. Garlick*, 240 F.3d 789, 793-94 (9th Cir. 2001) ("The test for multiplicity is whether each count requires proof of an additional fact which the other does not") (internal quotation marks and citation omitted); *Awad*, 551 F.3d at 937 (same).

For false statement counts under § 1001, the Ninth Circuit has held that where identical false statements are made in response to identical questions posed by the same agent, "the declarant may be convicted only once." *Stewart*, 420 F.3d at 1013 (quoting *United States v. Olsowy*, 836 F.2d 439, 443 (9th Cir. 1987)). That is so because "the repetition of a false statement does not further impair the operations of the government beyond the initial violation, and a contrary rule would permit the government to pile on multiple convictions by repeatedly asking a declarant the same question." *Stewart*, 420 F.3d at 1013. On the other hand, when a defendant "makes two separate false statements to two separate officials, each with distinct duties and functions," two convictions under § 1001 "are proper," even if the defendant told the same lie to each. *United States v. Salas-Camacho*, 859 F.2d 788, 791 (9th Cir. 1988).

The Ninth Circuit employs a two-part test for determining whether multiple false statements may form the basis for separate counts. The first step is to determine whether the defendant "was asked the same question and gave the same answer." *Id.* The second step examines "whether later false statements further impaired the operations of the government." *Id.*

In *Olsowy*, the defendant twice falsely denied receiving and cashing a Treasury check. 836 F.2d at 440. In addition, he prepared and signed a written statement denying that he had received, possessed, or negotiated the check. *Id.* All three denials were made to the same Secret Service agent. *Id.* Olsowy was charged with and convicted of one count of presenting a false claim to the government, and three false statement counts under § 1001. *Id.* On appeal, he claimed that all four counts were multiplicious.

The Ninth Circuit flatly rejected the defendant's argument that his false claim conviction was multiplicitous to his false statement convictions, since "they cover different facts and circumstances." *Id.* at 442. In fact, the "only thing the two have in common is that they concern the same general subject matter" – whether the defendant received and endorsed the check. *Id.* Otherwise, "the convictions stand quite independent of each other." *Id.*

The three false statement counts were a different matter, however. As the court noted:

> Olsowy made exactly the same oral denial to the same Secret Service agent twice and then signed a document embodying the very same denial. The repetition of Olsowy's initial false statement did not further impair the operations of the government. Once he misled the agent, repeating the lie adds little or nothing to the harm caused to the Secret Service's inquiry.

*Id.* at 443. Thus, the court held, where identical false statements are made in response to identical questions posed by the same agent, "the declarant may be convicted only once." *Id.*

Similarly, in *Stewart*, the defendant made identical false statements in response to identical questions from the same FBI agent in two separate interviews. 420 F.3d at 1013. "The same FBI agent asked Stewart twice whether he had threatened a federal judge, and Stewart made identical denials both times." *Id.* at 1014. Although the defendant mentioned the Aryan Brotherhood as a likely suspect during the first interview and identified the government's cooperating informant as another likely suspect during the second, "the FBI already had that information" by virtue of the cooperator's information and assistance. *Id.* The agent's testimony at trial established no additional impairment to the FBI's investigation

because of the second false statement. *Id.* Thus, the two false statement counts were multiplicitous. *Id.*

On the other hand, in *Salas-Camacho*, the defendant told the same lie to two *different* customs inspectors with different duties. 859 F.2d at 791. The primary inspector's job was to make "a preliminary determination whether an entrant, upon declaring no goods, should be allowed beyond the customs line," while the secondary inspector's duty was "to conduct a more searching examination." *Id.* Since both inspectors rely on information provided by the person seeking entry, "the ability of both officials to carry out their respective functions is impaired" when the entrant makes a false statement. *Id.* Thus, the defendant's lie to the secondary inspector "constituted an additional impairment" of governmental functions, and supported a separate conviction under § 1001. *Id.*

Here, defendant's lies to three different FBI supervisors are more akin to the facts in *Salas-Camacho*, than to those in either *Olsowy* or *Stewart*. Each supervisor had a different role to play, and each lie further impaired the FBI's investigation.

