1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3                 PORTLAND DIVISION

4
   UNITED STATES OF AMERICA,        )
5                                    )
                      Plaintiff,  )  Case No. 3:17-cr-00226-JO
6                                    )
                  v.               )
7                                    )  May 25, 2018
   W. JOSEPH ASTARITA,              )
8                                    )
                      Defendant.  )  Portland, Oregon
9  _____)

10

11

12

13            EVIDENTIARY HEARING - DAY 5

14                Pages 858 - 920

15            TRANSCRIPT OF PROCEEDINGS

16       BEFORE THE HONORABLE ROBERT E. JONES

17    UNITED STATES DISTRICT COURT SENIOR JUDGE

18

19

20

21

22

23

24

25

```
 1                              APPEARANCES

 2    FOR THE PLAINTIFF:
                           GARY Y. SUSSMAN
 3                         U.S. Attorney's Office
                           1000 SW Third Avenue
 4                         Suite 600
                           Portland, OR 97204
 5
      FOR THE PLAINTIFF:
 6                         PAUL T. MALONEY
                           U.S. Attorney's Office
 7                         1000 SW Third Avenue
                           Suite 600
 8                         Portland, OR 97204

 9    FOR THE DEFENDANT:
                           DAVID H. ANGELI
10                         Angeli Law Group
                           121 SW Morrison Street
11                         Suite 400
                           Portland, OR 97204
12
      FOR THE DEFENDANT:
13                         TYLER FRANCIS
                           Angeli Law Group
14                         121 SW Morrison Street
                           Suite 400
15                         Portland, OR 97204

16    FOR THE DEFENDANT:
                           ROBERT M. CARY
17                         Williams & Connolly LLP
                           725 Twelfth Street NW
18                         Washington, DC 20005

19    FOR THE DEFENDANT:
                           MEGHAN A. FERGUSON
20                         Williams & Connolly LLP
                           725 Twelfth Street NW
21                         Washington, DC 20005

22

23    COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                           United States District Courthouse
24                         1000 SW Third Avenue, Room 301
                           Portland, OR 97204
25                         (503)326-8191
```

1                                    INDEX

2    CLOSING ARGUMENT:                                    PAGE:

3      Plaintiff's Closing Argument by Mr. Maloney      861

4      Defendant's Closing Argument by Mr. Cary         872

5      Plaintiff's Rebuttal Argument by Mr. Maloney     911

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiff's Closing Argument

1                          TRANSCRIPT OF PROCEEDINGS

2                              (May 25, 2018)

3   (In open court:)

4           THE COURT:  Good morning, everybody.

5           MR. MALONEY:  Good morning, Your Honor.

6           MR. CARY:  Good morning.

7           THE COURT:  Ready to go?

8           MR. MALONEY:  Yes, Your Honor.

9

10                   PLAINTIFF'S CLOSING ARGUMENT

11          MR. MALONEY:  Good morning, Judge Jones.  Paul

12  Maloney for the government.

13          THE COURT:  Good morning.

14          MR. MALONEY:  May it please the Court, Counsel,

15  Mr. Astarita.

16          THE COURT:  Just a moment.  Fine.  Everything is

17  fine.

18          MR. MALONEY:  Your Honor, we're here today for

19  closing arguments in the motion in limine in the case involving

20  United States v. Mr. Astarita.  The question that the

21  government seeks to answer as part of this trial answers the

22  question who fired the round that caused impact "W."  Through

23  multiple expert witness testimony that you've heard, the

24  government seeks to answer that question.  We answer that

25  question with this 3D diagram.

Plaintiff's Closing Argument

 1      This 3D diagram reflects the work of multiple experts

 2  seeking to find an accurate point in time near to when impact

 3  "W" struck Finicum's truck shortly after he crashed it into a

 4  snowbank.

 5      It positions the individuals relative to where they're

 6  depicted on the video surveillance at the time -- at and near

 7  the time of the shot.

 8      Now, I know the Court knows the legal standards, but they

 9  do help to inform the broader audience in the community what

10  this litigation all week has been about.  The experts in this

11  case will be permitted to testify to their opinions within

12  their respective fields if they are able to testify to a

13  reasonable degree of certainty.  Absolute certainty is not

14  required, and the Court has broad latitude to make

15  admissibility determinations.  Experts may be qualified based

16  upon their knowledge, skill, experience, training, and

17  education.  The expert testimony must be both relevant and

18  reliable.  And the government, as the proponent of this expert

19  testimony, must demonstrate those by a preponderance of the

20  evidence.

21      As the Court is well aware, the United States Supreme

22  Court has informed us what factors may be considered.  And this

23  is not an all-inclusive list.  Again, the Court has broad

24  discretion as to what factors are important to determine the

25  reliability of the methods.  It's not the conclusions of the

Plaintiff's Closing Argument

1   experts that matter.  It is the reliability of their methods.

2        Things like whether the expert's theory and technique or

3   method can be or has been tested, whether it has a known or

4   potential error rate, whether the methodology has been

5   subjected to peer review and publication, and whether there's

6   standards controlling its operation and its general acceptance

7   within the relevant community.

8        You heard first from Mr. Frank Piazza.  He was the

9   audio/visual expert from New York City who came to testify to

10  this Court to the work that he did on this case.

11       In essence, Your Honor, he identified the points in time

12  on the Cox video where there was gunfire, the critical gunfire

13  that we're concerned about as potentially causing impact "W."

14       Shots four and five.  Those are the shots that occurred

15  just as Mr. Finicum was getting out of his truck.  He

16  synchronized that Cox video to the FBI aerial surveillance

17  videos so we could know and see where the operators were on the

18  roadway at and near the time of shots four and five.

19       He enhanced those videos for clarity, and he synchronized

20  those within frames of the FBI synchronization and within nine

21  frames of the Deschutes County synchronization.  There were

22  three synchronizations that you heard about in this -- during

23  the course of this proceeding.  Mr. Piazza's synchronization,

24  the FBI synchronization, and the DCSO synchronization.

25       And it's important, Your Honor, I think, to demonstrate

Plaintiff's Closing Argument

1  that although they were not all synchronized to the exact same

2  frame, they were synchronized to within a second of each

3  other's work.  And that, according to the expert, Mr. --

4  Professor Smith, was within that range of certainty, around the

5  time of shots four and five, that he determined to be 34

6  frames.  Just over one second.

7       You heard from firearms experts Victoria Dickerson and

8  Michael Haag.  Ms. Dickerson was the Oregon State Police

9  forensic examiner who responded to the scene and later examined

10 the Finicum truck and determined the trajectory of impact "W"

11 using ballistic rods and a centering cone.

12      Mr. Haag reviewed her work, and you heard him testify that

13 he could not validate her work without conducting his own

14 independent test, and that's what the government hired him to

15 do, and he did so.  He still used ballistic rods.  He measured

16 the angle of impact using a different methodology, which has

17 not been challenged in this case.  The 3D scanning technology.

18 He employed a different method to measure the impact "W."  He

19 used his rocker method.  It has been described different ways,

20 the rocker method, the lead-in method, and others, but the

21 technique is the same, and you saw him demonstrate that

22 technique using the infamous box now and his trajectory rod.

23 And you saw and you heard how solidly that rod places into that

24 trajectory -- into that lead-in mark when he demonstrated how

25 it comes up and down in the rocker method and seats into that

Plaintiff's Closing Argument

1   groove.

2        You heard his opinion, as validated by studies,

3   literature, as well as the empirical studies that he provided.

4   Those were the 3D scans he conducted where he shot into the

5   box, and he shot into the red car at similar angles, and he was

6   able to replicate impact -- impacts that shared features with

7   impact "W."

8        What is important and the takeaway is the horizontal

9   azimuth.  That is the angle from the front of the truck to

10  where the bullet struck the truck, and it is that line of

11  bearing, relative to the front of the truck, that will

12  determine where that round came from.

13       The vertical angle that you heard about was different by

14  11 degrees, and that was explained because Ms. Dickerson used

15  the centering cone method, and she was more accurately

16  measuring the angle of deflection that the bullet took after

17  penetration with respect to the vertical angle.

18       The horizontal azimuths were within 3 degrees of one

19  another.  Ms. Dickerson and Mr. Haag's measurements in the

20  important regard for this case were only 3 degrees separate.

21       Both of those angles come back to where the defendant was

22  standing with his rifle shouldered, trained on the Finicum

23  truck, clearly depicted in the video.

24       You heard from Kevin Turpen.  He was the deputy who

25  responded to the scene, the crash reconstruction expert who

Plaintiff's Closing Argument

1  supervised the total station data collection.  And how he

2  plotted those into a diagram, he placed Ms. Dickerson's

3  trajectory into that diagram and estimated the positions of the

4  individuals present on the roadway.  Individuals whose

5  identities he did not know.  That's an important consideration,

6  Your Honor.  He was just trying to figure out who is our

7  potential source.  Where did this bullet come from?  What's the

8  point of origin?  And inside the trajectory cone, as calculated

9  by Ms. Dickerson, was the defendant.

10     You heard subsequently from 3D Scene Reconstruction Expert

11  Toby Terpstra.  Again, a second expert brought in by the

12  government to review the data in this case and arrive at

13  independent conclusions.  He collected point cloud data from

14  the Finicum truck and from the scene.  He measured the total

15  station survey data.  He took total station survey measurements

16  at the scene.  He conducted a careful frame-by-frame analysis

17  of the video involved, as well as the photographs from the

18  scene.  He employed camera match photogrammetry techniques to

19  align the scene, place the vehicles in -- and the bipeds in

20  their relative positions to that scene, informed by the video

21  surveillance, and he created a 3D model of that scene .3

22  seconds before shot five.

23     And, Your Honor, you've heard a lot of testimony about

24  video 0000002, and I'd like to play that, just the relevant

25  portions, for the Court.