The first lie was to Supervisory Special Agent I.M. HRT Deputy Commander Scott Ward sent I.M. to the shooting scene to find out what happened and to report back. I.M. asked all of the HRT operators who were at the scene, including defendant, if they were hurt, and if they shot. ████████████████████████████████████████ ████████████████████████████████████████████████ Another HRT operator who was present told defendant that I.M could in fact ask, and that defendant needed to answer. ██████████████████████████████████████████████ I.M. sent that report back up the FBI's chain of command.

Had defendant admitted shooting, his weapon would have been secured, the rounds in his magazine would have been counted, the Inspections Division would have been notified, and a shooting incident response team would have been sent to investigate. In addition, defendant's spent shell casings could have been located, marked, and preserved. There would have been no occasion or opportunity for anyone to remove spent shell casings – including shell casings from rounds fired by members of the OSP SWAT team – from the scene.

Sometime later, but while the HRT operators were still at the shooting scene, Supervisory Special Agent B.M. asked defendant if he had fired his weapon. Defendant again denied doing so. Unlike I.M., who was not in defendant's direct chain of command, B.M was defendant's team leader and his immediate supervisor. This time, defendant's denial was direct and unequivocal.

Defendant's lie to B.M. compounded the lie he had already told I.M. Had he admitted shooting, his weapon could have been secured, his rounds could have been counted, and his expended shell casings could have been located and secured. The focus of the investigation would have shifted, and the shooting scene may have been processed differently. A shooting incident response team would have been mobilized. The FBI likely would *not* have ceded the officer-involved shooting investigation to local authorities had they known then that an FBI agent had fired his weapon.

The third lie was made to T.S., unit chief for the HRT Blue team, and B.M.'s immediate supervisor. ████████████████████████████████████████

████████████████████████████████████████████████████

By that point, the local investigation into the officer-involved shooting was well underway, and the shell casings had already been removed from the shooting scene. Nonetheless, had defendant admitted shooting, the FBI could still have secured his weapon, could still have done a round count, could have taken a full statement from him, and could have re-interviewed the other HRT operators who were present at the shooting scene about the two shots defendant took and, more importantly, about the missing shell casings. The FBI could have summoned the shooting investigation review team while evidence and witnesses were still present in Burns. And the FBI certainly could have informed local investigators that an FBI agent was responsible for the unaccounted-for round that struck Finicum's truck, thereby affecting the course and scope of the investigation. Yet none of those things happened because defendant told another lie to another FBI supervisor.

The FBI was thwarted in its effort to assess what happened the day Finicum was shot in at least three distinct ways. Defendant's first lie prevented the FBI from immediately gathering all of the evidence and assessing the scene, and it led the FBI to cede the shooting investigation to local authorities. Defendant's second lie to a different supervisor also prevented the FBI from commencing an investigation. His weapon was not seized, his rounds were not counted, and nobody bothered to look for his spent shell casings, which went missing and were never recovered. Moreover, it left the onus of the shooting

investigation on the major incident team. Defendant's third lie to yet another supervisor, which came on the heels of the discovery of the unaccounted-for shot and the missing shell casings, further impeded the investigation because investigators then had to undertake extraordinary efforts to determine the source of the additional two shots. If at any point along this continuum defendant had owned his shots, the investigation would have been concluded far more quickly and effectively.

If telling the same lie to two customs inspectors minutes apart is sufficient to sustain separate convictions under § 1001, *Salas-Camacho*, 859 F.2d at 791, then the lies defendant told to three separate FBI supervisors over the course of several days, which significantly affected the FBI's response to the shooting, supports separate counts as well. Dismissal before trial is, in any event, an inappropriate remedy, notwithstanding defendant's claim that he will suffer prejudice if the jury is allowed to consider each count in the indictment. *See United States v. Matthews*, 240 F.3d 806, 817-18 (9th Cir. 2001), *adopted by en banc court*, 278 F.3d 880 (9th Cir. 2002) (affirming the district court's post-trial dismissal of multiplicitous counts and rejecting the defendant's claim of unfair prejudice, where the government would have presented the same evidence at trial regardless of how the charges were "packaged in the indictment"); *United States v. Nash*, 115 F.3d 1431, 1438 (9th Cir. 1997) (even though the government conceded that several counts in the indictment were multiplicitous, a new trial was not warranted "because the government would have introduced exactly the same evidence had the indictment contained only one count").[7]

---

[7] Indeed, had all three of his lies been lumped together in a single count, defendant would likely have raised a duplicity challenge to that single count.