Plaintiff's Closing Argument

1          (Video played.)

2          MR. MALONEY:  Now, there's a lot going on in that

3  scene, especially with two videos playing side by side.  What I

4  prepared for the Court is a 34-frame clip from that scene at

5  and near the time of shot five.  That's going to run here in a

6  loop so that you can look back and forth and see the movements

7  of the individuals on the scene.

8          (Video played.)

9          MR. MALONEY:  34 frames, Your Honor.  That's what you

10 saw there played in a 30-second loop.

11      Mr. Liscio, you heard from him.  He said that there wasn't

12 enough information for him to know what was going on in that

13 series of events depicted on that video.  He blew it up, and he

14 didn't know.  He couldn't tell where people were.

15      Again, right before shots four and five.

16      Shortly after shots four and five.

17      .3 seconds before shot five.

18      Just over one second later.

19      Zooming in, this was the frame that Mr. Terpstra utilized

20 for the match.  .3 seconds before shot five.

21      Notice where the defendant is standing.  His feet are

22 firmly on the ground, separated in a shooting stance.

23      And there are other individuals.  When you play the video,

24 you can see them moving in the front of the middle-blocking

25 truck.  Just over one second later, the figures in front of the

1  centering-blocking truck are more defined.  Mr. Astarita's

2  stance, if it has changed at all, has changed minimally.  He is

3  still in a position, in a shooting stance, with his weapon

4  drawn.

5      From that -- from those frames, Mr. Terpstra performed his

6  3D scene reconstruction and placed the individuals.  Again, he

7  used a frame .3 seconds before shot five and just over one

8  second later.  You heard him testify about his range of

9  certainty and how he was able to move the individuals and --

10  and the critical vehicle, Mr. Finicum's vehicle, and how he

11  plotted that on this frame that I'm showing the Court right

12  now.  This is in his report, Your Honor.

13      And you see that there's a little fuzzy area around each

14  of the individuals as well as the Finicum truck, and,

15  correspondingly, around shot five.  That fuzzy area is the area

16  in which Mr. Terpstra was able to move the vehicles.  And once

17  they got out of alignment, in his judgment, in his professional

18  opinion, he determined that they were no longer aligned, and

19  that was how he determined the range of certainties in -- that

20  he detailed and documented in his report.

21      Through the course of this proceeding, you've heard from

22  multiple defense experts.  None of these experts performed

23  their own independent tests.  None of these experts were

24  retained to perform their own independent tests.  These experts

25  were performed -- were retained to evaluate the government's

Plaintiff's Closing Argument

1    experts' methodologies.

2        And you heard their testimony about their critiques in

3    each respect.  According to Bruce Koenig, Mr. Piazza did not

4    perform gunfire analysis.  You also heard from Mr. Piazza, the

5    government's expert witness, who has previously worked for the

6    Williams & Connolly firm, who testified that he didn't even

7    hold himself out as a gunfire analyst.  He wouldn't -- he did

8    not offer an opinion in that regard.  He did not perform that

9    work.  All he was doing was identifying when those shots

10   occurred.

11       Mr. Koenig indicated that his sync was poorly documented.

12   We heard from Professor Smith what he did not need the frames,

13   the frame count, like Mr. Koenig testified, in order to

14   evaluate and render an opinion on the accuracy of the Piazza

15   sync.

16       You heard from Matt Noedel.  Mr. Noedel was the defense

17   firearms expert.  He testified that he would not have used the

18   methods used by Ms. Dickerson and Mr. Haag, that he would have

19   used a different certainty range, a larger certainty range than

20   the plus-or-minus-5-degree certainty range that they testified

21   to, but he could not state how large a range of certainty he

22   would use.

23       He was asked on cross-examination how he would have

24   measured shots four and five, those low-angle impacts like "W."

25   He testified that he would have aligned the ballistic rod along

Plaintiff's Closing Argument

1   the lead-in mark, and that's the critical inquiry, Your Honor.

2   That gives you the horizontal azimuth.

3        Both Ms. Dickerson and Mr. Haag measured that line,

4   measured that lead-in mark, came within 3 degrees.  It is a

5   reasonable inference and it is no leap in logic that if

6   Mr. Noedel employed the test -- employed the methodology that

7   he described by taking the rod, aligning it with the lead-in

8   mark, and pressing down, as he testified to, that he would have

9   achieved a similar horizontal azimuth as the two government

10  experts.

11       He would have -- he testified he would have used a larger

12  certainty cone, but he didn't know, and he didn't try to

13  measure impact "W."

14       You heard about -- I think it's Dr. Bray, Dr. Andrew Bray,

15  and he pointed out the statistical flaws in a 10-year-old study

16  that Mr. Haag performed and used as a basis for his testing and

17  range of certainty.

18       You heard from Eugene Liscio.  He was critical of the 3D

19  model and the manual camera matching techniques employed by

20  Mr. -- Mr. Terpstra.

21       And, finally, you heard from Clifford Mugnier who was

22  critical of the manual camera match photogrammetry, yet

23  testified that if he were asked to perform a 3D camera match he

24  would be a layman in that regard and that he did not have the

25  necessary skills and experience to perform a 3D camera match or

Plaintiff's Closing Argument

1    build a 3D model like Mr. Terpstra.  You heard him testify that

2    he was not familiar with the applications and software used to

3    formulate that 3D model.

4        What he was -- what he does know is his projection

5    photogrammetry.  And you heard him testify about that, and you

6    heard him testify about his exhibits that he made at Walgreens.

7        Your Honor, with all due respect, evaluating a

8    twenty-first second technology with technologies from the 1970s

9    is an unfair comparison.  The model was not built to be viewed

10   under photographs created at Walgreens.  You heard multiple

11   witnesses testify that that 3D model is best viewed in a

12   virtual environment on a computer screen.  That's how it's made

13   to be viewed.

14       In sum, Your Honor, impeachment does not compel exclusion.

15   Rejection of expert testimony is the exception, rather than the

16   rule.  Disagreements amongst experts over controlling standards

17   is not a basis to exclude expert testimony.

18       Counsel stated in his opening statement that this issue is

19   so important.  It is important, Your Honor.  The community

20   needs an answer.  The government has sought out multiple

21   independent experts employing complex scientific methods,

22   methods that they fully documented, that they subjected to

23   scrutiny, that the defense was able to scrutinize and point out

24   every single minute problem.  That proves the point,

25   Your Honor, that we have met the *Daubert* standard.  The fact

Defendant's Closing Argument

1  remains that they have documented this so thoroughly that they

2  are able to be scrutinized.  It is not as if the experts are

3  taking the stand and saying, "I looked at it, therefore it is."

4      That's what the defense experts did.  They looked at it;

5  therefore, it is.

6      Finally, the last witness you heard from,

7  Professor Jeff Smith, he testified -- and I think this was

8  important, Your Honor -- that forensic sciences, they deal with

9  nonideal data.  It's not a laboratory.  It's a crime scene.

10 It's a crash scene.  This was surveillance video from two miles

11 away.  The government has no dispute about that.  It is what it

12 is, and it is incumbent upon the government to endeavor and

13 relentlessly pursue the truth of the matter.  That's what we

14 have done.  We're not afraid to have multiple experts review

15 this evidence.  Had they come to different conclusions, we

16 would have approached this with an open mind.  However, they

17 came to one conclusion.  One consistent conclusion.  The

18 defendant was the only person in a position to make and take

19 the shot that caused impact "W."

20     Thank you, Your Honor.

21         THE COURT:  Thank you.

22

23         DEFENDANT'S CLOSING ARGUMENT

24     MR. CARY:  Rob Cary for Mr. Astarita.  I would like

25 to begin this morning by thanking the Court and all the Court's

Defendant's Closing Argument

1   staff for everything they've done for us this week.  Literally

2   for looking out for our health and safety, for struggling with

3   us to understand these highly technical and sometimes dense

4   areas of evidence, for the time to present our evidence and our

5   arguments.  There is an argument that this -- made earlier that

6   this hearing was not necessary, and I think that what has been

7   elicited during this hearing this week of hard work proves the

8   importance of actually hearing from the witnesses and

9   having a -- actually having a hearing.

10      I would like to thank everybody in the courtroom for all

11  the hard work they have put in so far and the hard work ahead.

12  And it's hard for me to believe that we've only been here a

13  week.  It seems -- it seems much more.  It is hard to believe

14  we only started on Monday.  And before digging into the

15  individual issues one by one, as the government did, I want to

16  provide a little context.

17      From where we sit, the context is this:  Every expert that

18  they proffered made major mistakes.  It's not just impeachment.

19  They made mistakes.  They often admitted those mistakes.  I'm

20  not suggesting anything but good faith, but mistakes go right

21  to the heart of what this is about.  It's about methodology.  I

22  think one of our themes is is that this is what happens when

23  people in good faith and with enthusiasm push the envelope of

24  science further than it can be pushed.

25      In Mr. Liscio's words yesterday, he said it's, quote,

Defendant's Closing Argument

1    "overly aggressive."  He said it raises fundamental issues that
2    go beyond what science can deliver.  And we've worked very hard
3    to expose those mistakes, as we're duty-bound to do.  It's
4    required a lot of hard work, a lot of resources, and I'm sure
5    at times we've tried everybody's patience.  But from where we
6    sit, we find it very frustrating when every time we expose a
7    mistake we hear the same refrain, "It doesn't matter."
8        Well, this is a hearing about methodology, and mistakes do
9    matter.  They've pushed the envelope too far.
10       Let me give some examples.  Mr. Piazza.  We were told in
11   the government's opposition brief, the same brief in which they
12   said we don't need a hearing, that the error rate of his sync
13   is less than one frame.  At the hearing you heard it was at
14   least 11 frames.  And you heard from Mr. Smith yesterday and
15   from the government just now that it may be 34 frames.
16       The government seems to say, well, Agent Astarita isn't
17   moving during those 34 seconds.  But that's not the point.  The
18   point is that there could be a lot of movement from others
19   during those 34 seconds.  And the loop, to the extent I could
20   see at all, that they just showed, was supposed to be a
21   34-second loop, showed that people are moving -- or, I'm sorry,
22   34-frame loop showed that people were moving.  And people were
23   moving.  And the important point is other people could have
24   moved into that zone, the cone, whatever that cone is, and I'll
25   talk about that in a bit.