### B.     Counts 4 and 5 are Not Multiplicitous.

Without citing any authority, defendant claims that under the "multiplicity rule," the government "cannot proceed" on Counts 4 and 5 "without alleging that the second 'failure to disclose' further impaired the government's investigation" (D. Motion at 9). However, the two obstruction counts are not akin to multiple false statement or perjury counts where each count is based on reiterations of the same lie in response to the same question. The circumstances surrounding the two OSP interviews were markedly different. So were the nature and extent of defendant's statements and omissions. Defendant cites no case imposing an additional impairment requirement on multiple obstruction counts under § 1512(b)(3), and the government found none.

The first interview occurred the night of the shooting. Defendant was individually interviewed by two OSP detectives. The detectives were told – based on defendant's earlier lies to the FBI – that no HRT operator shot. Thus, they treated defendant and the others as witnesses only, not as potential shooters.

During the first interview, defendant provided a substantial amount of detail concerning the events leading up to Finicum's death. Defendant said he heard shots and saw Finicum drop to the ground, but claimed that he was unsure of who had shot, or whether other shots were fired. Defendant never indicated that *he* had shot. Twice.

By the time the second interview took place, the detectives knew that an unaccounted-for round had struck the roof of Finicum's truck, and that shell casings were missing from the scene. The HRT operators who were re-interviewed knew it as well. Accordingly, they

approached the second interview far differently, setting conditions and insisting on an unrecorded group interview.

During the second interview, B.M. acted as the spokesman for the group. According to one of the interviewing detectives, however, each operator – including defendant – spoke during the interview. All three were somewhat vague during the second interview, and defendant said far less than he did during the first interview. Once again, though, defendant said nothing about having fired his weapon. The missing casings remained unaccounted for.

Defendant engaged in different but equally misleading conduct under different circumstances during the two interviews. Counts 4 and 5 will therefore involve proof of different facts. Accordingly, they are not multiplicitous of each other.

## C.     *Counts 1 and 4 are Not Multiplicitous.*

Defendant claims that the false statement offense alleged in Count 1 is multiplicitous of the obstruction offense alleged in Count 4 because the elements of the two offenses "are completely overlapping," the two counts are "based on functionally equivalent exchanges," and the government "cannot allege that there was any separate impairment caused by the two exchanges" (D. Motion at 10). He is wrong in each respect. The elements, the statements made, and the resulting impairments are all markedly different.

Two different offenses alleged in the same indictment are not multiplicitous "if each offense requires proof of a fact that the other does not." *Nash*, 115 F.3d at 1437. In evaluating that question, courts "should look to the elements of the offenses alone, rather than the way they are charged" in the indictment. *Id.* The elements of the offenses "are determinative, *even if there is substantial overlap in their proof.*" *United States v. Roberts*,

783 F.2d 767, 769 (9th Cir. 1985) (emphasis added; internal quotation marks and citation omitted).

Section 1001(a) prohibits making "any materially false, fictitious, or fraudulent statement or representation" in "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States."  The elements of a § 1001 violation are "(1) a statement, (2) falsity, (3) materiality, (4) specific intent, and (5) agency jurisdiction."  *United States v. Camper*, 384 F.3d 1073, 1075 (9th Cir. 2004).  Section 1512(b)(3) prohibits engaging in misleading conduct toward another person with the intent to "hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense."  To establish that offense, the government must prove that "the defendant knowingly and willfully (1) engaged in misleading conduct toward another person, (2) with the intent to hinder, delay or prevent the communication of information to a federal law enforcement officer or federal judge, (3) about the commission or the possible commission of a federal crime."  *United States v. Veal*, 153 F.3d 1233, 1253 (11th Cir. 1998), *abrogated on other grounds by Fowler v. United States,* 563 U.S. 668 (2011).