Defendant's Closing Argument

1    The government only wants to focus on Agent Astarita, but
2  there are other -- where those other people are moving is
3  vitally important.  That's why the sync is so important.
4    Ms. Dickerson testified that she basically used a
5  technique that did not account for deflection.  She measured an
6  angle that went over everybody's head.  And the government's
7  response to that is, "Well, don't worry about it.  It doesn't
8  matter.  Deflection only affects the vertical angle.  It
9  doesn't affect the horizontal angle."
10    There's no scientific proof for that at all, not at all,
11  and I'll get to more of that in a minute.
12    With respect to Mr. Haag, he relied on his 2018 article to
13  validate plus or minus 5 degrees.  That's the whole theme of
14  the government's opposition to our *Daubert* motion.  We were
15  surprised when we saw that because we thought that his 2008
16  article had nothing to do with the rocker method.  They said,
17  "Actually it does.  There's some rocker method data in there."
18  So we dug deeply, and we spent Mother's Day weekend calling
19  around.  We were able to find a few experts early on who
20  weren't available in the time frame.  We spent Mother's Day
21  weekend trying to find an expert, and thank goodness we did.
22    Only after we find a statistician who comes in and says
23  that the 2008 article was all wrong as a matter of statistics,
24  they get on the -- did he get on the stand and he says, "Well,
25  actually he's right about the statistics, but it doesn't

Defendant's Closing Argument

1  matter.  Trust me.  Plus or minus 5 is the cone.  Everybody is

2  doing it."

3      Deputy Turpen, he measured the vehicle at -- at least nine

4  hours after the incident, and he acknowledges that while he was

5  there the vehicle moved.  But the government says, "Well, it

6  doesn't matter because it probably didn't move beforehand,"

7  even though it's in a deep snowbank, goes up to Deputy Turpen's

8  thigh.  It moved while he was there nine hours later, and I

9  think we are being asked to suspend common sense to think it

10  didn't move before that.

11      And then Mr. Terpstra, he made lots of mistakes.  I'll get

12  to those in a minute.  But the most fundamental and the most

13  basic is he used the wrong image.  The analysis was supposed to

14  be -- and he puts it over and over again in his report that it

15  was the exact time of shot five based on the Piazza sync.  It

16  turns out he was using the wrong image all along.

17      This is a hearing about methodology, and this methodology

18  is riddled with errors.  It doesn't meet the standards of

19  *Daubert*.

20      Now, another thing that we heard and we just -- we heard

21  it in the theme of the examinations, and we heard it just now,

22  is that, well, our experts didn't try their methods.  They

23  suggest that Mr. Noedel should have tried the rocker method.  I

24  have two responses to that.  First of all, it's the

25  government's burden, not ours, to prove the reliability of the

Defendant's Closing Argument

1    methods.  That's a -- should be especially true in a criminal

2    case; but, moreover, our experts should not feel compelled to

3    try methodologies that are not grounded in good science,

4    tested, objective, except in the relevant community.

5        Mr. Noedel says, "I don't use the rocker method because

6    it's subjective and it's sensitive to small subjective

7    movements."

8        Dr. Bray said, "I can't calculate the proper statistical

9    cone because the design was poorly studied.  I don't have good

10   data."

11       Mr. Mugnier and Mr. Liscio said, "The placement of people

12   in trucks is purely subjective, and we can't do it from the

13   blurry photos."  As I said in my opening, "You can't get there

14   from here."

15       The burden is on the party proffering expert testimony.

16   There's no burden on us to do an alternative analysis,

17   especially when it's impossible to do so.

18       So let me go through the points one by one.  And the first

19   point is going to be the rocker method.  I'm then going to turn

20   to the plus-or-minus-5-degree cone.  Then I'm going to talk

21   about Ms. Dickerson's method, the Terpstra diagrams.

22       I'm sorry.  I need to put something in Mr. Francis's fine

23   jar.  I meant "the Turpen diagrams."

24       Deputy Turpen's diagrams, the Terpstra model, the syncing

25   of the video, the enhanced video images, and then the eight

Defendant's Closing Argument

1   gunshots.

2        Let me begin with the rocker method first.

3        Ms. Dickerson testified that before she attended one of

4   Mr. Haag's seminars where he demonstrated it to her in October

5   of 2016, she was not aware of it.  None of her trainings or

6   reading had ever taught about it until October of 2016.

7        She testified that the Oregon State Police has no standard

8   operating procedure for the rocker point method.  In fact,

9   there's no standard operating procedure for the rocker point

10  method anywhere.  It's not published literature.  It's not in

11  unpublished literature.  You've got to go to one of Mr. Haag's

12  seminars to learn about it.  And it's not even written down

13  there.

14       When Ms. Ferguson asked, "Why is it not in your materials

15  for your course?"  He says it's, quote, "a minor technique and

16  only a small part of the class."  It's not even in his own

17  book.

18       And I admire his enthusiasm for this technique.  He's

19  trying hard.  Since one of his students showed it to him in

20  2004, he's been an enthusiastic proponent of this test.  But it

21  can't be repeated.

22       When Ms. Ferguson asked if he used tape or the magnetic

23  clamp first, he says he doesn't know.  That's because there's

24  no repeatable process written down anywhere about how to do it.

25       Here is what I heard him say as he described it:  With

Defendant's Closing Argument

1   great enthusiasm, and in -- in good faith, I believe, but he

2   said, "All you need is a finger's width.  You rock it back and

3   forth, and you can hear where it drops into the lead-in mark.

4   It settles in with just a little bit of nice pressure.  You

5   make sure the trajectory rod goes down and settles into place,

6   and then you evaluate.  I just hold it and take a scan in

7   place.  When I'm working alone, I duct tape it."  He says, "You

8   can almost hear it.  You can feel it."  In his notes -- I don't

9   think he did this in court, but in his notes he called it "the

10  sweet spot."  He admitted readily that it depends on who is

11  doing the feeling and the training, and he says it has to be a

12  thinking person to use it.  He says, "You feel how solid it

13  drops in, and you look down the rod to make sure that it's not

14  far off."

15       Your Honor asked, "Is it subjective?"  And he candidly

16  said, "Yes, it is."  But then he goes on to say, "Well,

17  everything in science is.  But this is different.  This is all

18  about feel."  That's what his testimony was.

19       Mr. Noedel says the literature doesn't say how to do it.

20  There are no protocols.  He says there's a spectrum of these

21  techniques.  On one end of the side is stability -- of

22  stability in the spectrum is if you have two points that are

23  far apart with a solid anchor, that's pretty stable.  The

24  centering cone, not so much; the rocker point, not at all.

25       With respect to acceptance, he said it's the same sort of

Defendant's Closing Argument

1  spectrum.   On one end you've got two points far apart with a

2  solid anchor and that somewhere in the middle is the centering

3  cone, and the rocker point is on the far end of the spectrum.

4      The problem, according to Mr. Noedel is you use just a

5  last little bit of the rod.   It's very sensitive to a minor

6  change.   If you are off by 1 millimeter in terms of where you

7  place the rod, you're 14 degrees off.   There's no assurance

8  that any two people are doing it the same way.   He says, "I

9  don't use it because it's subjective."

10     They talk about some studies.   One of those studies was

11 the Kerkoff study which talked about vertical angles only and

12 specifically disclaims the study for car metal.   The other

13 thing I heard reference to was something by somebody called

14 Hueske, I believe, who doesn't really describe it, everybody

15 admits.   There's some reference to a shoulder, but it's not

16 really a study of this.   It's not clear at all.   Everybody

17 admits that.

18     So, Your Honor, the rocker point method doesn't meet the

19 five factors.   It's not tested.   All we really have is the 19

20 shots that were taken for this case only after the fact.   And

21 there were a lot of exhibits.   But if you count them up,

22 there's 15 shots taken at one point; four shots at another.

23 That was not a blind study.   It was done by the proponent of

24 the test himself.   He did it himself for this litigation, and

25 there's absolutely no statistical analysis for it.

Defendant's Closing Argument

1    It's not published in any peer-review materials.  It's not

2    even published in Mr. Haag's own book.  I'll get to the error

3    rate in just a second in my next section.  There are no

4    standards.  It's not written down anywhere.  It can't be

5    replicated, and it's not generally accepted.  Mr. Noedel

6    doesn't use it, and there's not a single case that they have

7    been able to cite where it's been accepted in court.

8         That's the rocker method.

9         I now would like to talk about the plus-or-minus-5-degree

10   cone.  This cone is really important, because if you saw it

11   even from their picture from Mr. Terpstra, their crystal clear

12   diagram that we also object to, that 5-degree cone is

13   everything because there are other people not very far outside

14   of that 5-degree cone.

15        Ms. Dickerson testified about the 5-degree, plus or minus,

16   uncertainty range.  She says it's a, quote, "standard rate of

17   error."  She says it applies across all trajectory methods.

18   She cannot say where it comes from.

19        Mr. Haag surprised us -- the government surprised us when

20   they said that the 2008 article, which we thought on its face

21   only applied to the two-point -- two-point trajectory method

22   actually applied to rocker point as well.