Each of those offenses requires proof of facts the other does not.  Section 1001 requires a false statement.  Section 1512(b)(3) requires "misleading conduct toward another person," which includes conduct beyond making a false statement.  *See* 18 U.S.C. §§ 1515(a)(3)(A)-(E).  Section 1001 requires that the false statement be material – *i.e.,* that it be "capable of influencing or affecting a federal agency," regardless of whether the agency actually relied on it.  *United States v. Service Deli Inc.*, 151 F.3d 938, 941 (9th Cir. 1998)

(emphasis and citations omitted).  Section 1001 covers false statements pertaining to "*any*

matter within the jurisdiction of the executive, legislative, or judicial branch" of the federal

government (emphasis added).  Section 1512(b)(3), on the other hand, requires the specific

intent to hinder, delay, or prevent the communication of information about the commission

or possible commission of a federal crime to a federal law enforcement officer or judge.  In

some circumstances, the same proof may satisfy the elements of both offenses, as defendant

suggests (D. Motion at 10-11).  Nonetheless, the *elements* of the two offenses differ, and for

multiplicity purposes, the elements control.  *Nash*, 115 F.3d at 1437; *Roberts*, 783 F.2d at

769.  As in *Olsowy*, the only thing Counts 1 and 4 have in common "is that they concern the

same general subject matter"; otherwise, they "stand quite independent of each other."  836

F.2d at 442.  Count 1 is not multiplicitous of Count 4.[8]

### D.      Counts 2 and 5 Both Adequately State an Offense.

"In ruling on a pre-trial motion to dismiss an indictment for failure to state an offense,

[a] district court is bound by the four corners of the indictment."  *United States v. Boren*, 278

F.3d 911, 914 (9th Cir. 2002).  The court "must accept the truth of the allegations in the

indictment," cannot consider "evidence not appearing on the face of the indictment," and

---

[8]  Attempting to bootstrap a "separate impairment" requirement that applies to multiple counts
under § 1001 onto the separate elements inquiry that applies when an indictment alleges different
offenses, defendant claims, without citing any authority, that "the government cannot allege" that
the false statement alleged in Count 1 "caused any separate impairment" than the obstruction of
justice alleged in Count 4 (D. Motion at 11).  Given that the elements of the two offenses are the
controlling factor, however, the government was not *required* to allege a separate impairment.
Nonetheless, separate impairments are apparent; defendant's lies to the FBI supervisors impaired
the FBI's internal investigation of an agent-involved shooting, while his misleading conduct with
respect to the OSP detectives impaired their investigation into Finicum's death, including
whether anyone involved in the shooting may have committed a state or federal criminal offense.

should not hold an evidentiary hearing to test an indictment's sufficiency. *Id.* (internal quotation marks and citation omitted).[9] A defendant "may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence." *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996). "The indictment either states an offense or it doesn't." *Boren*, 278 F.3d at 914.

An indictment is sufficient if it "contains the elements of the charged crime in adequate detail to inform the defendant of the charge and to enable him to plead double jeopardy." *Awad*, 551 F.3d at 935 (internal quotation marks and citation omitted). *See also United States v. Davis*, 336 F.3d 920, 922 (9th Cir. 2003) (same). The test of an indictment's sufficiency "is not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Awad*, 551 F.3d at 935 (internal quotation marks and citation omitted). Where the indictment tracks the language of the statute, the indictment is sufficient "so long as the words unambiguously set forth all elements necessary to constitute the offense." *Davis*, 336 F.3d at 922.

Counts 2 and 5 both track the applicable statutory language. Both contain all of the elements of their respective offenses. Both are sufficient to state an offense.

### 1.    Count 2.

Count 2 alleges:

> On or about January 26, 2016, within the District of Oregon, W.
> JOSEPH ASTARITA, defendant herein, in a matter within the jurisdiction
> of the Federal Bureau of Investigation, knowingly and willfully made a
> false statement to Supervisory Special Agent I. M., knowing that the

---

[9] In contrast, a court may consider evidence beyond the contents of the indictment when considering a multiplicity claim. *See Boren*, 278 F.3d at 914.

statement was false and material to the FBI's decision not to call the
Shooting Incident Response Team to investigate the propriety of an agent-
involved shooting.  Specifically, defendant W. JOSEPH ASTARITA falsely
stated he had not fired his weapon during the attempted arrest of Robert
LaVoy Finicum, when he knew then and there that he had fired his weapon.