23        When we brought in a statistics expert, he quickly agreed

24   that the statistics were mishandled.  Mr. Haag quickly agreed

25   that the criticism was correct, and there was no fightback at

Defendant's Closing Argument

1   all.

2       Now let me talk briefly about Dr. Bray and what he found.

3   He found that there were three design flaws.  The first is a

4   lack of blinding.  The students knew what the right answer was.

5   Mr. Haag says, "Well, of course they did, because this was

6   teaching, and I wanted them to know -- I wanted them to learn."

7   That's not good research.

8       Dr. Bray said the conditions were not held constant.

9   Ms. Ferguson calls that mixed methods, mixing together three

10  different methods.  I call it lumping all three methods

11  together.

12      The reason that's so important is because we have one

13  method that people in the community seem to think works pretty

14  well.  Two fixed points far apart.  And you take the results

15  from that and you mix it in with the rocker point, and perhaps

16  the centering cone, as well, and you don't get a good -- good

17  result.

18      Dr. Bray says this is a poor estimate for any particular

19  scenario, a scenario whose result is driven by which method you

20  use most.  In this case, we don't even know.

21      In addition, Dr. Bray found that there were improper

22  treatment of outliers.  The outliers, the far-off measurements

23  that's supposed to measure accuracy of how this works, were

24  just thrown out.  They were not used.

25      Dr. Bray's bottom line:  Because these problems, any

Defendant's Closing Argument

1  estimate resulting from this data would not be appropriate for

2  application to a specific scenario, such as the rocker point or

3  the centering cone.

4      He also found computational errors.  Misuse of the

5  standard deviation.  He said that the English language

6  definition of "standard deviation" was incorrect and the math

7  formula was wrong.  It's something he's never seen before.  He

8  talked about misordered operations.  Basically, if you have a

9  measurement that's off by 20 degrees this way and 20 degrees

10 that way, it's averaged out to zero.  He finds that improper.

11     Finally, said there's improper weighting.  The same weight

12 was given if there were just two shots fired as if there were

13 15 shots fired.  That's not correct.

14     Finally, he found that the -- what he called the Gaussian

15 distribution, which I call a bell curve, was -- was unfounded

16 and should not have been applied.  His bottom line:  He cannot

17 recommend the 15 percent.

18     We did hear about these 19 shots he fired for this

19 litigation after the fact.  That's a subjective test.  In the

20 first place, it's not blind.  It's done by the proponent of the

21 method.  There's no statistical analysis.  And even then, he

22 did not write down -- it's not written down anywhere what he

23 did.

24     Could I have, Ms. Oakley, Exhibit 5-23, please?  And if we

25 can focus on the language about good scientifically defensible

Defendant's Closing Argument

1    methods.   This is from his 2008 article.

2        You'll see the very last three lines.   He writes, "Good

3    scientifically defensible methods often require an in-depth

4    statical analysis."   That's absolutely correct.   Your Honor,

5    those are Mr. Haag's own words.   There was none of that here.

6    All they have is this 19 shots fired for this case and this

7    case only.

8        He also wrote in his 2008 article that a larger cone may

9    be necessary for shallow-angle shots.   That's really important.

10   Because as we see from the -- the very photo or the very

11   diagram that they started off with, where that cone is is

12   vitally important, because there are other people just outside

13   of that cone.   5 percent matters a lot.

14       Mr. Noedel testified with respect to the

15   plus-or-minus-5-degree cone that here is what really should

16   happen.   He said we should, first of all, define the

17   methodology being tested.   Then we should do a properly

18   designed test.   It should be blind.   We need to make sure it's

19   reproducible before testing.   We need to eliminate the

20   variables, and that's what needs to be done to advance this

21   technique before it's ready for court.

22       And in testimony that -- at least those of us at the

23   defense table found riveting -- that's Mr. Francis's quote --

24   was he explained to us how the trajectory analysis or how the

25   5-degree cone came to be.   He said back in the '80s and '90s

Defendant's Closing Argument

1  people were using pencils and strings to do trajectory

2  analysis, and they started looking for validation.  And people

3  in the field said, "Well, if I have two nice, solid stable

4  points that are far apart, surely I'm good with plus or minus

5  5 degrees."  And that's how plus or minus 5 degrees became a

6  standard.  And it wasn't until Mr. Haag's study that we

7  decimated, I believe, that people actually had any hard data

8  about it at all.

9       There is one study that Mr. Haag talked about.  Mr. Noedel

10  told us, "Well, that's about handguns into walls with solid

11  points."  It's completely, completely different.  It doesn't

12  justify plus or minus 5 degrees.  Certainly not for the rocker

13  point method or the centering cone method.

14       He said it's not good for anything other than two stable

15  points with a hand cone.

16       So the problem, Mr. Noedel says, is we just don't know how

17  big our area is because we'd never done big studies that one

18  would need to do to deal with the variable as has been done

19  with DNA, and he says he can't use plus or minus 5 degrees for

20  every scenario.  He says all the books warn against that, and

21  you especially can't do it for shallow angles.

22       So with this 5 -- plus-or-minus-5-degree cone, here is

23  what we have:  We have unrebutted, uncontested evidence from

24  Dr. Bray that the study that they relied on in their opposition

25  brief is deeply flawed, can't be relied upon.  We have no

Defendant's Closing Argument

1    attempt whatsoever in any record in this case to justify plus

2    or minus 5 degrees for the centering cone, other than to say

3    that -- that that can be the standard for stable points.

4        Mr. Noedel says it's true for two stable points.  That is

5    the industry standard.  But the only attempt to justify for the

6    centering cone is to say it's industry standard.  And the only

7    fightback we have on the rocker point method is 19 shots.  The

8    19 shots taken for this case under conditions that just don't

9    meet even, under Mr. Haag's own standards, the statistical

10   validity that would be required to establish plus or minus

11   5 degrees.  It was subjective.  It was done just for this

12   litigation.  It's not blind.  There's zero statistical

13   analysis.  Plus or minus 5 degrees assertion doesn't meet the

14   *Daubert* test for the centering cone method or for the rocker

15   point method.

16       So the next thing I would like to talk about is

17   Ms. Dickerson's trajectory analysis.  She used a centering

18   cone.  She testified candidly that there's no standard

19   operating procedure for the centering cone technique either.

20   She described the defect, defect "W," that we saw in the

21   government's presentation, as, quote, "somewhat atypical."  She

22   doesn't remember whether the rod wiggled in the hole, but she

23   testified that if she was unhappy with how it fit, then she

24   would use a centering cone and would stick a cone in the hole.

25   She admitted on cross-examination that when she did so she

Defendant's Closing Argument

1    assumed that the bullet ran through the center of the hole.

2         She also testified that it's likely that deflection

3    occurred, and of course she has to admit that because her cone

4    goes over everybody's head.  Her explanation was that there's

5    vertical deflection but no horizontal deflection, and that's

6    the same thing we heard just now.  But there's no science for

7    that.  None.

8         Mr. Haag did not do a centering cone because of

9    deflection.  He says that's basically -- said that's not the

10   right technique to use here.  That's why he used the rocker

11   point because of deflection.

12        And if I can have Exhibit 5-24, please, page 9.

13        This is from Mr. Haag's book, and this is what he says

14   about deflection.

15        If we can have the fourth line down where it says, "A

16   bullet may be deflected by passage through a tree branch, a

17   windshield, or a panel of sheet metal," and then he goes on to

18   write, "Such deflection can occur in any direction in the

19   examples cited:  Up, down, right, or left."  That's what

20   Mr. Haag, the government's own expert, says about deflection.

21   He -- he doesn't say anything about it's only going to affect

22   the vertical angle.  He says it did go left or right.

23        And he also testified on Ms. Ferguson's cross-examination

24   that yaw can play a role in deflection.  And yaw is the

25   side-to-side movement on a vertical axis that happens in a

Defendant's Closing Argument

1  bullet.  And he writes in his book that bullet yaw at impact

2  plays a role in deflection.

3       He also testified on Ms. Ferguson's cross-examination that

4  it takes about 200 yards before a bullet goes to sleep and it

5  dampens out that yaw.

6       Mr. Haag, in essence, testified that the rocker point

7  method is a better method.  It's not good for all the reasons

8  we said.  It's not acceptable.  But it's better than what

9  Ms. Dickerson did because of deflection.

10      He testify that he and Ms. Dickerson measured different

11 things.  He said that Ms. Dickerson measured the path through

12 the metal after deflection.  He says, "I was trying to measure

13 the path before deflection."

14      Ms. Ferguson asked about it.  He says, "By going to the

15 path inside the metal, you're tracking the deflected bullet.

16 The rocker point is more tracking the path of the bullet before

17 deflection."

18      Now, I didn't hear it today, but there was some suggestion

19 that, well, maybe this was really a two-point measurement, it

20 wasn't -- it wasn't -- it was the sort of measurement that's

21 accepted.  But that's not proper use of the two-point

22 measurement system, and that's because these holes that were

23 used were very close together.  There's no measurement.

24 Ms. Dickerson made no measurement about how far apart they

25 were, but it's common sense.  It was the roof of the vehicle.

Defendant's Closing Argument

1   And there's a little fiberglass, some foam, and some fabric.

2   And there are actually three holes on the other side,

3   apparently because the bullet broke up.

4       I would like to show what was shown to Mr. Haag, which is

5   the Garrison passage.

6       Will you blow that up, please?

7       Garrison writes, "When two defects are this close

8   together, a quarter-inch error throws off the angle

9   measurement.  Two defects are unreliable in proving a shot

10  angle estimate."  That's what he writes below.  Two defects

11  that are very close together are unreliable in providing a shot

12  angle estimate.  That's no escape for the government to say

13  this was really a two-point -- two-point measurement.  We heard

14  some of that in the opposition.  We heard some suggestion of

15  that in the testimony.  It -- we did not hear it in the

16  argument just now.