All in violation of Title 18, United States Code, Section 1001.

It tracks the language in § 1001 and sets forth all of the elements of that offense.  It fully

informs defendant of the charge against which he must defend, and enables him to raise a

double jeopardy claim in the future.  It adequately states a violation of § 1001.

Relying on an incomplete excerpt of I.M.'s grand jury testimony that does not present

the whole picture, defendant claims that his statement to I.M. was not a factual assertion, and

was therefore neither true nor false (D. Motion at 11).  He also claims that it was

unresponsive to I.M.'s question – did you shoot? – and therefore "cannot as a matter of law

be considered material" (*id.*).  However, in deciding a motion to dismiss for failing to state

an offense, this Court is limited to the four corners of the indictment itself.  *Boren*, 278 F.3d

at 914.  It cannot consider evidence not appearing on the face of the indictment.  *Id.*; *Jensen*,

93 F.3d at 669.  Whether defendant's statement to I.M. amounted to a statement of fact and

whether it was material will be established at trial.  It is not appropriate for summary

disposition before any evidence has been adduced.  *Boren*, 278 F.3d at 914 ("A motion to

dismiss the indictment cannot be used as a device for a summary trial of the evidence")

(internal quotation marks and quotation omitted); *Jensen*, 93 F.3d at 669 (the district court

"erred in considering the documentation provided by the defendants"; by basing its decision

to dismiss "on evidence that should only have been presented at trial, the district court in

effect granted summary judgment for the defendants.  This it may not do").  Defendant's

motion to dismiss Count 2 for failure to state a claim should be denied.

2.      *Count 5.*

Count 5 alleges:

> On or about February 6, 2016, within the District of Oregon, W. JOSEPH ASTARITA, defendant herein, did knowingly engage in misleading conduct toward another person, that is officers of the Oregon State Police, by failing to disclose that he had fired two rounds during the attempted arrest of Robert LaVoy Finicum, with the intent to hinder, delay and prevent the communication from the Oregon State Police to the Federal Bureau of Investigation relating to the possible commission of a federal offense.

All in violation of Title 18, United States Code, Section 1512(b)(3).

It too tracks the statutory language, contains all of the elements of the offense, and fairly informs defendant of the charge against which he must defend.  It adequately states an offense under § 1512(b)(3).

Claiming that he did not speak at all during a group interview with OSP detectives on February 6, 2016, defendant argues that the government cannot establish that he took any affirmative action to engage in misleading conduct (D. Motion at 13-14).  He relies on a host of information extraneous to the indictment, including selected excerpts of reports from OSP and the OIG.  But his selected excerpts do not tell the whole story, which will come out *at trial*.  In fact defendant *did* speak during the February 6 interview, although he spoke less than others who were present, and considerably less than he did during the first interview. He did nothing to correct statements made on his behalf by B.M.  Those sorts of factual disagreements can only be resolved at trial, not in a pretrial motion to dismiss.  *Jensen*, 93 F.3d at 669.  Defendant's motion to dismiss Count 5 for failure to state a claim must be denied.

## III. CONCLUSION

Counts 1-3 are based on separate false statements that were made to separate FBI supervisors at separate times. They are not multiplicitous of each other. Neither are the two obstruction counts. The elements of the false statement charge in Count 1 are markedly different from the elements of the obstruction charge in Count 4, so those counts are not multiplicitous either. Finally, Counts 2 and 5, which track the statutory language and contain each element of the charged offenses, adequately state an offense. Defendant's motion to dismiss should be denied.

DATED this 2d day of February 2018.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

*/s/ Pamela R. Holsinger*
PAMALA R. HOLSINGER
Assistant United States Attorney

*/s/ Paul T. Maloney*
PAUL T. MALONEY
Assistant United States Attorney

*/s/ Gary Y. Sussman*
GARY Y. SUSSMAN
Assistant United States Attorney

# Exhibit A
## (Filed Under Seal)

# Exhibit B
## (Filed Under Seal)

# Exhibit C
(Filed Under Seal)

# Exhibit D
(Filed Under Seal)

# Exhibit E
## (Filed Under Seal)