17      So it's also worth noting, I think, on Ms. Dickerson's

18  measurement that she says it was, quote, "Very approximate."

19  So how do the five factors of *Daubert* apply to -- apply to

20  Ms. Dickerson's analysis?  One, has it been tested?  There's no

21  evidence in this record, none whatsoever, that the

22  centering cone method has ever been tested.

23      To the extent that this was really supposed to be a

24  two-point -- a two-point measurement, it's unrebutted evidence

25  that you can't use it in this -- when two points are close

Defendant's Closing Argument

1    together.

2        The error rate, there's nothing on centering cone.  I

3    frankly can't tell whether it was supposed to be part of the

4    2008 study or not, but they made no attempt to validate it at

5    all.  Has it been subjected to peer review and publication?

6    No.  It's not published anywhere.  Not -- not anywhere that's

7    part of this record.

8        Are there standards controlling this operation?  No.

9    Ms. Dickerson said there's no standard operating procedure

10   covering it.  Is it generally accepted?  There's no evidence of

11   that whatsoever on this record.  It doesn't pass *Daubert*

12   either.

13       That takes us to Deputy Turpen's diagram, Your Honor.  You

14   may remember that when Mr. Angeli cross-examined Mr. Turpen, he

15   admitted that when he testified before the grand jury he was

16   absolutely certain it was round five that struck the vehicle

17   and round four that missed.  Now he testifies he's not so sure,

18   and the reason is is because an agent told him that right

19   before this hearing.

20       Mr. -- the government said that it was very important that

21   Mr. Turpen did not know who was who when he did that diagram.

22   But if you examine his testimony closely, he testified on

23   cross-examination that he was told by investigators that they

24   doubted that Oregon State Police shot that bullet.  And he was

25   told -- he wasn't told the names of people, but he was told

Defendant's Closing Argument

1   which individuals were FBI agents and which were Oregon State
2   police officers.  It wasn't blind at all.  It was not
3   objective.  It was subjective.  He was told about it.
4        And what the government said, I'm sure in good faith, I
5   think, is -- I think is belied by the evidence.
6        In terms of qualifications, Deputy Turpen has no
7   bachelor's or advanced degrees.  He's never published anywhere,
8   and he admits that the measurements he took were a full 9 to 14
9   hours after the shooting.  Those measurements, by the way, have
10  no -- those are measurements of the truck, but they have no
11  bearing on the proper placement of individuals, which is really
12  what this is about.
13       With respect to Mr. Finicum's truck, he admits that the
14  truck was not in the same -- same position at the time of the
15  shooting because at least it settled from left to right during
16  that time.  But he can't say how much or how because -- how the
17  positions changed.  There's uncontroverted testimony that
18  Mr. Angeli brought out that the left rear portion of the truck
19  sank into a large depression.
20       Neither Mr. Turpen, nor anybody else from the government
21  on the investigation team, analyzed whether that event may have
22  caused the truck to rotate at all.  He admits that the truck
23  settled by 3 to 4 inches when he was there, but there's no
24  analysis about what happened before.  He does admit that it may
25  have settled by even more than that before he arrived nine

Defendant's Closing Argument

1    hours after the shots were fired.

2         He admitted that the truck would not have settled evenly

3    because the weights of the various people in the truck, people

4    moving around, temperature of different parts of the truck,

5    shifting weight, the fact is nobody measured any part of how it

6    actually settled, but everybody in this case admits that the

7    truck moved just a little bit.  It has a major effect on -- on

8    the trajectory cone.

9         The government says, well, it could not have rotated

10   because the truck was locked into position.  It required two

11   tow trucks, I think the testimony was, to remove it.  But

12   Mr. Turpen admitted that that was the condition at that time

13   when he arrived after all the settling, melting, refreezing,

14   and it may have been different at the time of the shots.

15        If I could have Exhibit 8.8, Ms. Oakley, please.  And if

16   we can blow up on the truck there.  This is a picture of the

17   truck after he arrived that the government didn't show, and it

18   shows that at this point, unlike the ones they showed, the

19   truck is not encased -- the wheels are not encased in snow.

20   There's a lot of room for movement in that truck.

21        Mr. Turpen himself didn't do any analysis to see what

22   happened to the cone of probability at the back end of the

23   truck if it's shifted by just a few inches from the time of the

24   shooting.  And he did not build any margin of error into his

25   analysis.  And that's a big problem for everything we've heard

393

Defendant's Closing Argument

1  today, which is we -- we all agree that the data was lousy,

2  that they didn't have the best evidence to work with, but the

3  problem is they come in here and present this evidence as if

4  it's precise and if it's exact.  You have robots of people --

5  replicas of people, models of people, holding their guns in

6  exact positions, and it's just not so.  It's just not the

7  way -- not the way it worked.  And it's presented as science,

8  and it's very dangerous.

9      Mr. Turpen admits that when you compare his diagram to

10 what it is that Mr. Terpstra did, he did it just based -- the

11 best he could based on subjectively trying to place people in

12 there.

13     If you put them side by side -- if I can have Exhibit 4-10

14 and Exhibit 4-23 side by side.  He admits that they're in

15 different positions, the green -- really, every single one of

16 them.  Just one example, in Mr. Terpstra's diagram, the green

17 person is in front of the orange person, and in Mr. Turpen's

18 diagram, the green person is behind the orange person, and so

19 it goes.

20     He testified that the way he decided where to put whom was

21 based on a video sync done by someone named Zach Neemann, which

22 we can see no evidence of in this courtroom.  None of

23 Mr. Neemann's methods or findings have been put into evidence.

24 We don't know what his sync was.  And perhaps most importantly

25 of all, we have no idea which frame it is that Mr. Turpen used.

Defendant's Closing Argument

1        And the government said something that -- they said that
2    everything has been documented so that we can know.  That is
3    absolutely not the case.  We have no idea what Mr. Turpen did.
4    He did not document what he did.

5        And when he was cross-examined by Mr. Angeli, he basically
6    admitted to all five of the *Daubert* factors that -- that this
7    doesn't -- doesn't meet *Daubert*.  He says his method has never
8    been tested.  There's no known error rate associated with it.
9    We heard this is somehow science that was done blindly.  It
10   wasn't done blindly.  There's huge errors with it, and there's
11   zero error rate associated with it.  The method he used has not
12   been published or subjected to peer review.  He didn't try to
13   replicate the method to see if he got the same result, and he
14   never asked a colleague to apply the same method to see if he
15   could replicate the result.

16       He admits -- he admitted it's not to scale.  He admitted
17   it's not accurate, but he cannot say how much it's off.  Very
18   definition is something that cannot be presented as science to
19   a jury with no error rate.  He has no idea what the error rate
20   is.  These diagrams don't build any margin of error.

21       Finally, what it is is it's a drawing of an unidentified
22   photo that purports to be scientific.  It's not.  It's deeply
23   prejudicial, and it should be excluded.

24       That takes us to Mr. Terpstra, which is the fifth of my
25   eight points I want to cover this morning.

Defendant's Closing Argument

1          THE COURT:  Would you like to take a recess at this
2     point?

3          MR. CARY:  That would be helpful, Your Honor.  Thank
4     you.

5          THE COURT:  We'll take a 15-minute recess.

6                        (Recess taken.)

7          THE COURT:  Proceed.

8          MR. CARY:  Thank you, Your Honor.  I would like to
9     return to Exhibit 8-8, if I could, and perhaps correct a
10    misimpression I may have given in my enthusiasm.

11         This is the truck -- photo of the truck that was taken at
12    about 1:30 in the morning, more than nine hours after the
13    incident, when Mr. Turpen and his team arrive on the scene.
14    And I'm told that the photos that the government showed were
15    taken at roughly the same time.  The point is that the
16    government did not show this particular angle which shows that
17    the rear wheels are not encased in snow.

18         It's also worth pointing out that you can see this
19    downward slant.  And as Mr. Liscio testified, if there was to
20    be movement, it likely would have been in a downhill direction.
21    The government's analysis does not take into account any
22    movement at all, notwithstanding the testimony from Mr. Turpen
23    and others that the truck clearly moved.

24         And it's undisputed, absolutely undisputed that if the
25    truck moves just a little bit, it changes the trajectory angle

Defendant's Closing Argument

1   completely.

2       So now let me turn to Mr. Terpstra.  He's an animator with

3   a junior college degree.  He's not an engineer, like

4   Mr. Liscio, and he's not a photogrammetrist.  It's true that

5   Mr. Mugnier is a photogrammetrist who does not use animating

6   software, but that's the science.  And when this case started

7   or when we had the opposition brief, we were told that this was

8   all going to be about photogrammetry.  And, in fact, we later

9   learned it's not about photogrammetry at all.

10      Mr. Terpstra or what Mr. Terpstra did, it's -- in the

11  words of Mr. Mugnier, it's subjective and it's graphic arts.

12      Mr. Terpstra stated repeatedly in his report that he was

13  using the Piazza frame at which shot number five was fired.  On

14  day number one, you may remember from my cross-examination that

15  we couldn't figure out why the crosshairs didn't -- with

16  Mr. Piazza, we couldn't figure out why the crosshairs didn't

17  line up between what was in Mr. Terpstra's report and the

18  Piazza sync.  We asked Mr. Piazza.  He did not know.  It

19  appeared to be the wrong frame, and, lo and behold, when

20  Mr. Terpstra comes into court, he admits that he, in fact, said

21  he was using the wrong frame all along.

22      In a case where small amounts of time matter because maybe

23  Mr. Astarita wasn't moving but the other people were, that

24  matters a lot.  He used the wrong time frame.  And in some

25  ways, it makes you wonder why we're here in the first place.

Defendant's Closing Argument

1        Now, there was a lot said in the government's

2   presentation, in terms of what Mr. Terpstra said in their

3   opposition brief about all the data that was collected by

4   Mr. Terpstra, and it's true that he collected a lot of data in

5   order to build his models of vehicles and in order to build the

6   scene.  But the most important things in the case is where do

7   you place the people and where do you place the Finicum truck?

8   And that, Your Honor, was subjective.  It was done with

9   eyeballing.  It was not done with data collection.  It was

10  simply a subjective placement.

11       Remember when Mr. Liscio showed us, when we zoomed in, and

12  he said, "Can you see a human being there?"  And, at least to

13  my eye, on many of them I couldn't, or I could just see a few

14  fuzzy pixels.  He took that image, and he took his biped models

15  that you get off the internet and placed them in there as if

16  that's an actual outline of the people that were there that

17  day.

18       He relied on Mr. -- he relied on an agent in order to

19  decide what the height of them was.  He did no other analysis.

20  There's nothing scientific about it at all.  It's 100 percent

21  subjective.  He took these blurry videos and turned them into

22  this crystal clear diagram.

23       There was no error rate.  None whatsoever.  The only test

24  he used was whether it aligned with his eye.  He agreed with

25  Mr. Francis on cross-examination that his test, which was

Defendant's Closing Argument

1   repeatedly looking at it to see if it lined up, was a test of
2   precision, not accuracy.  That is, he tested whether he got
3   consistent results, but he didn't -- he did not calculate --
4   his test has nothing to say about whether he got correct
5   results.
6        And the problem is, as we heard from our experts, is that
7   just because it looks like it lines up doesn't mean it lines
8   up.  It's not accurate as a matter of math.  Especially when
9   you're dealing with a fuzzy photo like this.
10        Mr. Terpstra, when he was re-called on direct examination
11   produced a study done in April of 2018, and that study was
12   something done under completely different circumstances than
13   this.  It used much more high-resolution photos.  It was close
14   to the ground.  Not far away.  There was not a snowbank, a
15   dynamic snowbank, in that photo.  And under those much better
16   circumstances, using this manual camera matching, which is an
17   eyeballing technique, he got -- came up with a 13-inch error
18   rate.  That changes everything in a case like this when inches
19   matter.
20        He admitted on cross-examination from Mr. Francis that in
21   order to do photogrammetry, the real science here, correctly,
22   you can't place an object into a 3D model unless the object
23   being placed is touching something firm that has been scanned.
24   In this case, he didn't do it.  He couldn't do it because of
25   the snowbank.

Defendant's Closing Argument

1        Can I have Exhibit 8-8, page 2, please, Ms. Oakley?

2        So that's actually in the summer.  That's the real ground

3    that it should have been attached to.  And if I can have 8-8,

4    page 1, please.  And that's the snowbank.  He admitted that

5    without that you can't use photogrammetry.

6        The literature for the technique that he did use says you

7    shouldn't use foliage in order to do camera matching, and that

8    makes sense because the place of leaves and trees and plants

9    may change.  But he did.  He didn't follow his own literature.

10   It says "Don't use lane markings if they've been repainted."

11   But he did.  He didn't follow the literature even for the

12   technique he used.

13       The literature says that photos taken at great distance

14   are poor candidates for camera matching.  Nevertheless, he used

15   photos taken more than two miles away, and common sense tells

16   us that those blurry photos are not very good for a technique

17   that really relates -- involves nothing more than eyeballing.

18       He didn't correct for lens distortion, even though his own

19   article says you should correct for lens distortion.  He used

20   the wrong focal length.  He was off by a third.  He misplaced

21   the vertical camera by a third of a mile.

22       And government said -- when we started and we got the

23   opposition brief, the government said the sync is off by one

24   frame at the most, and he acknowledged the sync rate -- the

25   error rate for the sync would affect his analysis.  And he was

Defendant's Closing Argument

1  cross-examined by Mr. Francis about Mr. Piazza, saying, "Well,

2  now I think the error rate is 11 frames."  Did he not build

3  that into his model?  He said he should have, but he didn't.

4       Mr. Liscio, the engineer, testified.  I said in my opening

5  that there were lots of measurements of the truck at the scene

6  which had changed.  When the rubber hits the road, what really

7  matters is where you place the people and where you place the

8  vehicles.  And here is what Mr. Liscio said about that.  He

9  said it's, quote, "purely subjective," end of quote, what

10 Mr. Terpstra did.  He said the wiggle room is massive.  He said

11 there's no calculations to check, unlike real photogrammetry

12 where you can do calculations to check.  Not so with the

13 technique employed here.

14      He testified that with analytical photogrammetry, when

15 math is used, rather than the subjective testing, the computer

16 tells you if it's a mistake.  He says with camera matching,

17 which is subjective, there's no way to know.  In his words, we

18 could be fooled by this technique.  Gross errors are possible.

19      He testified to a grave discrepancy between the Terpstra

20 model and the total station measurements that were taken.

21 They're completely inconsistent with the government's theory.

22 He was showing how with the -- with the different rods and how

23 the truck moved and how it couldn't possibly be correct, how it

24 was inconsistent, and that goes to the very heart of the

25 reliability of this method.

Defendant's Closing Argument

1      He said there are no studies, much less peer-reviewed

2   studies, validating what was done here by Mr. Terpstra.

3   Dropping a vehicle into a snowbank, dropping biped models where

4   he believes, based on his own eyesight, that the humans were,

5   it's purely subjective.  And, by the way, Mr. Smith agreed, as

6   well -- I think it was the last question of the hearing, or at

7   least Mr. Francis' last question -- that what was done here was

8   subjective.

9      There's no error rate.  It doesn't pass *Daubert*.  It's

10  presented as science when it's, in fact, art.

11     Mr. Mugnier, who I described in opening as the godfather

12  of photogrammetry with the impeccable credentials in terms of

13  analytical photogrammetry, and it may be that he's been at it a

14  long time and he doesn't use animation software, but that's

15  part of the point.  Just because you can use animation software

16  to drop something into a model doesn't mean that it's good

17  science.

18     He says there's no way to measure the accuracy of what --

19  what Mr. Terpstra did.  He says it's purely a subjective way of

20  guesstimating where people and objects were.  He says you're

21  simply using the eyeball to check whether it's plausible, and

22  he testified, as Mr. Liscio did, that you need -- in order to

23  place an object, you need to have what he calls a plane of

24  rectification, a flat surface that has been scanned.

25     That's why you can't place the truck in the -- in the

Defendant's Closing Argument

1  snowbank because you couldn't -- couldn't -- couldn't scan the

2  snowbank.  Nobody has argued otherwise.

3      Then he showed the Court the images floating in space with

4  his stereoscope.  He says this is the evidence of errors.  He

5  says this shows the blunder of trying to camera match in a

6  monoscopic way.  He said the error is evident but it cannot be

7  quantified.  That goes right to the heart of *Daubert*, whether

8  the error can be quantified, and here it can't.  That's what is

9  so dangerous about this is it's being presented at precise

10  science when someone who's been at real photogrammetry for

11  decades tells you that you cannot -- cannot calculate an error

12  rate.  He described it as subjective graphic art, not science.

13  And he may be a layperson in graphic art, but he is as

14  qualified a scientist as you can be.

15      So to return to the *Daubert* five factors, with respect to

16  Mr. Terpstra's methodology, whether the expert's theory,

17  technique, or method can be or has been tested, what he did has

18  not been tested.  It cannot be tested.  That's what Mr. Mugnier

19  said.  You can't test it.

20      Does it have a known or potential error rate?  No.  That

21  was the testimony from our experts.  You can't figure out an

22  error rate for this.  It's graphic arts.  It's eyeballing.  You

23  can't calculate an error rate.  If it was real photogrammetry,

24  you could; but not with what was done here.

25      And he admitted as much when he said, "Well, what I tested

Defendant's Closing Argument

1   was my precision.  Whether I get the same -- I, in my

2   subjective judgment, get the same result over and over again."

3   It wasn't a measure of accuracy.

4       Whether it's been subjected to peer-review and

5   publication, I went through the ways that he departed from

6   the -- from the articles, even for what it is that he did here,

7   whether standards controlling its operation, not -- not the

8   way -- once again, not the way he did it here.

9       Whether it's generally accepted within the relevant

10  community, the relevant community here, if this is science,

11  should be photogrammetry.  Not graphic arts.  And we brought

12  Mr. Liscio and Mr. Mugnier here to say that what he did --

13  there are perfectly good ways to use photogrammetry, but what

14  he did here is not accepted in the community.

15      Now I would like to turn to the syncing of the video frame

16  by Mr. Piazza.  In some ways, I'm not sure why this matters,

17  because the whole point was to give Mr. Terpstra the right

18  frame to use.  But if it does matter, let's look at what he did

19  in his testimony.  He says he cannot, in fact, associate a

20  frame with a shot.  He doesn't know whether it's shot four or

21  alleged shot five that matters.  He didn't really apply any

22  scientific process at all.

23      If I can have Exhibit 1-14, please.  If we can blow that

24  up just a little bit, please.

25      This is the photograph that he used to sync.  He came in

Defendant's Closing Argument

1    here and he showed us two photographs that he used to sync the

2    video.  This is one.  And it's a little hard to see there, but

3    you can see something -- perhaps it looks like a telephone

4    pole -- outside the -- the window of the video that was taken

5    inside the car, and he syncs that up with this photo.  But he

6    admitted on cross-examination that you could see the -- that

7    telephone pole for many frames before and many frames

8    afterwards, and it doesn't seem to be very good evidence of

9    syncing to me.

10         Then if I could have the other one.  1-17, please.

11         And then this is -- this is the other one he used that he

12   said gave him confidence that his syncing was correct, and it's

13   hard for my eye to see it, but apparently he sees an arm there,

14   and he says this is evidence that I've done a precise --

15   precise -- precise syncing.

16         He doesn't have any calculation of an error rate.  The

17   government originally said in its brief, based apparently on

18   what they told him, is that he was off by one frame at the

19   most.  I think he then said "Maybe I could be off by up to

20   three frames."  He then said on cross-examination, or actually

21   maybe it was brought out on direct, that it could be plus or

22   minus 10 frames.  He later examined -- expanded it to 11

23   frames.

24         This is what they said in their opposition brief.  "He

25   will testify that the two videos may be off by a frame at most

Defendant's Closing Argument

1    and likely less."

2        We now hear from Mr. Smith that it's -- 34 frames is the

3    proper error rate.  It's gone from 1 to 34.  That's not

4    science.  It just seems to be a guess.

5        It fails the other *Daubert* factors as well.  Not only is

6    there no scientific error rate, but his technique cannot be

7    replicated or tested because he didn't keep any notes or any

8    records of what he did.  He just showed us those two frames in

9    court.  That's -- that's all he showed us.

10        It's not been subjected to peer review or publication.

11    There are no standards, and there's no proof that it's accepted

12    within the relevant community.

13        The government has not met its burden on this sync.  It

14    fails on every single *Daubert* factor.  And we heard earlier

15    this morning that everything was documented, just not true.

16    Not only were there no notes from this expert.  To this day, we

17    haven't gotten a meaningful report from him.

18        The only thing really in that report is a vague

19    description of the software he used, the hardware he used, and

20    some identifying information with respect to the videos that he

21    was given and how he identified them after he converted them.

22        I now would like to talk to my second-to-the-last topic

23    which is the enhanced videos.

24        I don't think we heard from the government at all on the

25    enhanced videos today.  Mr. Piazza was very clear and very

Defendant's Closing Argument

1   forthright that he corrected color and enhanced sharpness on

2   some of the videos.  And to be clear, he didn't do it on the

3   main sync that he did, and he did not eliminate.  He says he

4   did not eliminate any objects, and we take him at his word on

5   that.

6       But what he did do, by color correcting and sharpening, is

7   he modified pixels.  Both Mr. Koenig and Mr. Liscio testified

8   about this, and there's no contradictory testimony.

9       And it's especially troubling because he didn't keep any

10  records of what he did.  None whatsoever.  So we can't go back

11  and figure out what it is that he did.

12      If I could have Exhibit 2-5, please.  If we could focus on

13  the right-hand side, please.  Blow that up a little bit.

14      So Mr. Piazza was kind enough to go back after the fact

15  and give us an example of the sorts of things he did.  This is

16  not something he did at the time, but he did it afterwards.

17  And Mr. Koenig testified that this shows clearly that he

18  modified the sharpness.  This is an example of what he did.

19  That's down at the bottom there.  He moved that -- that setting

20  to change the sharpness, and he testified, and it's

21  uncontradicted that when you change the sharpness, you change

22  the pixelation, and you especially take blurry photos -- things

23  that are blurry and make them look less blurry.  In a case

24  where who is moving when and at what time -- how many times

25  have we heard the government say, "Mr. Astarita is standing

Defendant's Closing Argument

1  there without moving at all."  It's completely unfair to us to

2  change that pixelation, to change the blurriness, without even

3  giving us a record of what it is that has been done so we can

4  testify to it.

5        For that reason, it should be excluded.

6        In addition, in the upper corner, Mr. Koenig explained to

7  us, if we go to that far left and maybe circle that far left,

8  that gray area, he says that when you correct the color, you

9  actually remove pixels.  And without a record of what was done,

10 that's not right.  We should use the original video in this

11 case, not enhanced video, especially when there's absolutely no

12 record of what was done in order to change the pixelation on

13 the photos.

14       Finally, I would like to talk about Mr. Piazza and the

15 identification of eight gunshots.  It is undisputed that

16 Mr. Piazza is not an expert on gunshot audio analysis.  It's

17 undisputed that he looked at narrowband spectrogram and

18 low-resolution waveforms.

19       You heard Mr. Koenig, who is the world's leading authority

20 on this, that those are insufficient to determine whether you

21 are, in fact, hearing a gunshot or hearing something else.  For

22 example an N-Wave that often precedes a second gunshot.

23 Similar to a sonic boom with an airplane or a reverberation of

24 that, such as an echo.  And Mr. Koenig, Your Honor, didn't do

25 anything that any juror can't do, which is simply listen.

Defendant's Closing Argument

1     The technique employed by Mr. Piazza doesn't pass muster

2  under *Daubert*.  He is not an expert.  His technique has not

3  been tested.  In fact, it's contrary to what the leading expert

4  in the world said it should be.  He hasn't even tried to

5  calculate an error rate.

6     What he did do was inconsistent with the standards that

7  Mr. Koenig says are the proper standards.  His technique hasn't

8  been subjected to peer review and publication.  It is not

9  accepted.  He wouldn't know whether it was accepted because

10 he's not an expert.

11    Those are the eight points I wanted to cover this morning,

12 Your Honor.

13    I want to conclude by referring back to the

14 cross-examination of Mr. Mugnier at the end of yesterday and a

15 theme that I think we heard in the government's presentation

16 this morning, and he was asked -- Mr. Mugnier was asked in a

17 question whether the nature of forensic work is to do the best

18 you can with what you have, and, I think, a theme that has

19 emerged throughout this hearing again today is that the

20 government's done the best they can.  And in some ways that's

21 certainly true.  They -- the evidence here is -- is not very

22 good.  The video is very fuzzy.  The truck was on a snowbank.

23 That's nobody's fault.  We don't know where it actually turned

24 up.

25    But "the best we can" is not the standard under *Daubert*.

Defendant's Closing Argument

1  *Daubert* requires validated, objective, repeatable,

2  nonsubjective science.  If the data doesn't allow us to reach

3  valid conclusions, then we shouldn't do so.  We shouldn't

4  reach -- in good faith and enthusiasm, they may be trying to do

5  their job, but you can't reach where science won't take us.  If

6  you have a shallow-angle atypical bullet hole that does not

7  allow you to reach a conclusion, then you can't reach a

8  conclusion with it.

9       If you have a blurry photo taken from over two miles ahead

10  in a snowbank that doesn't allow you to build a model using

11  valid photogrammetry with valid scientific techniques, then you

12  shouldn't build a subjective model using eyeballs.

13      *Daubert* does not allow for subjectivity when good science

14  fails to deliver the desired answer.  It certainly doesn't

15  allow subjective opinions to be presented as if it's good,

16  accurate science without an error rate, which is what we see

17  happening again and again with the government's evidence.

18      Your Honor, I close with the way I opened, which is that a

19  picture purporting to be based on science is worth a million

20  words, and I noted that that's the way that the government

21  opened and closed their presentation today.  That photograph

22  is -- is devastating to the defense, but it's not based on good

23  science.  The evidence -- scientific evidence needs to be

24  objective.  It needs to be repeatable.  It needs to be accepted

25  in the scientific community, and it needs to be validated by

Defendant's Closing Argument

1   large well-designed studies.

2       The standards that are applied need to be meticulously

3   followed.  That didn't happen here.  And anything else is

4   simply too dangerous in any sort of case, but especially in a

5   case where human liberty is at stake.

6       The government expert -- expert evidence, Your Honor,

7   should be excluded.  All of it.  Thank you.

8               THE COURT:  Thank you.  Do you want to confer before

9   you give your closing?

10              MR. MALONEY:  I have one -- I'm ready to proceed.  I

11  have one matter to briefly consult with defense counsel

12  regarding potentially a government exhibit that we had

13  discussed earlier this morning.

14              THE COURT:  Sure.

15                      (Pause-in-proceedings.)

16              MR. MALONEY:  Your Honor, the parties have conferred.

17  There was a study that Mr. Terpstra used during his second

18  testimony, when he testified about the LiDAR data that he used

19  with the USGS LiDAR data and plotting the cones and the car.

20  Counsel and I have conferred.  The government would like to

21  supplement the record.  We will be providing to the Court,

22  after court today, two exhibits:  A copy of the PowerPoint that

23  Mr. Terpstra used as well as a copy of the article.

24              THE COURT:  Very well.

25

1              PLAINTIFF'S REBUTTAL ARGUMENT

2         MR. MALONEY:  May it please the Court.  Your Honor,

3    you've heard from the parties.  We've summarized four days'

4    worth of litigation for you.  Again, the government wants to

5    reiterate Counsel's sentiments and thank everyone who assisted

6    us throughout this process and helped us with these issues.

7         Counsel mentioned the burden.  And to the extent counsel

8    interpreted the -- my assertions that those tests were not

9    performed by the defense experts, that was not the point or the

10   purpose of my remarks.  We certainly own our burden.  We know

11   it is our burden to persuade this Court to a preponderance of

12   the evidence that this evidence, these experts, their

13   testimony, their exhibits, are admissible.  My point being

14   two -- twofold.  They had the opportunity to conduct those

15   tests -- each one of their experts.  They had the materials.

16   We provided them with everything they needed to do to

17   independently do those tests.  Mr. Liscio had all the raw data

18   from which he could have used his own software, his own

19   PhotoModeler application, to process Mr. Terpstra's 3D data and

20   render his own model.  He chose not to do so.  That goes to the

21   bias of the witness.

22        He could have adduced that.  He could have had his own

23   analytical photogrammetry model done.  Mr. Mugnier could have

24   used his own glasses and blinked at the printed-out results and

25   tested it.  That could have been done, and it wasn't.

Plaintiff's Rebuttal Argument

1    Also, secondly, it emphasizes the government's willingness
2  to entertain a contrary expert opinion.  Yet, what we heard
3  throughout Counsel's closing was every single possible minor
4  and sometimes significant discrepancy.  We'll acknowledge that,
5  that there was a difference of .3 seconds from the frame that
6  Mr. Turpen -- Terpstra -- I'll but a dollar in the jar -- used
7  and represented in his report as the time that shot five was
8  fired.  It was .3 seconds before.

9    And to the extent that it doesn't matter, that wasn't the
10 government's point about the settling.  The government's point
11 about the settling of the truck and the reason why we brought
12 that up is plain and evident from Professor Smith's report.
13 The settling of the truck is an unknown.  It wasn't measured.
14 To rely on that is bad science, but it's an unknown, and it's
15 an acknowledged unknown in all the government's expert
16 witnesses.  They state it plainly they don't know.  There's
17 some evidence to suggest it may have shifted, but they are
18 unable to quantify it.

19    That was why it was so important for Mr. Terpstra to
20 conduct that 3D scene reconstruction at and near the time of
21 shot five, before the truck had any chance to settle in the
22 snow.

23    The other important point I would note, each and every one
24 of the defense experts were asked whether or not they could
25 rule out the government experts' conclusions, and each of them,

Plaintiff's Rebuttal Argument

1  with the exception of Mr. Liscio, were asked that question, and

2  they all acknowledged that they could not rule out the accuracy

3  of the government's experts' conclusions within that field of

4  study.

5      He talked about deflection and that there was no -- and

6  that that was possible.  That there could have been horizontal

7  deflection of shot "W."  So -- by that, it might be helpful to

8  demonstrate with Government 34.  The shot comes in at this

9  angle.  Vertical deflection would be the bullet taking a turn

10 and going into the truck at a steeper angle, entering the truck

11 steeper than it impacted the truck.  Horizontal impact -- or

12 horizontal deflection would mean that the bullet turned and

13 took a right-to-left change in direction upon entering the

14 truck.

15     There was evidence of vertical deflection.  There was no

16 evidence from any of the individuals who actually examined

17 impact "W" of horizontal deflection.  They acknowledge that it

18 was possible, but there is no evidence that the bullet did take

19 a turn.

20     The defense's own expert, Mr. Noedel, acknowledged that

21 he, too, would have lined up that trajectory rod along the

22 lead-in mark.  That is what delivers the important measurement

23 with respect to the trajectory in this case.  The horizontal

24 measurement is everything.  That determines the trajectory and

25 point of origin of that shot along the horizontal plain.  And

Plaintiff's Rebuttal Argument

1   if you recall, the individuals were lined up horizontally

2   across the roadway.  That tells you who -- who that trajectory

3   points to and identifies the possible shooter and the potential

4   point of origin for shot "W."

5       Mr. Mugnier talked about his photogrammetry glasses and

6   said that all you had to do was look through the glasses and

7   blink really fast or wink back and forth and you could see that

8   the images were given dimensionality.  If there isn't a more

9   subjective test that was offered in this case than that, it's

10  unclear to me.

11      He called it graphic art.  With all due respect, it took a

12  three-person team hours and hours to reach that result.  It was

13  much more than graphic art.  This was careful study.  It was

14  frame-by-frame analysis of the videos involved in this case to

15  make sure they got it right.

16      The enhanced videos were referenced.  The enhanced videos

17  were used in the -- were not used to base the model.  The

18  enhanced videos were used so that Mr. Terpstra and his team

19  could assess and analyze the movement of the parties within

20  that scene and the potential movement of any vehicles within

21  that scene.  There is no evidence that the vehicles moved

22  during the time -- the critical times of this inquiry.

23  There's -- there's evidence that individuals moved.  There is

24  no evidence that the defendant moved appreciably out of the

25  cone.

Plaintiff's Rebuttal Argument

1          There was a statement made about Mr. Piazza's audio

2     analysis of the gunfire and that he didn't do a gunshot -- a

3     true gunshot analysis.  He wasn't trying to find out what

4     caliber of gun it was that was fired at those points or

5     distinguish between different guns or determine a range from

6     the point of -- a range from the microphone that recorded the

7     gunshots.  He simply identified them as gunshots based upon the

8     amplitudes involved.

9          You heard from Professor Smith who ruled out the potential

10    for a reverb or an echo or an N-Wave affecting the audio

11    analysis in this case.

12         And, frankly, Your Honor, it -- the only person who didn't

13    readily identify that recording as gunfire was Mr. Koenig.

14    Everybody -- anyone can listen to that with common sense and

15    reason and determine that that truck was being shot at at that

16    point in time.

17         In total, we litigated for four days, and what was adduced

18    was nothing more than impeachment evidence.  As we know,

19    Rule 702 is a rule of inclusion and not a rule of exclusion.

20    And rejection of qualified expert testimony is the exception

21    and not the rule.  Where experts disagree, that's an issue for

22    the jury.  It will involve credibility determinations, because

23    certainly some of these issues that were brought up involve

24    factual disputes.  Juries decide that in these situations.

25         When analyzing this case and this evidence, one of the

Plaintiff's Rebuttal Argument

1  defense's themes is it's all too subjective.  It depends on the

2  individual opinion of the experts, and that's not good enough.

3  That is a similar line of attack.  We see it in court cases

4  throughout this country on latent print examinations.  But when

5  there are sufficient points of comparison, that evidence is

6  admissible.

7       So take a look at the points of comparison in this case.

8  The audio and video analysis, they were all synchronized of one

9  second of one another, and that's using Professor Smith's

10  inarguable, overly conservative 34-frame count, where he says

11  he looked at the frames inside the truck at and near the time

12  of shot four and five, and with the -- with confidence,

13  inarguably, he says they are synchronized.  And all of the

14  different synchronizations that were used in this case are

15  within that range of certainty.

16       The trajectory analyses, the horizontal azimuths, the

17  measurements that matter were consistent between both

18  examiners.  Undisputed.  And even the defense's own expert

19  would have acknowledged that he would have lined up that

20  trajectory rod along the same horizontal azimuth, but he

21  didn't, and we don't have that data point.

22       The 3D model and the line diagrams.  Take a look at them,

23  Your Honor.  One was made to be accurate within inches.  That

24  was the diagram for purposes of a speed and crash -- a speed

25  analysis in a crash reconstruction.  The overall geometries are

Plaintiff's Rebuttal Argument

1    remarkably and strikingly consistent.  Within the 3D model, the

2    multiple points in the video that are consistent with the 3D

3    model, the audio, the frame-by-frame analysis, the point cloud

4    data, the consistency between the diagram and the 3D model,

5    what Professor Smith described as the thorough and

6    well-documented report, that it was subjected to testing and

7    error rate analysis within that report.

8         Frankly, Your Honor, the government's experts have done

9    their work.  They've shown their work.  They have subjected it

10   to scrutiny and stand by their opinions.  Each and every one of

11   them testified that to a reasonable degree of scientific

12   certainty within their area of expertise that that is their

13   opinion.

14        Now, some of them were not conducting science.  Counsel

15   repeatedly references science as part of this.  Science is one

16   part of the inquiry, but there are many different types of

17   expert testimony that are admissible under Rule 702.  Any of

18   those types of evidence, based on knowledge, skill, experience,

19   or science.

20        Frankly, Your Honor, what the government has done here and

21   demonstrated through this is a continuing and ongoing pursuit

22   of the truth.  Multiple experts were brought in to review the

23   evidence in this case and to give us their findings.  And with

24   all due respect, Counsel has done nothing more than pick at the

25   edges and refused to acknowledge the consistencies between

Plaintiff's Rebuttal Argument

1   those opinions.  The consistencies that matter.

2       They were asked to do their own independent examinations

3   and to reach their own conclusions, not simply examine the

4   methods of another expert.

5       You heard Mike Haag testify that when he was first

6   approached could he validate Ms. Dickerson's work.  Do you

7   recall what his response was?  "I cannot.  I have to do my own

8   independent test."

9       That's a scientist.  That's an expert who approaches his

10  work with integrity.

11      To the extent that his integrity is being questioned,

12  that's an issue for the jury.

13      The consistent response from multiple experts lead to one

14  inescapable conclusion:  That the defendant was the only person

15  in a position to take this shot.

16      Thank you, Your Honor.

17          THE COURT:  Thank you.  The -- if the counsel wish to

18  submit a synopsis highlighting your positions, you're welcome

19  to do so.  I'm not requiring it, but I would like you to meet

20  and confer.  I would want both sides to agree to do that.  If

21  not, I'll -- I'm perfectly prepared -- not -- I'm prepared to

22  make my findings and conclusions of law.

23      I again wish to extend my sincere professional thanks and

24  personal thanks to everyone who has participated here.  You

25  manifested the highest level of professionalism.  I appreciate

1  that immensely.

2      I have a wonderful collection of data from which I can

3  render my opinion.  As I stated before, I plan to take this

4  expert by expert by expert.

5      If the government chooses to not call one of the experts,

6  advise me, so I won't be doing moot work.  But I don't

7  anticipate that.  So I hope to have my conclusions within two

8  weeks.  That's where we are.

9      Thank you again.  Court is in recess.

10          MR. CARY:  Thank you.

11          MR. MALONEY:  Thank you.

12

13                  (Hearing concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3            United States of America v. W. Joseph Astarita

4                          3:17-cr-00226-JO

5                         EVIDENTIARY HEARING

6                           May 25, 2018

7

8            I certify, by signing below, that the foregoing is a

9   true and correct transcript of the record, taken by

10  stenographic means, of the proceedings in the above-entitled

11  cause.  A transcript without an original signature, conformed

12  signature, or digitally signed signature is not certified.

13

14  /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
    _____
15
    Official Court Reporter      Signature Date: 6/11/18
16  Oregon CSR No. 98-0346       CSR Expiration Date:  9/30/20

17

18

19

20

21

22

23

24

25