1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF OREGON

3                       PORTLAND DIVISION

4
   UNITED STATES OF AMERICA,        )
5                                    )
                       Plaintiff,   )   Case No. 3:17-cr-00226-JO
6                                    )
                  v.                 )
7                                    )   July 16, 2018
   W. JOSEPH ASTARITA,              )
8                                    )
                       Defendant.   )   Portland, Oregon
9  _____)

10

11

12

13

14                     PRETRIAL CONFERENCE

15                  TRANSCRIPT OF PROCEEDINGS

16           BEFORE THE HONORABLE ROBERT E. JONES

17          UNITED STATES DISTRICT COURT SENIOR JUDGE

18

19

20

21

22

23

24

25

```
 1                              APPEARANCES

 2    FOR THE PLAINTIFF:
                              GARY Y. SUSSMAN
 3                            U.S. Attorney's Office
                              1000 SW Third Avenue
 4                            Suite 600
                              Portland, OR 97204
 5
      FOR THE PLAINTIFF:
 6                            PAUL T. MALONEY
                              U.S. Attorney's Office
 7                            1000 SW Third Avenue
                              Suite 600
 8                            Portland, OR 97204

 9    FOR THE DEFENDANT:
                              DAVID H. ANGELI
10                            Angeli Law Group
                              121 SW Morrison Street
11                            Suite 400
                              Portland, OR 97204
12
      FOR THE DEFENDANT:
13                            TYLER FRANCIS
                              Angeli Law Group
14                            121 SW Morrison Street
                              Suite 400
15                            Portland, OR 97204

16    FOR THE DEFENDANT:
                              JOANNA PERINI-ABBOTT
17                            Angeli Law Group
                              121 SW Morrison Street
18                            Suite 400
                              Portland, OR 97204
19
      FOR THE DEFENDANT:
20                            ROBERT M. CARY
                              Williams & Connolly LLP
21                            725 Twelfth Street NW
                              Washington, DC 20005
22
      FOR THE DEFENDANT:
23                            MEGHAN A. FERGUSON
                              Williams & Connolly LLP
24                            725 Twelfth Street NW
                              Washington, DC 20005
25
```

```
 1   COURT REPORTER:        Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                            United States District Courthouse
 2                          1000 SW Third Avenue, Room 301
                            Portland, OR 97204
 3                          (503)326-8191

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TRANSCRIPT OF PROCEEDINGS

(July 16, 2018)

(In open court:)

        THE COURT:  Good morning, everyone.  Have a seat, please.

        MR. SUSSMAN:  Good morning, Your Honor, Gary Sussman and Paul Maloney, appearing for the United States.  This is the time and place set for the final pretrial conference in the case of United States of America v. W. Joseph Astarita.  Case No. 3:17-cr-226.  Mr. Astarita is not present this morning, having previously waived his appearance; however, he is represented by five attorneys this morning.  They are Mr. Rob Cary and Ms. Meghan Ferguson from the Williams & Connolly firm in Washington, D.C.  Mr. Dave Angeli and Tyler Francis and Ms. Joanna Perini-Abbott from the Angeli Law Firm.

    Your Honor, there's a number of matters pending before the Court for resolution this morning, and the government is ready to proceed in whichever order the Court desires.

        THE COURT:  Thank you.  I'll proceed.

    First of all, we have resolved the jury issues.  We had 300 jurors noticed.  Of those, 150 responded that they would be available.  That has since reduced to 118.  The jurors are scheduled to come in Tuesday.  The issue on the jury questionnaire has been resolved.  There will be a jury questionnaire, the joint questionnaire only, and that will be

1    submitted to the jury when they come in at 8:00 a.m. on a week

2    from tomorrow, and the jury commissioner estimates that it will

3    take them about an hour to fill out the -- those

4    questionnaires, and that will be reformatted because some of

5    the questions are open-end questions that will require some

6    writing.  So I'll ask whoever -- whichever side prepared those

7    to coordinate with the jury commissioner, who I introduced you

8    to this morning, so that she can then make up, from her

9    computer, the jury questionnaire and make the copies and so

10   forth.

11        Yes, sir.

12            MR. MALONEY:  Yes, Your Honor.  Paul Maloney for the

13   government.  I think that task is going to fall to me.  The

14   parties wanted to clarify with the Court whether you wanted the

15   juror questionnaire that was previously submitted or the joint

16   jury voir dire that the parties submitted with our pretrial

17   documents.

18            THE COURT:  The joint one.

19            MR. MALONEY:  The joint one that we submitted with

20   our pretrial conference documents?

21            THE COURT:  Yes.

22            MR. MALONEY:  Thank you, Judge.

23            THE COURT:  Any questions?

24        Yes, and we will call in 75 so that we aren't bringing

25   in -- that's the agreed -- the commissioner said you were asked

1    how many do you want physically here, and both parties reported

2    75; is that correct?

3         MR. CARY:  Yes, Your Honor.  That's correct.

4    Rob Cary for Mr. Astarita.  75 is fine.

5         One point of clarification, I believe I have this right,

6    and government counsel can correct me if I'm wrong, but we did

7    have a joint questionnaire that was already formatted with more

8    space that we had done.  It had one additional question that we

9    wanted on it that was taken out when it became -- we thought it

10   was going to be voir dire instead of a written question, and

11   our proposal would be that we actually provide that joint

12   written questionnaire that's already formatted, that the jury

13   commissioner could change a little bit if she needs to, but

14   provide that.  I think it would remove one additional step from

15   the process.

16        THE COURT:  Do you agree?

17        MR. MALONEY:  We're fine with that, Your Honor.

18        THE COURT:  That's fine.  It's up to you, then.

19        The next issues -- I have your witness list.  Jointly, the

20   parties have requested 100 witnesses, approximately.  The -- I

21   have only the names of those.  The government has requested, I

22   believe, 72.  Just a minute.  Yeah, I have it here.

23        MR. MALONEY:  Yes, Your Honor, there are 72 witnesses

24   there.

25        THE COURT:  Okay.

1          MR. MALONEY:  We have included some of them, even

2    possible -- possible rebuttal witnesses.  We think at trial we

3    may be able to narrow the issues.

4          THE COURT:  I warned you.  It's not at trial that

5    we're going to make these decisions.  It's today.  Final

6    pretrial conference means what witnesses are you going to call?

7          MR. MALONEY:  And, Your Honor, those are --

8          THE COURT:  Did I make that clear?

9          MR. MALONEY:  Yes, you did, Judge, and those are all

10   the potential witnesses that we need the jurors to identify

11   whether they know or have conflicts with before they testify.

12   Some of them are trial case-in-chief witnesses.  We included

13   possible rebuttal witnesses, as well, in order to be thorough

14   and complete.

15         THE COURT:  Let me ask you -- have a seat.

16      The defendant's witness list is an additional 19 with an

17   additional 8 as possible impeachment.  Of course, the

18   impeachment witnesses they won't know whether to call until

19   you've had the direct testimony.  I do note that the defense

20   lists the defendant, W. Joseph Astarita, as testifying.

21   It's -- it says "the defense may call."  The last time I talked

22   to you, you said you hadn't decided.

23         MR. ANGELI:  That remains the case, Your Honor.  And,

24   of course, it will be Mr. Astarita's decision at the end of the

25   day.

1          THE COURT:  Say that again now.

2          MR. ANGELI:  It remains the case that we have not yet

3    decided, and, of course, it will be his decision at the end of

4    the day.

5          THE COURT:  That's fine.  That's not unusual.

6       Of your 72 witnesses that you've listed, can you tell me

7    for sure which ones are going to testify?  Would you like some

8    time to -- later on this morning to advise the Court?

9          MR. MALONEY:  If we could advise the Court later this

10   afternoon, after the pretrial rulings, that may provide some

11   clarity in which we can narrow the witness list, Your Honor.

12         THE COURT:  Normally, at the final pretrial

13   conference we have the list of the people and one sentence or a

14   small paragraph of what they're going to say.

15      Are you prepared to do that?

16         MR. MALONEY:  We can provide that to the Court.  I'm

17   not sure if I can get -- I can get that to you in writing

18   tomorrow morning.

19         THE COURT:  I don't need it in writing.  I just need

20   to know what they're going to say and who they are and whether

21   there's any objection to them.  That's what we -- we're here to

22   clarify.  So tomorrow morning won't work.

23      I'll cover Motion in Limine No. 119.  That is to preclude

24   the lay opinion of then-Police Officer Wes Murphy regarding the

25   left rear wheel of Finicum's truck.  I thought we had that

1    resolved.

2          MR. SUSSMAN:  Yes and no, Your Honor.  We still don't

3    have -- we still object to Officer Murphy testifying as to his

4    opinion as to whether or not the left wheel continued to spin

5    and for how long because we don't think he's qualified to give

6    that opinion.  However, they have since brought in an

7    automotive mechanic, who, assuming his qualifications pan out

8    at trial, probably would be qualified to testify to that.  So

9    we don't have an objection to the qualified automobile mechanic

10    testifying to that, but we don't think a police officer is

11    qualified to give that opinion testimony.

12          THE COURT:  All right.  Now, let's -- so we still

13    understand each other, you do not require anybody to testify,

14    expert or from lay experience, that when you have a stick

15    shift -- which we have; right?

16          MR. SUSSMAN:  Right.

17          THE COURT:  And that the -- you can have the motor

18    running and the wheels spinning at the same time, is that

19    correct, while in -- while in the snowbank?

20          MR. SUSSMAN:  With nobody behind the wheel of the

21    car?

22          THE COURT:  Yeah.

23          MR. SUSSMAN:  That's where I think we do need someone

24    with some expertise to testify to that, Your Honor, because

25    when we spoke with Officer Murphy, he started talking about

1    transmission differentials and all this other stuff.  We asked

2    him, "Are you a mechanic?"

3        He said, "No."

4        We asked him, "Are you an engineer?"

5        He said, "No."

6        We asked him, "Are you a trained accident

7    reconstructionist?"

8        And he said, "No."

9        He just has this general experience, you know, of having

10   driven for a number of years and having been stuck in the mud

11   one time, and we don't think that qualifies him to offer

12   opinions on what differentials do and whether one wheel can

13   continue spinning, even though others can't, with a manual

14   transmission that's stuck in the snow and nobody behind the

15   wheel.

16       Now, if they have a qualified automotive mechanic that can

17   testify to that, let the mechanic testify to that.  The officer

18   can testify what he saw, his personal observations.  We have no

19   problem with that.

20           THE COURT:  Which is what?  What he did see?

21           MR. SUSSMAN:  When the truck was removed from the

22   snow, he saw what was described as a rut underneath the left

23   rear wheel that had a coating of ice on it, and he saw what we

24   described as -- I think he called it scrapings, or something

25   like that, on the -- on the wheel.

1            THE COURT:  Is that what you've agreed to?

2            MR. SUSSMAN:  We don't have a problem with his

3    personal observations.

4            THE COURT:  Does that include wheel turning?

5            MR. SUSSMAN:  That's his opinion that goes on top of

6    that.

7            THE COURT:  Is that an opinion, or is it an

8    observation?

9            MR. SUSSMAN:  He doesn't observe the wheel turn.  He

10   wasn't there.  All he saw was -- he came hours later with the

11   rest of the investigators.  He reached a conclusion that the

12   wheel continued to spin for some time, and that's what caused

13   the rut, and that's what caused the freezing, and that's what

14   caused the scraping, and he opined that that could happen even

15   though all the rest of the wheels were firmly stuck up to their

16   axles in the snow, and that's what we think requires expert

17   testimony.

18           MR. ANGELI:  Good morning, Your Honor, we do, indeed,

19   intend to call --

20           THE COURT:  If you just remain seated and speak into

21   the microphone, please.

22           MR. ANGELI:  Will do.

23      Your Honor, we will be calling an expert witness, an

24   expert mechanic, to talk about the issues with the

25   differentials and the manual transmission and the like.

1    With respect to Detective Murphy, he's a 10-year member of

2  the Bend Police Department.  He's a detective.  He's been

3  extensively trained in crime scene processing.  He's lived in

4  eastern Oregon for apparently 50 years, and his testimony will

5  be, "I got there, and here's what I saw.  I saw when that truck

6  was pulled out there was smooth ice underneath the left rear

7  tire.  There was ice and snow that had been kicked up on the

8  sidewall of that tire, and that, to me, based on all of my

9  experience and training, is consistent with that left wheel

10  having spun for some period of time after the truck came to a

11  stop."

12    And we believe that that is heartland Rule 701.  It's a --

13  it's the lay opinion based on -- you know, as the Ninth Circuit

14  has said, a process of reasoning familiar in everyday life.

15  This is a detective who's going to say all of these things are

16  consistent with what I've seen in my life and in my career as a

17  police officer as being consistent with that wheel having spun.

18        THE COURT:  His experience is limited to wheels

19  spinning in some mud?

20        MR. ANGELI:  I think his experience -- all of us

21  probably, Your Honor, would draw that -- a similar conclusion

22  from the observations that he made, and he's been processing

23  crime scenes for ten years and --

24        THE COURT:  I'm not worried about that.  I am

25  concerned about what he saw at the time.

1    MR. ANGELI:  And that is what he saw at the time.  A

2  wheel --

3    THE COURT:  I'll limit him to what he saw at the

4  time.  Any conclusions beyond that, I'll take as an offer of

5  proof, and he'll either admit it or reject it at that time

6  after I've heard him.

7    MR. ANGELI:  Okay.  So we'll lay a foundation,

8  Your Honor, and then you'll make a decision?

9    THE COURT:  Yes.

10    MR. ANGELI:  Okay.  Thank you.

11    THE COURT:  Then, procedurally, somebody still asked

12  for an instruction on sidebar conferences.  I thought if I ever

13  communicated anything to anybody -- we never do that in this

14  jurisdiction.  Ever.  So we don't have sidebar conferences.

15    If you have something to take up with the jury, we have

16  the jury go into recess -- step out.  We don't have whispering

17  contests up here.  We don't approach the bench and offer this

18  and offer that.  That just isn't done.  So I hope we've made

19  that clear.  So that instruction will not be given, and we

20  won't go into that any further.

21    The next issue is the opinion of Officer 3 as to what he

22  believed or who fired the shot that hit the roof of Finicum's

23  truck.  My ruling is to exclude that as an improper -- just his

24  estimate or guess.  The -- unless somebody wants to be heard,

25  that's my ruling.

1          MR. ANGELI:  Your Honor, may I be heard briefly?

2          THE COURT:  Yes.

3          MR. ANGELI:  Okay.

4          THE COURT:  No, you can be heard.  That's -- I want

5  you to -- now is to be heard, brief or not.  Just say what's on

6  your mind.

7          MR. ANGELI:  There were two grounds upon which we

8  moved -- which we opposed the motion regarding Officer 3.  I

9  think I've heard Your Honor's ruling, so I won't break my pick

10  on the first ground, which is we think, based on the fact that

11  he was an eyewitness to the events, that he was looking at

12  Agent Astarita when the shots were fired, that he saw the

13  muzzle flashes from Officer 1's rifle moments later when he

14  fired the shots, that he was aware what the trajectory angles

15  were that were being measured on the truck, that based on all

16  of that body of knowledge in his 20-years-plus as a SWAT

17  officer, we think he's qualified, under Rule 701 and 702, to

18  offer that opinion.

19      But, second, Your Honor, the second ground that we argued,

20  I think the Ninth Circuit has made clear that we should have

21  some latitude to be able to explore the integrity of the

22  investigation and whether this was a biased investigation.  And

23  the fact that he made this disclosure to the investigators

24  while they were examining the truck, based on everything that

25  he knew, I think we're entitled to explore what the

1    investigators and the forensics people -- what, if anything,

2    did they do with that information?

3         And, interestingly, it's not even noted in the

4    investigative reports.  It fell out of the investigative

5    reports that he made this disclosure to them.  And so that's

6    the second basis.  Whether it's independently admissible as an

7    opinion, I think we're entitled to explore what the

8    investigators did, if anything, with this information when they

9    received it.

10        And just to give Your Honor a little bit more background

11   on this issue of the integrity of the investigation, there was

12   a press conference that was held in March of 2016 before the

13   grand jury ever even heard from a single witness in this case,

14   and at that press conference the Deschutes County sheriff, who

15   was leading this investigation, announced that he had concluded

16   that an HRT agent is the one who fired the shot.  And this was

17   just weeks after Officer 3 had offered his opinion to the

18   investigators.

19        And, subsequently, the grand jury proceeded and, to our

20   knowledge, did not call a single Oregon State Police officer to

21   testify in the grand jury.  Not one.  Again, notwithstanding

22   the fact that this person who has been training with Officer 1

23   for the last ten years, or so, and has been a SWAT member for

24   over 20 years offered his opinion.

25        So I apologize for the long lead-up, but --

1          THE COURT:  That's fine.

2          MR. ANGELI:  The second basis we're offering this is

3    on the issue of was this a fair and unbiased investigation.

4          THE COURT:  All I can say is it confuses the issues.

5    We're dealing with -- I'm not going to allow a lay opinion or

6    expert opinion as to who -- as to this witness's conclusions.

7    They will be excluded.  That is a -- all my rulings today will

8    be definitive unless I advise you to the contrary.  So that's

9    where we are.

10         The next defendant's -- the -- we're looking now at

11   Defendant's Motion in Limine No. 120.  By the way, I was

12   referring to Officer 3 under No. 130 of the government's

13   motions in limine.

14         I'm now turning to No. 120.  Motion to exclude testimony

15   overheard video regarding six missing shell casings.

16         Do you wish to speak to that?

17         MR. FRANCIS:  Yes, Your Honor.  Excuse me.  Yes,

18   Your Honor.  Tyler Francis for Special Agent Astarita.

19         Your Honor, this is a completely uncontrolled scene.  We

20   have vehicles driving through, people walking all over, and

21   plenty of people around during the daytime who would have been

22   in a position to see anything like what the government is

23   alleging happened here with these shell casings.

24         The government is arguing that evidence that someone

25   concealed evidence is admissible to show consciousness of

guilt, and it sure is, but first you have to show that someone actually concealed evidence. They have no evidence, none, that Special Agent Astarita picked up any shell casings from that scene.

Instead of evidence of that, they want the jury to speculate that he did. And if they can't do that, they want to take a shortcut. They want to argue it doesn't matter who picked up the shell casings as long as it was someone from the FBI. So they want the jury to conclude, number one, that Special Agent Astarita knew that someone else from the FBI had picked these up and that he, quote, acquiesced to those actions and therefore can be held responsible for them. And, again, without any evidence, and, frankly, without support in the law.

They go hunting for case law to support this guilt by association notion, and the case they come up with is if a co-conspirator murders a witness, then the defendant loses his confrontation clause rights. That's a far cry from what's happening here. They couldn't find some shell casings that someone saw earlier, so, therefore, someone must have stolen them. The FBI is looking for gear that they dropped, so they must have picked up the shell casings, too, while they're at it. And Special Agent Astarita worked for the FBI, so he must be responsible for anything they do.

Even if they can't prove he actually did anything himself, that chain of inferences that's required to make this testimony

1    relevant is simply too attenuated and it should be excluded.

2              THE COURT:  Your response?

3              MR. SUSSMAN:  Well, those are their interpretations

4    of the evidence, but the jury is entitled to draw its own

5    interpretations and its own inferences from the evidence.  And

6    the evidence is this:  There were shell casings on the roadway,

7    and they were seen on the roadway in at least two different

8    locations by several different officers or agents; and, yet,

9    when they went to collect those shell casings from the roadway,

10   they were gone.  And some of the shell casings that

11   disappeared, disappeared in an area right in front of a truck

12   that was parked in the middle of the roadway, but into the

13   southbound lane, that did not move at any time before the

14   investigators got out there to look for those shell casings, in

15   a place where there was no vehicular traffic going because of

16   the truck being in the way, in a place where the only people on

17   the scene were law enforcement officers.

18        This wasn't an uncontrolled scene where members of the

19   public were coming in and coming out.  That is a

20   mischaracterization.  This was a controlled scene where the

21   only people present were law enforcement officers, and,

22   frankly, once the two officers who had shot and admitted

23   shooting were removed from the scene, there were very few

24   Oregon state troopers there.  They were there on the perimeter

25   for scene security.

1          The people that were wandering around in the middle of

2     this crime scene, tromping in and out of this unsecured crime

3     scene, were HRT operators, and they can be seen on the overhead

4     video bending over, picking things up, looking under vehicles,

5     and all of this in an area where evidence from a crime scene

6     was located.

7          They took that stuff.  Those shell casings didn't pick up

8     and walk themselves off the scene.  They didn't go off the

9     scene in car tire treads because there were no vehicles going

10    through the area where at least some of those shells were seen.

11    They disappeared because somebody picked them up.

12         That's the inference we're going to ask the jury to draw,

13    and that's a permissible inference based on the evidence.  And,

14    for that reason, Your Honor, even though the agents may be able

15    to offer a different explain, such as "We were looking for

16    sensitive items" -- which, by the way, they didn't pick up and

17    were recovered on the scene -- then, you know, that's an

18    inference that they can raise, and that's an inference that the

19    jury is free to either accept or reject.  But the fact that

20    there are alternative inferences available does not make the

21    evidence of disappeared shell casings irrelevant or improper in

22    this case.

23              THE COURT:  Is there any evidence that the defendant

24    picked up any of the shell casings?

25              MR. SUSSMAN:  Defendant was one of the people seen on

1    the video wandering around in the crime scene.  We also know

2    that --

3              THE COURT:  What's the answer to my question?

4              MR. SUSSMAN:  Well, we can't see what was being

5    picked up because it's from the FBI video, but we know that he

6    was looking in the -- he and the other HRT operators were

7    looking in the area where shell casings had been.

8              THE COURT:  Other HRT operators are not the

9    defendant.  My question is directed at is there any evidence

10   that the defendant bent over or had anything to do with the

11   shell casings?

12             MR. SUSSMAN:  Well, we do know he was one of the

13   people out there picking stuff up and looking for stuff at the

14   scene at least, and we also know that --

15             THE COURT:  Now, you jumped two things.  Is there any

16   evidence that he picked up any shell casings?  Yes or no?

17             MR. SUSSMAN:  Do I have a witness who says, "I saw

18   him pick up the shell casing"?  The answer to that is no.

19             THE COURT:  Okay.

20             MR. SUSSMAN:  But we do have every other operator who

21   was there expressly deny picking up shell casings, and we know

22   that defendant approached a fellow operator and said, "Hey, did

23   you see anything on the ground?"  So we know he's looking for

24   stuff on the ground.

25             THE COURT:  Thank you.

1    We're not going to unscramble what happened at the scene.

2    What happened at the scene happened at the scene.  It has some

3    relevance, and the motion to exclude will be denied.

4    In respect to the next issue, motion to exclude Haag

5    testimony, that the defense team sought to retain him, that has

6    been agreed will not be brought up, unless, for some reason, on

7    challenging Haag's qualifications, the defense opens the door

8    for it.  That will be granted.

9    Motion to exclude Piazza's testimony, that the defense law

10   firm retained him in a previous case, the same ruling, that

11   will be excluded, unless -- which is not going to happen -- the

12   defense opens the door for that.

13   The next issue is to exclude the testimony from

14   Jeff Smith.  There's been no offer from Catalin Grigoras, that

15   I know of, regarding the method of identifying gunshot sounds

16   on audio recording, and Terpstra's method in producing his 3D

17   model.

18   Would you like to speak to that?

19   MR. FRANCIS:  Your Honor, I think we're closer on

20   this issue than we were when we started.  The government's

21   response makes it clear that there -- they may call

22   Professor Smith or Grigoras about other things they did besides

23   vouching for what Mr. Terpstra did.

24   To the extent that's their testimony, that's not the

25   subject of our motion.  Our motion had to do with the subject

1  of Mr. Smith's testimony, similar to his testimony at the

2  *Daubert* hearing, that was primarily to vouch for Mr. Terpstra.

3           THE COURT:  Do you agree?

4           MR. MALONEY:  We do, Your Honor.  To the extent --

5  and if we do feel that defense has opened the door to that

6  topic, we'll certainly bring it up to the Court prior to

7  inquiry.

8           THE COURT:  The objection would be sustained.  Thank

9  you.

10     Motion to exclude testimony from those not present at the

11 scene, narrating or commenting on what is depicted in the photo

12 or video exhibits.

13     We covered this in our previous hearing.  What I'm trying

14 to communicate, we don't want to have some person who wasn't

15 there tell us what is there.  What I expect that the government

16 will have, you will have people state, "I was there.  That's

17 me.  That's the defendant.  That's this.  That's that."

18     Shawna Cox has been listed as a witness; is that correct?

19          MR. SUSSMAN:  She is listed, Your Honor, yes.

20          THE COURT:  Is she going to be called?

21          MR. SUSSMAN:  Most likely not.

22          THE COURT:  The issue, then, is to give continuity to

23 the government's case that it would be helpful to the jury as

24 long as it's not offering evidence to simply introduce this is

25 the view from the fixed wings.

1        By the way, were they manned fixed wings or drones?

2              MR. SUSSMAN:  They were manned aircraft, Your Honor.

3   In fact, one of our witnesses is going to be one of the pilots

4   who shot the video.

5              THE COURT:  He will be able to introduce the video

6   that he shot.  The Cox video, I assume, can be -- it's already

7   been stipulated --

8              MR. SUSSMAN:  Correct.

9              THE COURT:  -- that she took the videos that are

10  offered, so all your -- the narration, I assume, would be just,

11  "We are now showing X."

12             MR. SUSSMAN:  Yes and no.  It will not be an instance

13  where we have someone narrating, "And this is Agent M and this

14  is Officer 3 and this is the defendant."  That's not the

15  purpose of the narration.

16      What we were talking about, Your Honor, is to bring out

17  certain details that might not be readily apparent to a casual

18  viewer.

19      To point out, for example --

20             THE COURT:  Who is on the witness stand?

21             MR. SUSSMAN:  For example, with Frank Piazza, we can

22  have him testify that he located frames in which debris is

23  visible coming through the roof of the truck.  Now, that's only

24  a few fleeting frames, and that could easily be missed by a

25  casual viewer.  He's seen that many, many times and has gone

1    through it frame by frame, and he can point out the specific

2    frames and point out the debris coming through the roof.

3              THE COURT:  Have him do so.

4              MR. SUSSMAN:  Right.  That's the kind of narration we

5    were talking about, not a running commentary.

6         On the infrared video, we were going to have someone talk

7    about what the infrared video characteristics are because it

8    looks a little different than your classic video, and we were

9    going to talk about things like, you know, pointing out someone

10   bending over to pick something up or looking underneath a

11   vehicle, things like that, that may be difficult to see.

12             THE COURT:  Well, you would have a witness, though,

13   do that testifying.  You know, "I was there.  This is what I

14   see."  I'm not sure that -- who is going to say that?  Who is

15   going to -- let's take Piazza.  Is he going to say, "Please

16   notice that this officer is on his knees looking for

17   something"?

18             MR. SUSSMAN:  Probably not.  It would probably be our

19   case agent, Your Honor --

20             THE COURT:  Oh.

21             MR. SUSSMAN:  -- who's seen that video hundreds and

22   hundreds of times.

23             THE COURT:  I can't imagine, but close.  All right.

24   This is fairly innocuous.

25             MS. PERINI-ABBOTT:  Your Honor, I think we're fairly

1    close with the government on this because the case law is clear

2    that an agent who's watched the video numerous times can point

3    out nuances that would be not caught by a casual observer.  So,

4    for example, the -- the described of it coming through the

5    roof, what Frank Piazza testified, we don't object to that.

6        What we do object to is if it's visible on the video that

7    somebody is bending down, the jury can see that someone is

8    bending down, and the case agent is no longer offering helpful

9    commentary.  They're just offering running commentary on what's

10   happening.

11       I think that that actually is the perfect distinction that

12   the cases draw.  The cases they cite of *Torralba-Mendia*, which

13   we also set -- that sets forth this principle, and *Begay*, both

14   involve the officers pointing out nuances in the video that are

15   beyond what the jury would just see for themselves.

16       So while we think that they could have Frank Piazza

17   testify that, for example, when the sparks come through, that's

18   a nuance that the jury -- the jury wouldn't see on their own,

19   they can't have a case agent say, "Now, look at the person

20   bending down," because that's something the jury can simply see

21   for themselves.

22           MR. SUSSMAN:  But there may be other things, Judge,

23   that the agent can point out to the jury that the jury wouldn't

24   know.

25           THE COURT:  Just ask the agent a leading question,

1    "Well, what do you make of this?"  I don't know.  It seems not

2    prejudicial to anybody to just have a very brief continuity

3    statement by the witness, and you can ask a leading question

4    for clarification.  Thank you.

5              MR. SUSSMAN:  Thank you, Your Honor.

6              THE COURT:  We're not going to have somebody looking

7    at all this and then have a running narration.

8        So the objection is sustained, essentially, that there

9    won't be any continuous statement by someone who wasn't there

10   as to telling us what's there.  That can be done through

11   witnesses.

12       The other thing is that the government is -- all you need

13   is to have the evidence in evidence by the time of your closing

14   argument.  You have -- you'll be replaying the key stuff that

15   you think is important, and you'll be able to make your own

16   statement.  "Now, look, this is what they're doing.  This is

17   what you should infer they're doing.  This is what they're

18   doing now."  You will cover all of that.

19             MR. SUSSMAN:  But there may be some things,

20   Your Honor, that I think the agent can testify to, that -- that

21   we would need the agent to testify to, such as, for example,

22   there are places in the video where you see what looks like

23   someone swinging a rifle back and forth, and you can't tell

24   what they're doing; but the agent, who's familiar with both

25   infrared videography and tactical operations, can say what

they're doing is they are combing the area with the flashlights

on the end of their rifles, and the rifle is slung right-handed

or the rifle is slung left-handed.

THE COURT:  And that's typical.  What I said is

innocuous.  That's fine.

MR. SUSSMAN:  Thank you.

THE COURT:  All right.  Now, the next thing is about

the shooting stance.  Again, all we're talking about is someone

saying, "He was holding a rifle like this."  To say, "He's

holding this like a shooting stance," well, where's the harm?

You know, you can have the witness say, "He's holding it like

this," or you can say "He's holding in a shooting stance," it

doesn't seem like that's prejudicial and that it's -- so they

can describe what they saw, and you can leave out "was this a

shooting stance?"  You could just say, "What did you see?"  And

we'll leave it at that.

So the answer is the witness can testify and physically

describe what the stance was, but we'll leave out the, quote

"shooting stance."  Again, I think it's not necessarily helpful

one way or the other.

The jurors will understand what the person's movements

meant.

Motion to exclude testimony.  Restrictions on the second

interview.  HRT operators.  My ruling is that will be

dismissed, and at the -- your request, and that the -- I want

 1    to make sure I say this correctly.  It's still evidence that

 2    the government can offer what he said, whatever the second

 3    interview was.  Do you want to state that for the record?

 4              MR. MALONEY:  Your Honor, I think we're conflate --

 5    we might have conflated two issues, and if we've confused the

 6    Court, we certainly apologize for that.

 7              THE COURT:  Maybe I'm confused.  I should apologize.

 8    But, anyway, go ahead.

 9              MR. MALONEY:  The second interview objection --

10              THE COURT:  The one I want is the one you agreed to

11    dismissal as long as you could show what was said.

12              MR. MALONEY:  These are the statements to Special

13    Agent -- Supervisory Special Agent IM.

14              THE COURT:  Count what?

15              MR. MALONEY:  Count 2, Your Honor.

16              THE COURT:  That's what I'm talking about.

17              MR. MALONEY:  Count 2 is different from the second

18    interview objection that counsel has brought.

19              THE COURT:  Oh, wow.  I am confused, then.  I was

20    confusing -- I was addressing the second count.

21              MR. MALONEY:  So as to the second count, we conferred

22    with defense counsel.  We understand their concession now is

23    that those statements relating to defendant's statements to

24    Supervisory Special Agent IM are admissible and relevant to

25    prove the other counts in the indictment.

1          THE COURT:  Right.

2          MR. MALONEY:  Accordingly, the government will move

3   to dismiss Count 2.

4          THE COURT:  That's dismissed.  Thank you.

5      All right.  Now let's go back to motion to exclude

6   testimony.  The second interview.

7          MS. PERINI-ABBOTT:  Your Honor, maybe I can clarify

8   what this motion is.  Before the second interview, there is

9   evidence that the government will put on.  It's contested, but

10  the government will put on evidence that Special Agent Astarita

11  and two other agents put certain conditions on their

12  willingness to be interviewed.

13         THE COURT:  Oh, okay.

14         MS. PERINI-ABBOTT:  We don't contest that the

15  government can put on evidence that they wanted to be

16  interviewed in a group and that it be unrecorded.  We're not

17  challenging that evidence being admissible.

18      We did challenge whether or not they could get into the

19  fact that Special Agent Astarita be asked to be represented by

20  counsel at that interview, and the government has conceded they

21  have no intention of bringing up that evidence.

22         THE COURT:  Good.

23         MS. PERINI-ABBOTT:  So the only issue still to be

24  decided on this motion is whether they can bring out the fact

25  that Special Agent Astarita asked that he not be asked

1    questions he had been previously asked without first being

2    given the right to look at his previous statements, and we move

3    to exclude that basically on pure relevance grounds and 403

4    grounds.  It's simply not relevant because that right was

5    afforded to every single law enforcement officer interviewed in

6    this case.  It's essentially a nonissue.  Everyone was given

7    that courtesy of being able to review their prior statements

8    before being asked questions again.  It's simply like asking to

9    have heat on in the interview room.  It's just not something

10   that affects whether -- what happened in that interview, in

11   terms of making it different from what the other interviews

12   were in this case.

13        And the jury may infer some type of malintent or

14   malfeasance in asking for it.  And because the probative value

15   is so low here, even that minor prejudicial value substantially

16   outweighs the minor probative value here in this situation, and

17   it should be excluded.

18             MR. MALONEY:  Your Honor, the defense has made clear

19   that they intend to challenge this as a biased and incompetent

20   investigation.  The conduct of the investigators, why they

21   asked certain questions and didn't ask other questions is

22   plainly going to be before the jury.  The jury may well

23   speculate that the -- the second interview was an incomplete

24   interview and not know why the investigators didn't pose all

25   these other questions to these witnesses collectively in this

1   group.  We think that it is relevant.  It is probative.  It's

2   directly responsive to one of the attacks on the investigation.

3   We ask that you deny the motion.

4           THE COURT:  Anything further?

5           MS. PERINI-ABBOTT:  I would just say that we don't

6   intend to specifically attack whether or not they asked certain

7   questions in the second interview, and if we did open the door

8   by raising such a specific question, then an answer like that

9   could come in, but it's not probative in the initial stance.

10          THE COURT:  Okay.  Thank you.  It's innocuous.  It's

11  not prejudicial to either side.  It will be allowed.

12      So the motion is denied.

13      The motion to exclude reference to anonymous facts, that's

14  stipulated; is that correct?

15          MR. SUSSMAN:  That is correct, Your Honor.  We are

16  not planning to introduce any evidence on that.

17          THE COURT:  That's granted.

18      Motion to exclude evidence that certain text and email

19  messages from HRT operators were not retained.

20      The government -- I have a note the government will elicit

21  testimony that the evidence is missing but will also make it

22  known that the failure to retain the messages is not

23  attributable to the defendant or HRT.

24      Would you like to be heard?

25          MR. CARY:  Yes, Your Honor.  We're very concerned

1  that that is prejudicial to Agent Astarita, that there will be

2  some notion or inference that the jury may draw that that is

3  some sort of conspiracy by the FBI, and in today's age, with

4  all the accusations in the media about the FBI, we think it's

5  very unfair, and we also think it's time-consuming and not

6  something we ought to be wasting our time with.

7          THE COURT:  I don't think it has any relevance to

8  what we want.  It will be granted.

9      Parties in the court --

10         MR. SUSSMAN:  Your Honor, if I may, on that?  Once

11 again, we just heard counsel a moment ago talk about this being

12 an incomplete and biased investigation.

13         THE COURT:  I heard it, but I'm not buying it.  We're

14 not going into testimony that this is a biased investigation.

15 I will hear offers of proof and so forth.  I have no intention

16 of clouding up the great issue on this case.  Did he fire the

17 weapon?  Did he lie about it?  That's where we're going to keep

18 it.

19         MR. SUSSMAN:  I guess the government is concerned,

20 Your Honor, that the jury might be left wondering why didn't

21 they check his text messages?  Why didn't they check his email

22 messages?  We want to be able to tell them we tried.

23         THE COURT:  They won't even get an opportunity to

24 submit that to the jury.

25     So the parties and Court should not describe expert

1    witnesses as "expert."  We've already covered that, but I -- we

2    give the expert testimony and expert testimony instruction

3    where you use the term "expert."

4        What I don't allow is to have a witness say, "Well, I was

5    described as an expert by Judge Brown or Judge Simon or Judge

6    So and So."  That's not going to be allowed.  But if the

7    parties -- you know who you're calling as experts.  You can

8    refer to them, but that doesn't -- I'm not going to anoint --

9    tell them that they're an expert or that they're qualified to

10   testify as a, quote, "expert."  You won't hear that.

11       So that's granted to that extent.

12       Now, the questionnaire is resolved.

13       The next thing I have are exhibits.  I have the government

14   challenges to defense exhibits.  How many exhibits is the

15   government offering?

16           MR. SUSSMAN:  Your Honor, I believe we have 263

17   exhibits on our exhibit list.

18           THE COURT:  Thank you.

19       And the defense, roughly?

20           MR. FRANCIS:  Your Honor, it's roughly -- it's

21   roughly 900 or 1,000.  But the vast majority of those are

22   photographs.  I would say 80 to 85 percent of those are

23   photographs.

24           THE COURT:  Well, they're still exhibits, but they --

25   so let's look at -- we'll go through.

1        Now, I hope I made it clear that at final pretrial

2   conference we settle all exhibit issues.  They are offered, and

3   we don't -- if there's any question about authentication, it

4   has to be done during final pretrial conference, not in front

5   of the jury.

6        So I need to talk about what are the exhibits that are not

7   going to be admitted.

8        Now, there was testimony -- there was objections that the

9   defense was going to offer excerpts from 60 Minutes and from

10  other videos and other media about the grueling training that

11  these HRT operators go through.  I now see that this has been

12  reduced to nine still photographs demonstrating various HRT

13  training exercises.

14       Now, first of all, we're not going to have portrayals --

15  and it's not even offered anymore -- about 60 Minutes and other

16  matters of the HRT and their heroics and so forth.

17       I would assume the defense has considered -- I mean, the

18  prosecution has considered, as to any objection, as to the

19  training of the HRT, is that this may work in the government's

20  favor because any trained HRT operator who's in a shooting

21  environment is going to give a straightforward answer, not use

22  ambiguous responses, and that they would automatically turn

23  their weapons over for inspection if they are following their

24  grueling training and their operation procedures.

25       But you're objecting to it, so let's clarify what you are

1    objecting to.

2              MR. SUSSMAN:  Well, Your Honor, we're not objecting

3    to testimony that HRT -- that the HRT selection process is

4    difficult and that they go through a tremendous amount of

5    training.  What we do object to is exhibits showing people

6    rappeling down the face of a waterfall, skydiving, people

7    standing around.

8              THE COURT:  Are these in the nine photographs?

9              MR. SUSSMAN:  Yes, they are, Judge, and I can tell

10   you exactly which one it is.  Defendant's 2336.  They are

11   rappeling down the cliff face of a waterfall.

12             MR. CARY:  I don't mean to interrupt.  We can save

13   everybody some time.  We'll withdraw those nine exhibits.

14             THE COURT:  Thank you.  Thank you.

15        Now, we will have the Finicum truck here for the

16   government?

17             MR. MALONEY:  Yes, Your Honor.  We intend to use

18   that.

19             THE COURT:  It will be down in the sallyport?

20             MR. MALONEY:  Yes, Judge.  Does the Court require an

21   order, to that effect, for a jury view?

22             THE COURT:  I thought -- I don't require, but maybe I

23   should --

24             MR. MALONEY:  I can file a written motion requesting

25   a jury view.

1           THE COURT:  -- for the marshals.

2       Is the marshal going to bring it over?

3           MR. MALONEY:  No, Your Honor.  I believe Deschutes

4   County Sheriff's Office is going to be conducting the

5   transport.

6           THE COURT:  Do you need anything further than my

7   order on the record?

8           UNIDENTIFIED SPEAKER:  No, Your Honor.

9           MR. SUSSMAN:  The only thing we're not sure of, I

10  guess, is whether the marshals will require the Court's

11  authority.

12          THE COURT:  I'll sign whatever is needed.

13          MR. SUSSMAN:  Thank you.

14      Your Honor, just for clarity's sake, those nine exhibits

15  are not the only ones the government is objecting to.  I don't

16  know when you want to take up objections to other exhibits.

17          THE COURT:  I'll take any other objections the

18  government has to defense exhibits, yeah.

19          MR. SUSSMAN:  All right.  Well, there's a number of

20  them, and I don't know the easiest way do this, but I guess

21  we'll just go exhibit by exhibit.

22      As a general matter, the defense has marked as exhibits a

23  number of police reports.  Now, we're in -- now, the authors of

24  those reports are also on the defense's exhibit -- or witness

25  list, and some of them are also on the government's witness

1  list.

2      Now, if those witnesses testify, of course, their reports

3  would be cumulative to their testimony.  So to the extent that

4  the officers or agents testify to the matters in the reports,

5  we would object to the reports as being cumulative under

6  Rule 403.

7      In addition, there's some hearsay issues with them.

8  There's personal identifiable information in a number of them.

9  There's a lot of problems with a lot of these reports.

10     For example, we've got the improper opinion testimony

11 which we continue to -- you know, with respect to Defendant's

12 Exhibit 2002.  That's Wes Murphy's report.

13     In 2004, there's a lot of personal identifiable

14 information in there.  There's also a complete list of all of

15 the items of evidence seized by the Deschutes County Sheriff's

16 Office.  I'm not sure how that is relevant.

17     In 2005, Supplemental Report No. 1 contains hearsay.

18     2006 is okay, but it's probably cumulative if Deputy Zilk

19 testifies.

20     2007, they've listed certain things as being redacted.  We

21 would need to see what the redactions are before we can --

22          THE COURT:  Well, before we go further, have you met

23 and conferred over these objections?

24          MR. SUSSMAN:  Not specifically.  No, Your Honor.

25          THE COURT:  Well, that's required.  How many more do

1   you have?

2           MR. SUSSMAN:  Quite a few.

3           THE COURT:  We're going to take our morning recess.

4   I'll require counsel to meet and confer, and we'll see where --

5   what timing we have for that.

6           MR. SUSSMAN:  Okay.

7           THE COURT:  But I try to make clear in final pretrial

8   conference that you are to meet and confer over exhibits so

9   that I have a list of precisely what exhibits are offered and

10  whether you met and conferred and whether there was any

11  objection; and, if so, the objections, so I can make a measured

12  response.  I don't have that.

13      I'm getting something that a report may have hearsay.

14  Well, as you know, police reports can qualify as either

15  business records or as public records under 803.6 and 803.10.

16  And as far as evaluative reports as to what is admissible and

17  what is not, you are all very familiar with that.

18      So I'm going to need exhibits as to what you agree to and

19  what you don't agree to, and, I don't know, we might have to

20  defer that until tomorrow.  So we'll see.

21      We'll take a recess now for 15 minutes.

22                      (Recess taken.)

23          THE COURT:  Good afternoon.  Have a seat.

24          MR. ANGELI:  Good afternoon, Your Honor.  I'm pleased

25  to report some progress on the exhibits.

```
 1              THE COURT:  Fine.

 2              MR. ANGELI:  May I be seated to walk through some of

 3    this?

 4              THE COURT:  Please do.

 5              MR. ANGELI:  Okay.  Your Honor, with respect to some

 6    of the defense exhibits, first, the defense has agreed to

 7    withdraw certain exhibits, and, with the Court's permission,

 8    I'll walk through those.

 9              THE COURT:  Put them on the record.

10              MR. ANGELI:  We've agreed to withdraw Exhibit 2004,

11    2010, 2012, 2016, 2017, 2025, 2026, 2027, 2036, 2046, 2048,

12    2066, and 2336 through 2344.  We've also agreed, Your Honor --

13    Exhibits 2028 through 2034 are learned treatises, and we've

14    agreed that those exhibits themselves, pursuant to the rule,

15    will not go back to the jury but that we may read excerpts of

16    them from the record, pursuant to the rule.

17              THE COURT:  That's fine.

18              MR. ANGELI:  We've agreed, Your Honor, to redact the

19    handwritten notes from Exhibits 2062 and 2063.

20         And then with respect to -- as Mr. Sussman was explaining

21    to the Court, many of our exhibits are police reports, and the

22    parties have agreed that those exhibits will come in but that

23    the defense will redact hearsay.  So if the report says, "I

24    heard from Officer X" something, we'll redact the hearsay, and

25    we'll also redact any personal identifying information --
```

1    telephone numbers, addresses, and the like -- for officers.

2          THE COURT:  Okay.

3          MR. ANGELI:  I think, Mr. Sussman, did I miss

4    anything?

5          MR. SUSSMAN:  Your Honor, just as a minor matter,

6    there are some questions as to one of the exhibits.  I think it

7    may be 2044.  I think the parties need to do a little bit more

8    research into that.  I think there may have been a page put in

9    the wrong place.

10         There's also another exhibit that had a missing

11   attachment that we're trying to run down.

12         And with respect to a couple of -- a couple of -- a couple

13   of their exhibits, one is an analytical report from

14   Tori Dickerson, from the state police crime lab, which is their

15   Exhibit No. 2056; and then there's also some field notes that

16   she took that have been redacted as well.  The parties have

17   discussed the fact that the redactions have to do with the

18   trajectory calculations that she did in this case.  The defense

19   redacted that because they felt compelled to do that in order

20   to preserve their objections to the admissibility of that

21   testimony.

22         However, we pointed out that if they seek to introduce

23   those exhibits as currently redacted, that the government will

24   be seeking to introduce the full unredacted versions under the

25   rule of completeness.

1            THE COURT:  Fine.

2            MR. SUSSMAN:  And then, Your Honor, one other issue

3    is with respect to Defense Exhibit 2051.  That is the key, the

4    code key, for the officers' names.  That's going to have some

5    redaction done to it.  But the parties were discussing that it

6    would be beneficial if there was a way that the key could go

7    back to the jury without being a part of a publicly available

8    record.  I don't think the parties had an objection to the key

9    going back so long as some of the reports that require it go

10   back to the jury, but we're just concerned with maintaining

11   officer confidentially in a broader, sort of, public context.

12           THE COURT:  It will be retained as you suggest.

13           MR. SUSSMAN:  I think that's it for the defense

14   exhibits, Your Honor.

15           THE COURT:  All right.  Now does that mean the

16   remainder of the exhibits will be received without objection?

17           MR. SUSSMAN:  Well, what we were talking about before

18   Your Honor was -- we were going to suggest that the Court

19   conditionally receive the exhibits, such that if they were

20   actually used in connection with witness testimony, shown to a

21   witness on the stand, then those exhibits that were used with a

22   witness or shown to the witness while on the stand would go

23   back to the jury; and if an exhibit was not used with or shown

24   to a witness, then it would not.

25           THE COURT:  We call that the Judge Marsh rule.  He

1    kept a record once of all exhibits that had been received and

2    nobody ever paid any attention to them or mentioned them again,

3    so of course.  That makes good sense, practical sense.  If

4    you're going to use it, fine; if you're not going to use it,

5    then it doesn't go in.

6            MR. SUSSMAN:  I mean, between the two of us, there's,

7    what, 1,100 exhibits, almost 1,200 exhibits.

8            THE COURT:  Yes.

9            MR. SUSSMAN:  I don't think anybody is intending for

10   that size of a pile to go back to the jury room.

11           THE COURT:  All right.  That's fine.  Anything

12   further on the exhibits?

13           MR. SUSSMAN:  I was going to say not on the defense

14   exhibits, I don't think; but there are some objections to, on

15   the part of the defense, to some of the government's exhibits.

16           MR. FRANCIS:  Thank you.

17       Your Honor, turning to the government's exhibit list,

18   these fall under a couple of different categories, so I want to

19   start with a number of objections that we have.  We

20   discussed -- everything I'm about to share with the Court we

21   discussed with the government already.

22       These are objections that we have to the government's

23   exhibits that we're making for reasons that we have already

24   articulated in previous motions.  The Court has ruled on these

25   issues already.  We're preserving our objection.

1       THE COURT:  Yes.  Well, the rulings that I made, you

2  don't have to raise again in front of the jury or even now, as

3  far as the *Daubert* rulings; but as far as any rulings today, I

4  said they all will be definitive rulings.  You don't have to

5  raise them in front of the jury to preserve your record.

6     So that's where we are on what you have to object to to

7  preserve your record.

8       MR. FRANCIS:  Yes, Your Honor.  What I'm specifically

9  doing is linking up those rulings to specific exhibits.  We

10 have specific objections.  We have not made a record on our

11 objections to these exhibits for the --

12      THE COURT:  Go right --

13      MR. FRANCIS:  -- reasons the Court has already

14 stated.

15    These are for -- these have to do with the Motion in

16 Limine No. 1 from the defense, the shell casings issue.

17      THE COURT:  Yes.

18      MR. FRANCIS:  On that basis, we object to Exhibits 2

19 and 3, in part, to the extent that they're used to depict or

20 argue anything regarding the missing shell casings issue that

21 we were discussing this morning and also Exhibit 16, in its

22 entirety, for the same reason.

23      THE COURT:  That's overruled, as I've stated.

24      MR. FRANCIS:  As to certain exhibits being used in

25 connection with Mr. Piazza, and this is Exhibits 6 through 15

1    and 17 through 20, we object to these documents for the reasons

2    that we've stated in our *Daubert* motion against Mr. Piazza;

3    namely, that these are enhanced videos with no record of what

4    he did to these videos to enhance them.

5            THE COURT:  I'll adhere to my prior ruling.

6            MR. FRANCIS:  And to exhibits relating to

7    Victoria Dickerson, Exhibits 98, 99, and 100, we object to

8    these as they depict trajectory measurements using the

9    centering cone method for the reasons we articulated during the

10   *Daubert* hearing.

11           THE COURT:  I reiterate my ruling.

12           MR. FRANCIS:  As to exhibits pertaining to

13   Michael Haag -- Exhibits 134, 138, 140, and 141 -- these

14   exhibits all depict Haag's trajectories using the rocker

15   method, and we object for the reasons previously stated.

16           THE COURT:  Same rulings.

17           MR. FRANCIS:  As to Mr. Turpen, Deputy Turpen,

18   Exhibits 129 through 132, we object to these exhibits for the

19   reasons we raised during the *Daubert* hearing and that

20   Mr. Turpen admits that his techniques meet literally none of

21   the *Daubert* factors.

22           THE COURT:  Same ruling.

23           MR. FRANCIS:  As to Mr. Terpstra, now, many of the

24   government's exhibits, in general, fall into this category.  We

25   object to all of them for the reasons we articulated during the

1    *Daubert* hearing.   Those exhibits are -- and I apologize.   It's

2    a lengthy list -- 36 through 46, 50 through 52, 165 through

3    167, 169 through 171, 173 through 175, 177 through 179, 181 to

4    184, 186 through 189, 191 through 193, 195 through 197, 199

5    through 202, and 204 through 246.   So we object to all of those

6    on the grounds that we previously argued during the *Daubert*

7    hearing.

8             THE COURT:   I adhere to my prior rulings.

9             MR. FRANCIS:   Now, we have another set of issues with

10   Terpstra's exhibits.   These fall into a different category.   We

11   are seeking a ruling from the Court today on the issue I'm

12   about to outline.

13            THE COURT:   Fine.

14            MR. FRANCIS:   These exhibits we strongly believe do

15   not and, frankly, cannot comply with the Court's *Daubert* order

16   that it did issue.

17       So this is the issue that we raised in our trial memo

18   regarding exactly what the government is trying to do in

19   response to the Court's *Daubert* order.   We had some concerns

20   about this based on what was produced to us during discovery by

21   Mr. Terpstra after the *Daubert* order.   And now that we've seen

22   what has been designated on their exhibit list, we felt we

23   needed to bring this to the Court's attention right away.

24       I brought some of these to show to the Court, which I

25   think I'm set up here to do.   It's a lot more helpful to show

1   you what it is we're talking about than to try to describe it

2   to you.

3           THE COURT:  I've been told that Terpstra has revised

4   his material.

5           MR. FRANCIS:  He has done so, Your Honor.

6           THE COURT:  Is that what I'm looking at?

7           MR. FRANCIS:  I'll be clear about what you're looking

8   at, but a portion of what I'll be showing you are exhibits that

9   were designated by the government and that come from revised

10  work that Mr. Terpstra has done after the *Daubert* hearing.

11          THE COURT:  Okay.

12          MR. FRANCIS:  Just so the record is clear on this,

13  I'm going to be discussing one set of images, but the arguments

14  I'm making apply to an entire category of exhibits that are

15  substantially similar.  So I would like to talk about this set

16  as an example, and, then, at the end, I will go into detail

17  about exactly what exhibit numbers we feel suffer from the same

18  problem.

19      So, Your Honor, what I'm showing the Court now is from

20  Mr. Terpstra's original report prior to the *Daubert* hearing.

21  This is what they started with.

22          THE COURT:  If you folks want to see these things,

23  you can go to the jury box and see it on the screens.

24      I think it's set up, isn't it, Becky?

25          DEPUTY COURTROOM CLERK:  It depends how they're

47

1  projecting it.

2          THE COURT:  Maybe they're not interested.  I don't

3  know.

4      Don't be shy, folks.  Just you came from -- you get up in

5  the jury box.  Go on.  Go on.

6      Thank you.  All right.

7          MR. FRANCIS:  All right.

8          THE COURT:  This is a revised --

9          MR. FRANCIS:  No, Your Honor.  This is what they

10  started with.  This is what was in Mr. Terpstra's original

11  report prior to the *Daubert* hearing.

12          THE COURT:  Okay.

13          MR. FRANCIS:  This is what they want to show to the

14  jury.  This is Exhibit 214 from the government.  This is

15  Exhibit 214, by comparison.  They want to go from this, the

16  original exhibit, to this.

17          THE COURT:  Okay.

18          MR. FRANCIS:  As a general matter, Your Honor, the

19  defense does not believe that this is in any way compliant with

20  the Court's order on what Mr. Terpstra is and isn't allowed to

21  do by placing individuals into this scene.

22      Going from this, which is the original lineup of people

23  from Mr. Terpstra's report, to this, which is

24  Government Exhibit 238, does not solve the problem and does not

25  comply with the Court's order that Mr. Terpstra's methodology

1  cannot accurately place the location of the individuals.
2  Taking their arms off and removing the legs of some people does
3  not solve the problem.
4      Now, this is Government Exhibit 30.  This is a still frame
5  from the FBI video.  If they want to show this to a witness and
6  have -- I'm going to zoom in on it here.  If they want to show
7  this zoomed-in version of Exhibit 30 to a witness and have them
8  identify where they are in this picture --
9           THE COURT:  We have to lower it.
10          MR. FRANCIS:  I can't, unfortunately, Your Honor.
11  This is a screen -- a screenshot of it zoomed in.
12          THE COURT:  All right.
13          MR. FRANCIS:  So if the Court will focus on this
14  area, on this -- on this area right here and try to -- you
15  know, we have the fuzzy splotches here, the fuzzy smudges, from
16  the video.  They don't want to show -- the government does not
17  want to show this exhibit to the witness and have them show
18  their location.  They want to show this exhibit, which is a
19  zoomed-in version of Exhibit 41, to a witness and have them --
20  take this image, which shows where Mr. Terpstra has placed
21  these people, and have the witnesses identify which of these
22  Mr. Terpstra positions corresponds to them.
23          THE COURT:  Go back.  The blue is defendant?
24          MR. FRANCIS:  Correct.
25          THE COURT:  Well, that --

1          MR. FRANCIS:  It's, of course, not just --

2          THE COURT:  Just leave it there for a minute.  That

3  can't be lowered?

4          MR. FRANCIS:  I can zoom it out so we can see

5  everything, Your Honor, and I have a picture that's going to

6  get to that in a moment.

7     And I -- I'm focusing here on the other two individuals,

8  besides the defendant, just -- just for clarity's sake.

9  Your Honor, it's not only the position of the defendant that is

10  the issue here.  It's the position of everyone who is -- who is

11  in this scene.

12         THE COURT:  All right.  Go ahead.

13         MR. FRANCIS:  So, again, the Court -- the Court's

14  ruling, as we understand it, makes it clear that Mr. Terpstra

15  can use camera matching and photogrammetry to place the

16  vehicles.  And if they want to overlay a trajectory even on top

17  of that, that's coming out from Mr. Finicum's truck, that's

18  fine too.  That's in compliance with the Court's order.  And

19  then if they want to take a scene, if they want to zoom in on

20  it and ask witnesses, "All right.  Where were you at the time

21  that Mr. Finicum got out of the truck?" and have them identify

22  their positions in a scene like this that has Mr. Terpstra's 3D

23  vehicles, that's one thing; but to start with their finger on

24  the scale by having Mr. Terpstra place those people into the

25  positions that Mr. Terpstra believes that they are using camera

1  matching and photogrammetry, we do not believe that that is in

2  compliance with the Court's order.

3      Our understanding of what they want to do here is to take

4  an image like this and show it to the jury and show it to the

5  witness, have the witness identify, "Hey, where are you in this

6  image?"  A better example of a leading question, I cannot think

7  of, because they've already placed the people into this image

8  before they show it to a witness.  The witness is going to, I

9  guess, bless where these people are, and eventually they're

10 going to come up with an image that looks like this.

11     This is Government's Exhibit 41, with Mr. Terpstra's

12 positions for each of these people as Mr. Terpstra placed them.

13 Just having a -- showing this to a witness and having a witness

14 say, "Yep, looks good to me," does not address the Court's

15 concern that Mr. Terpstra's methodology cannot accurately place

16 the location of the vehicles.  There's the reason -- "of the

17 people."  Excuse me.  I said "of the vehicles."

18     Now I want to talk about why this is a problem.  We're not

19 just fighting about how someone can indicate people on this

20 video what shape of circle or what color of circle they used.

21 The question is who gets to place these people and what does

22 Mr. Terpstra get to say to the jury about what those positions

23 mean?  What they want to do is have Mr. Terpstra place the

24 people and then testify that those are the true, correct, and

25 accurate positions of those people.

1    People that were placed using photogrammetry and camera

2    matching, that's exactly what this Court said they weren't

3    allowed to do.  Only by taking the position of these people as

4    accurate, is Mr. Terpstra then able to throw them into his

5    model and move the camera around so he can show the jury

6    pictures like this -- this is Government Exhibit 243 -- or

7    this, Government Exhibit 241; or this, Government Exhibit 240.

8    There are no photographs like this.  There is not even a

9    fuzzy smudge that corresponds with this angle or the previous

10    one, 241, or the previous one, 243.  There's no video frame,

11    fuzzy smudge, or otherwise, that shows anything from this

12    angle.  This is entirely computer generated.

13    You can't generate this image unless Mr. Terpstra is

14    permitted to use camera matching to, quote, accurately place

15    the location of the individuals into his model.  Again, that's

16    exactly what the Court said he couldn't do.

17    If you want to switch views, switch positions, get away

18    from the ariel overhead FBI plane view and switch to a top-down

19    view, for example, or an over-the-shoulder view, the only way

20    to do that is to do something like this.  This is Exhibit 237.

21    Now, this does comply with the Court's order.  This is,

22    again, a view that doesn't exist anywhere in photography.

23    There is no video frame that shows this image.  This is also

24    entirely computer generated.  But unlike the other images I've

25    shown you already, this only has the trajectory and it only has

1    the trucks.  That complies with the Court's ruling.

2        If they want to show this to a witness and have them draw

3    an X, "I was here," illustrate their testimony by saying, "I

4    started out over here and then I moved in some fashion as

5    things developed," that would be one thing; but they want to

6    show this picture to the jury instead:  Exhibit 245.

7        Again, this has Mr. Terpstra's positions for these people,

8    not the positions that these eyewitnesses would place

9    themselves in, and we know exactly what the government wants

10   Mr. Terpstra to say about this from their trial memo.

11       The government's trial memo, on page 13, "Mr. Terpstra,"

12   quote, "applied camera matching photogrammetry techniques to

13   position the vehicles, personnel, and trajectory measurements."

14       Further down the page, quote, "Mr. Terpstra created

15   visualizations to illustrate the movements and the positions of

16   the people."

17       Finally, quote, "The model clearly shows that the

18   defendant is the only person within the point of origin for the

19   bullet that caused impact W."

20       That is not illustrating the testimony of an eyewitness,

21   which the Court said the government could do, but that is

22   Mr. Terpstra purporting to testify that his methodology can

23   accurately place the location of the individuals.  That is

24   precisely what the Court said he couldn't do.  That's the only

25   way that Mr. Terpstra can say, "I know who is in the cone and

1    who is not in the cone."

2        As I said, Your Honor, I've shown one sequence of -- I've

3    shown a sample of images.  I have a list I can share with the

4    Court as we move further into this argument of all of the

5    exhibits that are infected with this same problem.

6            THE COURT:  Let's stop here and have the government's

7    response.

8            MR. MALONEY:  Yes, Judge.  If we could -- if we can

9    take control.

10       Judge, what the government attempted -- the government did

11   was, in an effort to comply with the Court's order and to

12   address some of the issues that came up with Mr. Terpstra's

13   testimony during the *Daubert* hearing, was to take multiple

14   frames from the FBI overhead video and apply those camera

15   matching techniques, the same ones that Mr. Terpstra testified

16   to during the *Daubert* hearing, to multiple frames of video, all

17   surrounding the time of shot "W" as identified by

18   Mr. Frank Piazza.

19       So what you see here, Your Honor, in the side-by-side view

20   on your viewer screen, is Government Exhibit 26 and 37.

21   Government 26 is the overhead video.  Government 37 would be an

22   exhibit that will help the -- help the jurors understand the

23   scene, help the witness to be able to demonstrate and

24   illustrate their testimony as to who was positioned where.  The

25   witnesses will be asked whether that is fair and accurate to

1   their recollection of the positions of the individuals at the

2   time that Mr. Finicum got out of his truck.

3         As the Court saw throughout the *Daubert* hearing, this

4   whole incident took place in those seconds as Finicum got out

5   of the truck, and that's what we've tried to capture here.

6         The next file in sequence.

7         So that was 26 and 37.

8         Here should be 27 and 38.  You'll notice the figures have

9   moved further along the timeline of events.  Again, this is

10  going to be used to demonstrate and illustrate the movement of

11  the individuals at or near the time Mr. Finicum got out of his

12  truck.  The colors are being applied so that it is clearer so

13  that the individuals can identify themselves and, to the extent

14  that they are able, to identify the other operators present and

15  moving through the scene.

16        Next figure, please.

17              THE COURT:  All right.

18              MR. MALONEY:  We have a whole sequence of these.  So

19  we're showing multiple things with this and demonstrating not

20  only just where they were at a certain point in time, but the

21  sequence demonstrates the movement through the scene, which is

22  probative and illustrative to the witness's testimony, and

23  these images help to explain their testimony and make things

24  clearer for the jurors.

25        Then we have Mr. Terpstra testify later in the case to

1    explain both the vehicles and the camera matching technologies

2    that he used for the placement of the vehicles and the

3    trajectories.  And to the extent that the witnesses are able to

4    identify where they were in the frames that we've demonstrated

5    for the Court, Mr. Terpstra will explain how he was able to

6    create these images that are in 26 and -- 26 and 37, 27 and 38,

7    and pair those images for the jury to explain what the 3D model

8    was able to create in terms of the demonstrative evidence.

9        If the Court is convinced that the government has met its

10   burden by a preponderance that we have now demonstrated that

11   the images from the 3D model and the 3D model are relevant and

12   reliable, we would ask the Court to reconsider the *Daubert*

13   hearing in light of the new eyewitness testimony and to admit

14   those exhibits.

15       In the absence of that, we still are within the ruling of

16   the Court to use those as demonstrative aids with the

17   witnesses, to explain how they -- how these images were

18   generated within the 3D model, and to show Mr. Terpstra's

19   manner in which he placed them.

20       I agree with counsel insofar as if the witnesses can't say

21   that that is fair and accurate to where they were, that

22   Mr. Terpstra's model would be limited to just the vehicles and

23   the trajectories.  But there's a critical component that we're

24   trying to harmonize with the Court's previous ruling, and that

25   is factoring in the eyewitness testimony.

1          We believe that these exhibits help demonstrate and

2     illustrate their testimony and will be helpful to the jury in

3     that regard.  To the extent the government has laid sufficient

4     foundation for admissibility based upon Mr. Terpstra's

5     testimony and the testimony of the eyewitnesses, we would ask

6     the Court to consider admitting them all in full.  In any

7     event, we can still use them, in part, as demonstrative

8     evidence.

9               THE COURT:  All right.  In respect to this matter,

10    you can still use the left screen and have the witness

11    identify, "Can you find yourself on this screen?"  The witness

12    find on the stand.  And I assume that in preparation for the

13    testimony, that you can use anything to refresh memory.  If you

14    remember what we used to say, you can use a ham sandwich to

15    refresh memory.

16         Anyway, the -- so you start with the one on the left and

17    say, "Please mark where you were, if you know, on that screen,"

18    and I assume the witness will be able to do that.  If so, all

19    they have to do is circle it.  On the other hand, if your

20    witness breaks down, then I have -- I think it might be -- I

21    think it's a close question as to whether you can show them the

22    right screen and say, "Does that refresh your memory?"  And at

23    that point they can say, "Yeah, that's me."  That is now

24    verified.  It's not Terpstra.  It's now verified as to whether

25    they can identify where they are.

1      But it will not come in as Terpstra saying this is X, Y,

2  Z.  Is that clear?

3          MR. FRANCIS:  That makes sense to us, Judge.

4          THE COURT:  Fine.

5          MR. MALONEY:  Just so the -- are we able to use the

6  right-hand screen with the witness?

7          THE COURT:  Not unless -- you start off, you'll use

8  the left-hand screen.  The witness should be, with proper trial

9  preparation, be able to identify themselves.  "Would you please

10  just use your finger and circle where you are on that screen?"

11  And that's all you need.

12      The position of the vehicles -- trucks, cars, et cetera --

13  are not in dispute.

14      So if they can't do that, then -- I'm considering it --

15  you put the other screen up and say, "Does that refresh your

16  memory?"  But "Where were you?" and not "Is that you?"

17          MR. MALONEY:  Understood, Your Honor.

18          MR. FRANCIS:  Your Honor, if I could make a clear

19  record, since we're referring to the left side and right side

20  of the screen here?  So the left side of the screen, which, as

21  we're currently looking at it, is Government's Exhibit 28, this

22  image and the other images similar to it, we have not objected

23  to any of those exhibits.

24          THE COURT:  Right.

25          MR. FRANCIS:  The image on the right side --

1          THE COURT:  Would you give us the number?

2          MR. FRANCIS:  That's Government Exhibit 28.

3          THE COURT:  Thank you.

4          MR. FRANCIS:  The image on the right side of the

5    screen currently displayed is Government's Exhibit 39.  That

6    image is -- just to describe it, is the view from the FBI video

7    with Mr. Terpstra's trucks and outlines overlaid on top of it.

8        As I indicated a few moments ago, Your Honor, I have a

9    list of all the government's exhibits which are similar to the

10   right side of the screen which use these outlines.  Those

11   exhibits are Exhibits 36 through 46, 50 through 52, 208 through

12   222, 223 through 236, portions of a video marked as

13   Government's Exhibit 207, and Exhibits 239 through 246.

14          THE COURT:  Thank you.  So I hope that we now -- the

15   preference, to keep this accurate, is to have the witness take

16   the original exhibit and circle where they were or where

17   anybody else was.  It might take two or three witnesses to

18   identify people.  If that doesn't work, you can use the other

19   one to refresh memory to see if they have it, and you just ask

20   the question, "Does that refresh your memory?"  And if so,

21   "Where were people, if you know?"  And they can verify it that

22   way.  But it's not coming in as Terpstra's interpretation of

23   where they were.  That's his credibility.  We have to have the

24   witness's credibility at stake.  That's what it is.  I don't

25   think we need to discuss that further.

1          MR. FRANCIS:  Thank you, Your Honor.

2       I have several final matters as regards to the

3    government's exhibit list.

4       Exhibit 134, we raised a different objection to this

5    earlier, but we also object to Exhibit 134 on the grounds that

6    it represents Michael Haag's entire report.  Mr. Haag will

7    testify his report is hearsay.

8       I don't know if we want to --

9          THE COURT:  Do you have a response?

10          MR. MALONEY:  Judge, you know, we're in a spot where

11    we're putting in all kinds of different expert reports.  We

12    thought that -- the government's position was if

13    Ms. Dickerson's report is coming in, in part, but then

14    eventually it's going to come in under the rule of

15    completeness, Mr. Haag's report, as it dovetails off of hers,

16    takes her information and refines it, would be admissible to

17    explain that.

18       We can do it through his testimony.  We just thought that

19    was going to be a cleaner way to do it so that the jury

20    wouldn't have questions, in their mind, as to why we have

21    reports from one expert and not the other.

22          THE COURT:  So what's before the Court?

23          MR. FRANCIS:  Your Honor, Victoria Dickerson's

24    report, as we've -- as we've offered it, doesn't contain any

25    expert testimony in it.  It's her observations and her

1    measurements.

2          THE COURT:  Measurements, right.

3          MR. FRANCIS:  Right.  Her observations and the

4    measurements, to the extent they're not -- they don't require

5    her expertise.  So our position is still that Mr. Haag's report

6    is hearsay.  And if they're going to put that on, they need to

7    put it on through his testimony.

8          THE COURT:  Well, Haag will be testifying about the

9    contents of his report, won't he?

10          MR. MALONEY:  He will, Your Honor.

11          THE COURT:  And then his report would be cumulative.

12          MR. MALONEY:  As would Ms. Dickerson's.

13          THE COURT:  Yes.  So the testimony is what counts.

14    Not the reports that they had made for pretrial discovery or

15    for the *Daubert* hearing.  So the reports -- if there's an

16    objection to the reports themselves, they don't come in.  But I

17    can't tell what you've agreed to and what you haven't at this

18    point.

19        I'll ask the defense which reports do you admit should

20    come in as helpful and which ones do you object to as

21    cumulative?

22          MR. ANGELI:  Your Honor, we don't think any expert

23    reports should come in.  And the document of Ms. Dickerson's

24    that we offered is not her expert report.  Before she offered

25    any expert opinions in this case, she was an investigator.

1          THE COURT:  The reports generally do not come in.

2    It's the testimony that comes in.

3          MR. ANGELI:  We agree, Your Honor.  We haven't

4    offered any expert reports.

5          THE COURT:  So my ruling is the reports do not come

6    in.  It's the testimony that the people have, not their

7    reports.

8       Okay.  That's where we are.

9          MR. FRANCIS:  Your Honor, the last issue we have to

10   deal with is Mr. Bundy's medical records and photos of

11   Ryan Bundy in the hospital.  The government has marked as an

12   exhibit the entirety of Ryan Bundy's medical records.  There's

13   absolutely no reason these need to be shown to the jury.

14         THE COURT:  Well, the photo of his wound is, though.

15         MR. FRANCIS:  The photo of his wound is?

16         THE COURT:  Admissible.

17         MR. FRANCIS:  Your Honor, with respect, we disagree.

18   There is no dispute that someone fired a round into the roof of

19   Finicum's truck and that that round made a bullet hole in the

20   roof of the truck, broke the window, and caused something to go

21   flying into Mr. Bundy's shoulder.  We would stipulate to all of

22   that.  There's no reason for the government to literally wave

23   the bloody shirt and show photos like --

24         THE COURT:  The photograph is relevant evidence.  It

25   will be received.

1          MR. FRANCIS:  Your Honor, there's a sequence of

2    photographs that they designated.

3          THE COURT:  One.

4          MR. FRANCIS:  They get one?

5          THE COURT:  One photograph of the wound.  No medical

6    report.

7          MR. FRANCIS:  Your Honor, the parties have agreed

8    that CVs for expert witnesses will not be admitted.  We did not

9    designate any on our -- on our exhibit list.

10         THE COURT:  The witness can briefly describe their

11   background.  We have one CV that was 72 pages long.  I was

12   amazed.  But, yeah, the CVs, you can either -- you can do it

13   two ways.  You can have a one-page report, a CV, that

14   highlights their background.  We don't need how many speeches

15   they gave to where and when and how many training missions did

16   they go to.  That's not helpful.  In fact, it's the opposite.

17      So let me suggest that you have a mini CV for each of the

18   experts.  So I'll save you from trying to agree to it all.

19   I'll so order it.

20         MR. FRANCIS:  That's fine, Your Honor.  Your Honor,

21   we separately agreed that the CVs would not come in.

22         THE COURT:  Well, I think a mini CV is fine.  That's

23   helpful for the jury to remember.

24      That's okay with you?

25         MR. MALONEY:  Yes, Your Honor.  If I could, could we

1    briefly revisit the Bundy medical record issue?

2              THE COURT:  What's in there?

3              MR. MALONEY:  There's a narrative from Mr. Bundy, his

4    chief history of complaint, where he recounts how he was

5    injured.  We'd like to admit that.

6              THE COURT:  That goes to a fact issue.  It doesn't go

7    into how his wound would be treated.

8              MR. MALONEY:  Your Honor, we also would like to admit

9    the portions where the doctor evaluated that injury and

10   determined that it did not need to be removed.  That goes to

11   explain why the government does not have possession of that

12   evidence.  We would also like to admit the radiograph image of

13   the 1.4 centimeter metallic object that is in Mr. Bundy.  We

14   think that explains the nature and the scope of the material

15   that is in his body.  And also --

16             THE COURT:  What do you claim it is?

17             MR. MALONEY:  Judge --

18             THE COURT:  It's not a bullet.  It's a fragment?

19             MR. MALONEY:  I can't say whether it's a fragment of

20   the bullet or --

21             THE COURT:  But what -- excuse me.  I don't mean to

22   interrupt you.  Go ahead.

23             MR. MALONEY:  I cannot explain to the Court whether

24   it's a fragment of a bullet.  I can't explain to the Court

25   whether it's a fragment of the roof or some other object of

1  debris that impacted him.  We know he stated in the video that

2  he got hit.  We know that he was on scene and refusing medical

3  treatment.  We know that the defendant was interacting and one

4  of the arresting officers with Mr. Bundy at the scene.  We will

5  prove, through witness testimony, that he actually moved

6  Mr. Bundy's cowboy hat from his head.  Those facts are

7  determinative to the circumstances under which the shots were

8  fired and when the defendant learned that the occupants in the

9  vehicle were injured and potentially injured as a result of his

10  shooting.  We believe that that could -- that the jury could

11  infer from that that it's at that point that Mr. Astarita

12  determined that he needed to pick up brass and he needed to

13  deny that he shot.

14      Those facts --

15          THE COURT:  Wait a minute.  What's that last

16  statement?  It's relevant to Astarita's state of mind about

17  what?

18          MR. MALONEY:  To Astarita's knowledge as to when

19  occupants of the vehicle reported being injured by gunfire.

20  That Mr. Bundy was reporting that he got hit and injured.  When

21  FBI went to treat him, he refused treatment and wanted to

22  transported to medical.  This is the medical treatment that he

23  received.

24          THE COURT:  So what has that got to do with the

25  shooting?

1          MR. MALONEY:  It goes to show when Mr. Astarita

2    learned that he had -- that he had injured someone inside the

3    truck.

4          THE COURT:  So what?

5          MR. MALONEY:  That's why he went to pick up shell

6    casings and one of the reasons why he denied -- he denied the

7    shooting.  It's against FBI policy to shoot into a vehicle.

8          THE COURT:  Oh?  That's the first time I've heard

9    that.  Do you have proof on that?

10         MR. MALONEY:  We will have witnesses and agents

11   testify that FBI policy is not to shoot into a vehicle.  FBI

12   policy is to shoot armed suspects or a driver of a vehicle.

13         THE COURT:  And those would be reasons why he did not

14   report it?

15         MR. MALONEY:  That's a reasonable inference that the

16   jury could draw.  Yes, Your Honor.

17         THE COURT:  Your response?

18         MR. FRANCIS:  Your Honor, the problem with that is --

19   I want to link this back up to the exhibit we're actually

20   talking about, which is the medical records.  There's no

21   evidence that Special Agent Astarita is aware of the medical

22   records themselves.  What the evidence they're talking -- they

23   want to put on evidence about what Special Agent Astarita

24   actually knew based on what he observed back on the scene,

25   that's one thing; but this medical record is taken at the

1    hospital where there's no evidence that the defendant knew

2    anything about -- about what happened at the hospital or that,

3    in fact, when he's complaining that he got shot he actually got

4    shot.  Their stated reason why this is relevant doesn't

5    actually link back up to the defendant at all.

6            THE COURT:  The ruling of the Court is definitive.

7    The photograph of the wound will be admitted.  The remainder of

8    the medical report is not relevant to the issues in this case.

9            MR. FRANCIS:  Finally, Your Honor, the parties have

10   agreed that Government Exhibit 16 -- we've objected to this on

11   other grounds.  Not -- without waiving that objection, this

12   exhibit can be shown as a demonstrative but will not go back to

13   the jury.

14           THE COURT:  That's which one?

15           MR. FRANCIS:  This is Government Exhibit 16.

16           THE COURT:  Which is what?

17           MR. FRANCIS:  Your Honor, I'll play it on the screen.

18      So this is a portion of the overhead video with a red

19   circle drawn around an individual that tracks this individual's

20   movements throughout the duration of the roughly

21   eight-and-a-half-minute video.

22           THE COURT:  What is wrong with that?

23           MR. FRANCIS:  Your Honor, our issue is with the

24   circle.  We don't think that should go back to the jury.  If

25   they want to use that as an aid -- in an aid of testimony,

1    that's one thing.  The government has agreed with this, and

2    they do not intend to send this back to the jury.

3            THE COURT:  Do you agree?

4            MR. MALONEY:  We would prefer to have this as an

5    exhibit.  We think it's helpful to the jury.  But it is a

6    mod -- it is an enhancement that Mr. Piazza did to a video

7    that's already in evidence, so we're happy to play it as a

8    demonstrative and leave if at that if that's the Court's

9    ruling.

10           THE COURT:  Leave it as demonstrative.

11           MR. FRANCIS:  Your Honor, that is it when it comes to

12   the exhibits.

13       I have one other issue I wanted to raise to the Court

14   while I still have the microphone, and it pertains to

15   Mr. Turpen.

16       The Court may have -- we raised this argument in our trial

17   brief as well, but understanding the Court's position, as

18   articulated in the *Daubert* opinion, but I think it's worth

19   pointing out that Mr. Turpen, indisputably, also relied on the

20   same fuzzy smudges that Mr. Terpstra was using in order to

21   place the people in his diagrams as well.  He relied on nothing

22   more than that.  He had no other information that he was

23   relying on that Mr. Terpstra did not have access to.  So we're

24   simply asking for consistency that Deputy Turpen's diagrams

25   also be subject to the limitation that they can only place the

1    location of individuals to the extent that eyewitness testimony

2    can put them there.

3              THE COURT:  What are we talking about?  What exhibit?

4              MR. FRANCIS:  Your Honor, this encompasses

5    Exhibits 129 through 132, as well as the testimony that would

6    go along with them.

7              MR. ANGELI:  We'll get them up for you in just a

8    moment, Your Honor.

9              THE COURT:  Okay.

10             MR. FRANCIS:  It will be this exhibit and one similar

11   to it, Your Honor.

12             THE COURT:  Well, the officer is going to be here.

13             MR. FRANCIS:  Yes.

14             THE COURT:  He will be testifying.

15             MR. FRANCIS:  Yes.  That officer is not an eyewitness

16   to any of the events that he's depicting in this diagram.

17             THE COURT:  This deals only with the placement of the

18   cars?

19             MR. FRANCIS:  Of the individuals, Your Honor.  Our

20   concern --

21             THE COURT:  Oh, I see what you now -- what you're

22   talking about, yeah.

23             MR. FRANCIS:  Your Honor, what we would be seeking is

24   something similar to what the Court has already articulated for

25   Mr. Terpstra.  If Deputy Turpen wants to put this diagram up or

1   if the government wants to put this diagram up with just the

2   cars and the trajectory and have people identify where they

3   were, fine.

4           THE COURT:  Well --

5           MR. FRANCIS:  But having Deputy Turpen place them

6   based on his viewing of the video and his viewing of the same

7   fuzzy smudges --

8           THE COURT:  I would have to have assurance from the

9   government that you would have a witness who would verify the

10  position of these people, and you're in a position to do that,

11  I think.

12          MR. SUSSMAN:  Well, first of all, Your Honor, this

13  was the subject of litigation at the *Daubert* hearing, and the

14  Court's ruled that this is admissible as it is.  It's already

15  that -- that's the Court's ruling, and that's in the order.

16      Second, Deputy Turpen described in some detail how he

17  placed those people there with reference to fixed objects, the

18  locations of which he knew, such as the corner of the vehicle,

19  the wheel of the vehicle, the centerline, the fog line, things

20  like that.  But I anticipate that we would have the same

21  witnesses who would be able to identify themselves in the FBI

22  video would be able to place themselves on these diagrams as

23  well.

24          THE COURT:  I thought that was my statement, is

25  you're going to have witnesses that can verify this, their

1   position.

2           MR. SUSSMAN:  I presume so.  With the exception of

3   the blue figure, who's Agent Astarita, who, of course, we can't

4   put on the stand to have him verify anything for us.

5           THE COURT:  But the other people can tell where he

6   was.

7           MR. SUSSMAN:  I would anticipate so, yes.

8           THE COURT:  Promise we have somebody to authenticate

9   these people either -- I don't know what the sequence is,

10  whether you're going to call Dickerson, Turpen, et cetera, or

11  the other way around.  As long as I have your assurance I'll

12  have an independent witness to identify from that exhibit where

13  those -- who those people were and where they were at that

14  time, that's all the Court wants.

15      I would just trust the prosecution to assure the Court

16  that that's going to happen.  That's all we need.

17          MR. SUSSMAN:  Well, then you have my assurance

18  because, if we can't -- if we can't establish it, obviously

19  we're not going to put that up there.

20          THE COURT:  All right.  Perfect.

21          MR. FRANCIS:  Understood.

22          THE COURT:  Okay.  Anything further?

23          MR. CARY:  Your Honor, one relatively minor thing on

24  exhibits, and that is we had understood that the exhibit

25  labels -- that we were using different number sets so that

1   there would be one joint set of exhibits and not government

2   exhibits.

3          THE COURT:  I thought that was settled?

4          MR. CARY:  We've done that.  But the government has

5   "government" exhibit labels on their exhibits.  Ours simply say

6   "exhibit."  And I know it sounds minor, in some ways, but

7   there's a traditional jury instruction that's given to address

8   the prejudice that one might have by there being different

9   labels, like the government owns those exhibits, and we would

10  ask that all the exhibits say -- simply say "exhibit" on them,

11  not "government exhibit."  And ours say "exhibit."

12         THE COURT:  Who is going to change the labels?

13         MR. CARY:  They're electronic, Your Honor.

14         THE COURT:  Well, I thought you had an agreement with

15  Becky that we just have the numbers and not who offered them.

16  A lot of them are -- could be offered by either side.

17     So any problem with that?

18         MR. SUSSMAN:  Your Honor, we're a week away from

19  trial now.

20         THE COURT:  What?

21         MR. SUSSMAN:  We're just a week away from trial now,

22  and I think it would be a little unseemly at this point to ask

23  us to relabel all of our exhibits.  We've got the burden of

24  proof here, and I don't see what the problem is with calling an

25  exhibit Government's Exhibit 1, Defense Exhibit 2000.

1        THE COURT:  All I ask, I thought you had -- that you

2   folks had agreed to just have them numbered without who offered

3   them.  But, traditionally, if you marked them, you've offered

4   them.  We call it your exhibit -- whatever they marked.

5        So considering the number of exhibits -- how many do you

6   have?

7        MR. SUSSMAN:  Well, with the removal of the CVs,

8   we're probably down to around 250.  I would guess somewhere

9   thereabouts.

10        THE COURT:  You have a thousand?

11        MR. CARY:  Yes, Your Honor.  All which simply say

12   "exhibit."

13        THE COURT:  I don't think changing who offered the

14   exhibit is going to make any difference to the jury at all.

15        Counsel can explain to the jury that many of these

16   exhibits were for both sides.  The simple thing would be just

17   to change your stickers.

18        MR. CARY:  We understand it's an electronic process,

19   Your Honor.

20        THE COURT:  I didn't know that.  Is that true?

21        MR. SUSSMAN:  Where they're being presented

22   electronically, I believe that is correct, Your Honor.

23        THE COURT:  Well, let's just keep it -- just it'll be

24   your exhibits.  We'll take off the "government."  Defense

25   hadn't labeled theirs, so we just have exhibits.  And even

1    mine, you don't have -- may I have your attention?  Can I hear

2    directly from your -- you can speak into the mic, please.  No.

3    Sit down and speak into the mic.

4            MS. HARRIS:  Your Honor, I approximate about a day of

5    my work because I have to remove the annotations and reapply

6    them.

7            THE COURT:  I just changed my mind.  We're not going

8    to fiddle around with -- this is minutia.  Not having to do

9    with anything the jury is going to do.  Just leave them as it

10   is.

11       My, what overwhelming argument that was.

12       All right.  Now, the next thing is that I have the

13   witnesses.  We have David Klinger.  I already expressed that

14   I'm concerned because he was not offered at the *Daubert*

15   hearing.  The defense did put on their statistician, so I don't

16   know why Klinger wasn't put up at that time.  I also am

17   concerned that without some issue being raised by anybody that

18   they don't have a present memory of what shots were fired

19   except, I think, one witness said he wasn't sure.

20       So do you want to state on your case for Klinger?

21           MS. FERGUSON:  Yes, Your Honor.  Meghan Ferguson,

22   speaking for the defendant, with respect to the issue of

23   Dr. Klinger's proposed --

24           THE COURT:  By the way, good luck.

25       This is -- she's going for surgery.  This is Edie Greene's

sister.  Edie Greene was the co-author with Elizabeth Loftus,
and sometimes Geoffrey, and a whole spew of these forensic
psychologists, of which Klinger is also.  So all I can say is
that when we got into the eyewitness testimony, which these
were famous for, the unreliability, the psychologists would
talk generally about there's an issue in this case about the
reliability of eyewitness testimony, but they would not check
the individuals that were involved in the bank robbery or the
assault and so forth.

I understand that you're trying to put Klinger in that
slot, in that posture; but, in this case, other than one
witness saying, "I'm not sure how many rounds I fired," I
haven't heard any evidence that there's going to be a question
of someone being traumatized to the point they can't remember
even firing a weapon.

So you've got my somewhat biased opinion.

Go ahead.

MS. FERGUSON:  Yes, Your Honor.

Special Agent Astarita's ability to present a complete
defense, including the proposed testimony of Dr. Klinger,
implicates his Fifth Amendment right to due process and his
Sixth Amendment right to the effective assistance of counsel
and the basic fairness of this trial.  And the Court is correct
in that Dr. Klinger's testimony will not be offered to prove
that any specific officer on the scene experienced sensory

1    distortions or memory gaps; but it will be helpful to the jury,

2    however, for Dr. Klinger to explain for jurors who may be

3    unfamiliar with these phenomenon that are commonly experienced

4    by officers, to explain how it is possible that each of the

5    three potential shooters on that roadway may each sincerely

6    believe that he did not fire shots four and five.   It is

7    important for the defense to be able to demonstrate this and

8    for Dr. Klinger to be able to explain his research to jurors

9    who may be totally unfamiliar with the kinds of distortions and

10   recall issues that -- that the -- that his research and other

11   research demonstrates that officers do commonly experience in

12   these kinds of events.

13        And your -- the Court mentioned expert testimony regarding

14   eyewitness identifications.  The Ninth Circuit has also, in the

15   context of child sexual abuse victims, allowed experts to

16   testify generally without conducting specific interviews of

17   parties involved in those cases regarding scientific studies

18   that point to general characteristics that can be experienced

19   by victims that would help to explain, for example.

20            THE COURT:  In all those cases, the child was shown

21   not to be able to articulate what happened.

22        Is there any showing in this case that any of these

23   officers are unable to articulate what happened?

24            MS. FERGUSON:  I think the evidence will show, for

25   example, Your Honor, that there are, on the part of officers,

1   an inability to recall having fired.  All of these officers --

2           THE COURT:  Any one of the three?

3           MS. FERGUSON:  Well, each of the three officers have

4   denied taking shots four and five, and so, therefore, do not

5   recall taking shots four and five.  And at least one of the

6   officers who took multiple shots, I believe, wasn't able to

7   specifically recall the precise number of shots that he did

8   take.

9           THE COURT:  I remember that one, yeah.

10          MS. FERGUSON:  And Dr. Klinger's research does speak

11  to the specific issue of round count.  His research shows that

12  officers are often unaware of how many rounds they fired and

13  often undercount their rounds when they fire multiple shots.

14      His research also does indicate examples of officers who

15  were not aware, at the moment they pulled the trigger, that

16  they were pulling the trigger, and it was only after external

17  cues basically told them "I must have pulled the trigger" that

18  they realized that.

19      In this case, we don't necessarily have external cues.

20          THE COURT:  All right.  Anything further?

21          MS. FERGUSON:  No, Your Honor.

22      Oh, sorry.  With respect to the timing, the defense has

23  already indicated, in correspondence with the Court, that we

24  did not understand the Court's order from October of 2017 to

25  impose a requirement of simultaneous expert disclosure.  We do

1   not believe Federal Rule of Criminal Procedure 16 contemplates

2   simultaneous disclosure.

3          THE COURT:  Well, I can tell you this:  I have done

4   dozens, if not hundreds, of *Daubert* evaluations.  We always do

5   them together.  It's a pretrial matter.  At the same time.  Not

6   necessarily that -- when I say "together," that they can

7   testify separately, but we clear the expert *Daubert* issues

8   in -- that are going to come into trial.  So when you say the

9   rule doesn't contemplate it, well, the practice certainly does,

10  and so that's where we are.

11     I would prefer to not have an issue come up, with respect

12  to counsel, to think that you didn't have to disclose your

13  expert witnesses for the *Daubert* week we set aside, so I'm

14  trying to avoid that issue.  But let's hear from the defense --

15  I mean, the prosecution.

16         MR. SUSSMAN:  Well, in terms of timing, Your Honor,

17  they've known from the outset what this case is about.  It's

18  been going for a long time.  And we served them with a

19  discovery request way back in February where we asked for

20  expert discovery.  They didn't give us anything.  They told us

21  they would give it to us along with their *Daubert* motion, and

22  the discovery we got with the *Daubert* motion were just the

23  witnesses we heard from at the *Daubert* hearing.

24     And we didn't learn until just three weeks before the

25  trial about a criminologist and about a psychologist, who they

have since said will not be testifying, and about their new statistician, who is different than the one that testified at the *Daubert* hearing.

We also heard for the first time about their mechanic, but that is something that arose for the first time at the *Daubert* hearing.  We don't have an issue with that.

The point is if it's going to be a -- could someone have fired without knowing about it?  That's been in this case from the outset, and there's absolutely no reason why this shouldn't have been brought up at the beginning of this case, and there's no reason why it couldn't have been brought up at the beginning of this case.

But the point is that the Court has noted there is no evidence, not a shred of evidence, that have any of these officers fall into the kind of sensory distortions that Professor Klinger says sometimes happen.  There was not a single one of those perceptions, at least as I read the article, that occur in a majority of the cases.  Most of them were somewhere between 35 and 50 percent, and there's no indication that they occurred in this case.  And especially when you consider all of the people out at the scene were very experienced, very highly trained tactical officers, and there's nothing that I saw in his research that suggested that those people were particularly or more susceptible to the sort of sensory perception distortions.

1    And so that being the case, Judge, it just doesn't fit the

2    facts of this case.  It's not helpful to the jury to have

3    somebody come in here and say, "Well, it could happen.  We

4    don't know if it happened in this case, but it's possible.  It

5    happens sometimes.  We don't know if it happened here, but it's

6    possible it could happen sometimes."

7         It's just not helpful, Judge.

8              THE COURT:  As I stated before, there's no evidence

9    that anybody, with the exception of the one who didn't know how

10   many rounds he fired -- he certainly knew he was firing.  It's

11   not an absence of "I didn't know I was -- my gun went off."

12   There is no evidence that would justify the Court in allowing

13   generalities of possibilities of something being the case.

14        On the other hand, some -- in the trial, if the defendant

15   gets up and testifies that he has no memory -- he may well have

16   fired the shots in dispute, but he has no memory of it -- that

17   it's blocked out -- well, that isn't before the Court, and I

18   don't know if it is going to be.

19        I don't have to speculate it.

20        So I'll wait and hear whether the defendant is going to

21   testify; and, if so, if he's going to testify as to this

22   particular issue.  It will be excluded unless a foundation is

23   laid.

24        Now, in respect to the -- that's a definitive ruling, to

25   the extent it's possible.

1          When I say "it's definitive," unless the landscape changes

2   with the testimony that would justify its admission, but

3   certainly not on the record before the Court.

4          I really can't express my gratitude to the lawyers for the

5   efforts you put in.  It's just been a wonderful experience to

6   have such competency from both sides.  Particularly with

7   complicated litigation like this, the work has been superb.  I

8   include in that, your offer -- your submission of the

9   instructions.  I'll give the preliminary instructions, but the

10  issue is as to what am I going to instruct on and as to which

11  counts?  I would like to make a definitive ruling on the counts

12  before we appear before the jury.

13         What is your position on Count 2?

14              MR. SUSSMAN:  Your Honor, we moved to dismiss that

15  this morning, and you granted it.

16              THE COURT:  I know.  I wanted to verify it.

17         Are there any other issues to be dismissed?

18              MR. SUSSMAN:  Not at this time.

19              THE COURT:  All right.  Is there some issue as to it

20  at another time?  Are there some soft issues that you would

21  rather not get into?

22              MR. SUSSMAN:  Your Honor, we think -- well, we're

23  convinced that the remaining counts are each properly charged

24  as separate counts.

25         Now, one of the things that defendant has asked for in

1  their trial brief is that you reduce this entire case to a

2  single count.  But you can't do that because there are two

3  separate substantive offenses, different statutes with

4  different elements, and we can't just make one of them go away.

5           THE COURT:  No.  But take your hearings, your

6  interviews, just -- you know, this morning we got whether we

7  talk about a count or whether we talk about an interview --

8  Interview No. 2 and Count No. 2 -- and they weren't the same.

9       So run through it, step by step, as to what is left as to

10  the interviews.

11           MR. SUSSMAN:  All right.  Well, there were two

12  interviews with Oregon State Police detectives.  The first on

13  the night of the shooting itself, and the second --

14           THE COURT:  Well, no, but what was said at that

15  interview by whom and to whom?

16           MR. SUSSMAN:  Well, that -- those were individual

17  interviews, Your Honor.  Each of the operators spoke to the

18  state police detectives individually.

19       On the first interview, Mr. Astarita went into some detail

20  talking about the events leading up to the -- the incident at

21  the roadblock.  He described how Mr. Finicum's truck came

22  accelerating rapidly toward the roadblock; how he was convinced

23  that the truck was not going to stop; how he believed everybody

24  was there -- that was there, all the law enforcement officers,

25  were in danger; how at the last minute Mr. Finicum's truck

1    swerved off into the snowbank, narrowly missing Special

2    Agent JN.  Mr. Astarita firmly believed at the time that JN had

3    been struck and might be dead.

4         He talked, you know, about knowing that the occupants of

5    the vehicle were armed and believed to be dangerous.  He talked

6    about hearing -- he talked about hearing no shots fired until

7    the time when Mr. Finicum ended up being shot and killed by one

8    of the state -- by the state police officers.

9         He never mentioned during that interview that he had

10   fired.  He never mentioned during that interview that he had

11   picked up brass.

12              THE COURT:  Did anybody ask him?

13              MR. SUSSMAN:  Not specifically because --

14              THE COURT:  Well, that's the problem.

15              MR. SUSSMAN:  Well, let me finish, please, if you

16   would, because they were told at the outset that no HRT members

17   fired, and that was based on the earlier statements that were

18   told to Supervisory Special Agent IM and Supervisory Special

19   Agent BM, and so the -- those initial lies ended up triggering

20   the statements to the state police detective saying none of the

21   HRT guys shot.  They were only witnesses.

22         And so that -- so that is what happened at that end.

23              THE COURT:  Well, that wasn't -- what did the

24   defendant say about shooting at that first interview?

25              MR. SUSSMAN:  He did not say he shot at that first

1   interview.

2           THE COURT:  He didn't say anything.

3           MR. SUSSMAN:  Right.

4           THE COURT:  But he said all sorts of other things.

5           MR. SUSSMAN:  Yes, he did.

6           THE COURT:  He's charged with lying.

7           MR. SUSSMAN:  Engaging in misleading conduct.

8           THE COURT:  Well, now, are we talking about a lie, or

9   are we talking about obstruction of justice?

10          MR. SUSSMAN:  We're talking about one in the same.  I

11  mean, the charges --

12          THE COURT:  No, they're not the same.  They're

13  separate counts.

14          MR. SUSSMAN:  The charge is obstruction of justice by

15  engaging in misleading conduct.  Misleading conduct is defined

16  in the statute in several different ways.

17          THE COURT:  If you're offering that under the

18  obstruction of justice, that's one thing.  I'm asking you about

19  the lies that he affirmatively denied shooting.

20      Now, we know at the beginning he didn't affirmatively deny

21  shooting.  He said, "You can't ask me that now, bro," et

22  cetera, or a similar account.

23      That is not a specific confession "I did not shoot."

24      Then we have this interview that we talked about.  Again,

25  he did not affirmatively say, "I did not shoot."  But there

1  were other occasions where he did, and that's what I want you

2  to tell me.

3           MR. SUSSMAN:  Oh, okay.  Sorry.  I misunderstood you.

4       The case in where he affirmatively said, "I did not

5  shoot", first of all, were made to his direct supervisor,

6  Supervisory Special Agent BM, who said, "Are you okay?" and

7  "Did you shoot?"  And he affirmatively said, "I did not shoot."

8           THE COURT:  Right.  That was at the scene.

9           MR. SUSSMAN:  That was at the scene, and that's

10 Count 1 of the indictment.

11          THE COURT:  Fine.

12          MR. SUSSMAN:  Then sometime later, within the next

13 few days, Supervisory Special Agent TS again approached

14 Mr. Astarita, along with BM and JN, and asked each of them, "Is

15 it possible that you may have shot and not realized?  Because

16 if you did, we need to tell them."  And to a man, according to

17 TS, each of them specifically and explicitly denied shooting.

18          THE COURT:  Including Astarita?

19          MR. SUSSMAN:  Including Astarita.

20          THE COURT:  Okay.  Now you've got the two.

21          MR. SUSSMAN:  That's Count 3.

22          THE COURT:  Then where do you go from there?

23          MR. SUSSMAN:  Now, in between those two instances,

24 after the lie to BM but before the lie to TS, Astarita is

25 interviewed by the state police, and that -- for that

interview, he's charged with obstruction of justice based on
misleading conduct, because the state police officers are not
federal law enforcement, and so 1001 doesn't fit.

THE COURT:  So you're count what?

MR. SUSSMAN:  That's Count 4, Your Honor.

THE COURT:  Yeah.

MR. SUSSMAN:  The second interview with the state
police on February 6 is Count 5, and that's, again, obstruction
of justice by engaging in misleading conduct.

THE COURT:  Perhaps I'm losing counts.  If we exclude
the ones where he didn't expressly say, "I did not shoot,"
which -- the ones he did say, "I did not shoot," are the lying
ones.

MR. SUSSMAN:  Correct.

THE COURT:  They are Counts 1 --

MR. SUSSMAN:  And 3.

THE COURT:  -- and 3.  2 is gone.

MR. SUSSMAN:  2 is gone.

THE COURT:  So 4 and 5 are obstruction of justice?

MR. SUSSMAN:  Correct.

THE COURT:  That's what I wanted to know.  Thank you.
Now, your response, anybody?

MS. FERGUSON:  Yes, Your Honor.  So the government
has to -- has agreed to dismiss Count 2, which is one of the
three false statement counts, but that still leaves two false

1    statement counts and two obstruction of justice counts; so four

2    criminal lying charges in total.

3            THE COURT:  Wait now.  Wait now.  The lying counts

4    are No. 1 and --

5            MS. FERGUSON:  3.

6            THE COURT:  -- 3 okay.

7            MS. FERGUSON:  Yes, Your Honor.  So two false

8    statements counts, 1 and 3; two obstruction counts, 4 and 5;

9    four criminal lying charges in total.  And that's still three

10   too many criminal lying charges, because where there is one

11   alleged lie and one alleged impairment stemming from that lie,

12   as a matter of law, that supports one crime -- one charge of

13   criminal lying.  So we've asked the Court in our trial memo,

14   and I ask the Court now --

15           THE COURT:  You asked for that pretrial, and I

16   already ruled on that when you moved to dismiss the indictment

17   for multiplicity, so I -- your position is the same?

18           MS. FERGUSON:  Correct.  And --

19           THE COURT:  That's the thing that I -- that I think

20   the -- I don't dismiss -- I won't grant that on grounds that

21   there involves similar -- same or similar conduct or

22   multiplicity counts.  I've already covered that.  But I am

23   concerned about the obstruction of justice.  I'm not concerned

24   about the two lying counts.  That's fine.

25       The obstruction of justice counts, though, when somebody

1    is siting in a room and they're asking everybody, "Did anybody

2    shoot?" and he doesn't stand up and say, "I did" or "I

3    didn't" -- he doesn't say anything -- my issue is how can that

4    be obstruction of justice?

5            MS. FERGUSON:  Yes, Your Honor, and for the reasons

6    stated in our motion to dismiss, we do believe that that's a

7    problem, especially with respect to Count 5, where the

8    definition of "misleading conduct" requires there to be a false

9    statement or at least there to be a statement from which

10   something is omitted that makes it misleading.

11       And so with respect to the second interview, if there's

12   silence on the part of defendant, that does not satisfy the

13   definition of misleading conduct.

14           THE COURT:  That's my feeling.  I want to hear the

15   government's response on obstruction of justice.

16           MR. SUSSMAN:  Well, first of all, we don't agree with

17   the defense that the defendant said nothing.  There was a

18   characterization by a detective who --

19           THE COURT:  Well, they say he didn't talk as much as

20   he did before, but he -- when asked to state, "Did anybody

21   shoot?" he said nothing.

22       That's my recollection of the evidence.  Do you want to

23   correct that?

24           MR. SUSSMAN:  That is an incomplete understanding of

25   the evidence, Judge.

1       You haven't heard the evidence yet.  That's the problem

2    here.

3              THE COURT:  Well, let's hear what you've got.

4              MR. SUSSMAN:  Well, we have testimony from a state

5    police detective who, as a matter of fact, conducted both

6    interviews.  He was one of the two detectives, was the same in

7    each interview.  And that detective will testify that at the

8    outset of the second interview he -- and this is the group

9    interview where they're all standing together in the gym.  He

10   sets up a laptop computer on the bleachers and he shows the

11   overhead video from the FBI surveillance plane, and he stops it

12   about the time shots four and five happen.  And he says, "All

13   right.  Look, guys.  The DA has already said that the shots we

14   know about are justified.  We just need to clear up who fired

15   the unattributed shots."  And we looked at all of them, and he

16   said, "Did any of you shoot?"  And they all denied shooting.

17             THE COURT:  Right.  They didn't deny shooting.  They

18   didn't say anything.

19             MR. SUSSMAN:  No.

20             THE COURT:  At least as far as the defendant is

21   concerned.

22             MR. SUSSMAN:  Well, as far as --

23             THE COURT:  He did not deny shooting.

24             MR. SUSSMAN:  He was right there.

25             THE COURT:  Well, he did not deny shooting, correct,

1    except by inference?

2             MR. SUSSMAN:  Well, Agent BM, you know, said --

3             THE COURT:  Come on now.  Let's --

4             MR. SUSSMAN:  I'm trying to get there, Judge.

5             THE COURT:  Did he open his mouth and say, "I did not

6    shoot"?  Did he say that?  Yes or no?

7             MR. SUSSMAN:  One second.

8             THE COURT:  Come on.  Don't get so hung up on your

9    advocacy that you're blurring the facts.

10        Well, let me put it this way:  The evidence that I deduce

11   will be forthcoming.  And your offer of proof is that they had

12   everybody there.  They're trying to find out about the shots in

13   dispute.  They've cleared out the shots that killed Finicum.

14   And they said, "Now, did anybody here shoot those two shots?"

15   And the defendant said -- did not say.  The defendant did not

16   say, "I fired those shots" or "I deny firing those shots."

17            MR. SUSSMAN:  What we have in the report from the

18   detective, Your Honor, is that it said none of them admitted

19   shooting.

20            THE COURT:  Okay.  That's where we are.  So he didn't

21   deny it, as in words.  He may have by inference of his conduct.

22   That's about where you are, isn't it?

23            MR. SUSSMAN:  Right.

24            THE COURT:  Now, what did you say?

25            MS. FERGUSON:  Our argument is that silence, that

1  making no statement, at all cannot be misleading conduct as a

2  matter law.

3        THE COURT:  I know that's what you think, but what

4  does the law say about it that I instruct the jury?  You can

5  both answer.

6        MS. FERGUSON:  Oh, the definition is that misleading

7  conduct means knowingly making a false statement, intentionally

8  omitting information from a statement, and thereby causing a

9  portion of such statement to be misleading or intentionally

10 concealing a material fact and thereby creating a false

11 impression by such statement.

12       THE COURT:  Okay.  How do you match up to the

13 instruction or the -- or the -- what was just stated?

14       MR. SUSSMAN:  Well, at the very least, if they said,

15 "None of us shot" --

16       THE COURT:  They didn't say that.

17       MR. SUSSMAN:  I believe at least BM said that.  "None

18 of us shot."  Defendant is right there.  Defendant hears him

19 say that.  Defendant says nothing.  Defendant adopts that

20 statement, by silence, as his own, and that's misleading

21 because he shot, and he knew he shot.  At least that's the

22 government's allegation.

23       THE COURT:  Your response?

24       MS. FERGUSON:  Your Honor, we requested a jury

25 instruction that silence, making no statement at all, cannot be

1   misleading conduct.

2           THE COURT:  I know that's what you requested.  I'm

3   just asking you in respect to Mr. Sussman's statement.

4           MS. FERGUSON:  Our position would be that even

5   silence, in the face of a statement by another individual who

6   is not on trial in this case, cannot constitute misleading

7   conduct, and therefore cannot constitute obstruction of

8   justice.

9       In addition, one of the detectives indicated that the

10  defendant did not speak during that interview.

11          THE COURT:  Yeah.  Okay.  My ruling is that that's

12  not sufficient to justify obstruction of justice by just

13  sitting there.  This is a schooled person.  He knows he does

14  not have a legal duty to incriminate himself.  His silence --

15  certainly, if he had been given *Miranda* warnings, his silence

16  couldn't be issued -- concerned as a -- could not be -- qualify

17  as an adoptive admission.  This is a close question.  Close

18  questions go to the defense.

19      That count will be stricken.

20      Now, your other count for obstruction, I would like to

21  hear again.  What's your evidence going to be?

22      Hang in there.  Do you want a break?

23          MR. SUSSMAN:  No, I'm good.

24      The evidence is going to be he made a very detailed

25  statement during that.  He talked about what happened leading

1    up to the incident, what happened at the incident, and I don't

2    believe he talked very much about what happened after the

3    incident.   But the one thing he never said during that second

4    interview, despite talking about how he thought Finicum was

5    going to hit the agent, how he thought the agent had been hit,

6    what he did, where he went, he said he couldn't remember

7    exactly where he was or exactly what he was doing because he

8    was moving around.   But the one thing he never said during the

9    course of making all those statements is, "Oh, by the way, I

10   shot."   And that creates a misleading impression, and that is

11   sufficient, even by Ms. Ferguson's definitions of obstruction

12   of justice.

13           THE COURT:   Your response?

14           MS. FERGUSON:   Certainly, the defendant did not make

15   a false statement in his January 26, 2016, interview with

16   Oregon State Police detectives.   He did not --

17           THE COURT:   This is not the lying count.   This is

18   obstruction.

19           MS. FERGUSON:   Correct.   And with respect to Count 4,

20   the defendant did -- did speak, so that distinguishes it from

21   Count 5; but I think the government would have to then revert

22   to the definition of misleading conduct that falls under 3(b),

23   intentionally omitting information from a statement and thereby

24   causing a portion of such statement to be misleading or

25   intentionally concealing a material fact and thereby creating a

1   false impression of such statement, and our position is, of

2   course, that the defendant did not shoot and, therefore, he did

3   not lie and wasn't attempting to create any sort of a false

4   impression about that.

5           THE COURT:  Getting back to the prosecution, I'm

6   going to deny the motion to strike that count.  I think it's

7   sufficient to justify submission, if you want to do that.  You

8   know, we've had a lot of cases together.  And as a student, I

9   said, "You're prosecutors.  Try the case with your elbows in.

10  Keep it simple.  Keep it straightforward.  Don't -- if you've

11  got a strong count, stay with your strong count.  Don't team up

12  with some mushy count."

13      You've got flat-out statements that he lied.  You've got,

14  now, that -- the inference of obstruction of justice.  I'll

15  leave it in if you want, but it's your call.

16          MR. SUSSMAN:  We'd appreciate it if you would.  We

17  would also appreciate it if you'd let us present our evidence

18  on Count 5 before you decide to take it away from the jury.

19          THE COURT:  Well, I asked you what your offer of

20  proof was, didn't I?

21          MR. SUSSMAN:  You did.

22          THE COURT:  All right.  I assume that I can rely on

23  that as your offer of proof in final pretrial conference as to

24  what your evidence will be.

25          MR. SUSSMAN:  Well, of course the testimony is likely

1   to be in a lot more detail than an offer of proof here in

2   court, Judge.

3           THE COURT:  Well, this was your opportunity.  If you

4   want, you can bring him in.  We'll be available tomorrow.

5           MR. SUSSMAN:  Well, Judge, I believe he's in Central

6   Oregon, so -- but, in any event, et --

7           THE COURT:  He can testify on the phone, can't he?

8           MR. SUSSMAN:  We can try and find him, Judge.

9       In any event, I mean, I -- I know you had mentioned

10  earlier that the statements that were made during that second

11  interview might still be admissible regardless of whether the

12  substantive count was still there.

13          THE COURT:  Well --

14          MR. SUSSMAN:  Because we think that's part of the

15  whole -- the whole deceptive and misleading conduct, was the

16  fact that it happened not once but twice.

17          THE COURT:  As I said, it's out as far as the count

18  is concerned, but not as -- as to what was -- what happened.

19  It's out as far as a count on Count 2, but you can certainly

20  offer it as relevant conduct.

21          MR. SUSSMAN:  Count 5, Judge.

22          THE COURT:  What?

23          MR. SUSSMAN:  Count 5.

24          THE COURT:  Okay.

25          MR. SUSSMAN:  Okay.  Thank you.

1              THE COURT:  How is our court reporter holding up?

2              THE COURT REPORTER:  I'm fine.

3              THE COURT:  What is your next issue?

4              MR. SUSSMAN:  Judge, the defendant, in his trial

5    memo, had requested to be able to ask leading questions of

6    every government witness or every witness who works for the

7    government, I should say, regardless of which party calls the

8    witness as their own.  He points out that Rule 611 does allow

9    for leading questions of a witness on direct examination that's

10   identified with an opposing party; but, of course, that's

11   discretionary with the Court.

12        And it seems to me, Judge, that, you know, if they're

13   going to call a witness as their own witness, then they ought

14   to be able to do a direct examination of the witness without

15   asking a ton of leading questions; and, along those same lines,

16   what they're -- the HRT agents that we've been dealing with, we

17   would submit that under their logic, Your Honor, those HRT

18   agents are clearly identified with the defendant in this case.

19   Their bro; one of their teammates.  Some of them have been

20   overtly hostile toward us as we've been preparing this case for

21   trial.

22        So to the extent that they want to be able to ask leading

23   questions of, for example, Deschutes County sheriff's deputies

24   or Oregon State Police officers, then we should be able to ask

25   leading questions of all the HRT guys, as well, or we can just

1    all do normal direct examinations and not lead our witnesses.

2            THE COURT:  Well, as far as leading questions, there

3    are, I think, nine exceptions to that rule.  I've already told

4    you that I encourage narrative questions.  They don't have to

5    all be Q and A.  You know, you were there -- time, place,

6    person, presence -- and tell us what you saw and observed

7    happened.  That's fine.

8        As far as leading is concerned, if there's any showing of

9    hostility, even though they may be police officers, that

10   doesn't mean that they side with one side or the other.

11       So we'll follow the general rules.  You can ask

12   narratives.  I am not saying that you have to, but they aren't

13   forbidden; secondly, we will follow the normal rules as to

14   direct questions by the calling party, and if there's a showing

15   of hostility, leading questions will be permitted.

16       That's where we are.

17           MR. SUSSMAN:  Your Honor, one more thing, and this is

18   kind of a logistical trial issue that came up, and that is the

19   *Daubert* hearing.  Counsel used a lecturn placed in front of the

20   witness and directly in front of the jury box.

21           THE COURT:  Yeah.

22           MR. SUSSMAN:  Because I think that's probably what

23   they're used to, especially the guys from D.C.

24           THE COURT:  I use it here all the time.

25           MR. SUSSMAN:  What's that?

1            THE COURT:  I use it here, quite frequently, for --

2    the lectern.

3            MR. SUSSMAN:  For witness examinations?

4            THE COURT:  Oh, no.  I'm sorry.

5            MR. SUSSMAN:  That's what I was getting at.  At the

6    *Daubert* hearing, that's one thing.  There's no jury here.  It

7    doesn't really matter.

8            THE COURT:  Our standard procedure in this

9    jurisdiction is to ask questions from counsel table, so that's

10   what we'll do.

11           MR. SUSSMAN:  Very good.  Thank you, Your Honor.

12           THE COURT:  Anything further for the government?

13           MR. SUSSMAN:  We've got a list we're going to

14   double-check.

15           MR. MALONEY:  We're working our list, Your Honor.

16           THE COURT:  Well, let's take a break.  Fifteen

17   minutes.

18       Yeah, we still have the statistician that's different than

19   the one we had before.

20           MR. FRANCIS:  Yes, Your Honor.

21           THE COURT:  We'll take that up after we get through

22   our break.

23                         (Recess taken.)

24           THE COURT:  All right.  You want to take on the

25   objection to the statistician?

1          MR. MALONEY:  Judge, we have consulted with counsel.

2    We know who the statistician is.  We have seen his -- his CV,

3    but we have not seen his report, and that is waiting on a

4    report from another defense expert, Mr. Liscio, and we haven't

5    seen that report either.

6       So as we get those materials, if there are issues, we'll

7    certainly identify them for the Court, after consulting with

8    counsel, and seeing if we can't work something out; but we're

9    not in a position to say that we agree to the admissibility of

10   their testimony because we don't know what they're going to

11   say.

12          THE COURT:  Well, we will wait and see.  What else do

13   we have?

14          MR. MALONEY:  Judge, I have some kind of "mode and

15   manner of the presentation of evidence" questions.  Mr. Sussman

16   brought up the issue of questioning the witnesses from the

17   podium.  I understand the Court's -- we're going to adhere to

18   the standard in this district and question from counsel table.

19          THE COURT:  Sure.

20          MR. MALONEY:  Counsel had requested that the

21   government's case agents not sit next to the jury.  We were

22   thinking we would have them sit directly behind us so that

23   they're accessible to us through the proceedings but not to be

24   a distraction or interference.

25          THE COURT:  That's fine.  You can have them at the

1    counsel table.  I don't care.

2              MR. MALONEY:  Just so the court is aware.

3              THE COURT:  Often we have the case agents at counsel

4    table.

5              MR. MALONEY:  We have three case agents on this case,

6    Judge.  We have --

7              THE COURT:  Just keep them back there.  Well,

8    whatever.  I don't care.

9              MR. MALONEY:  I identify them only in case the Court

10   had concerns about them being present during the testimony in

11   the trial.

12             THE COURT:  No.

13             MR. MALONEY:  And we intend to have the jury view

14   during and as part of the presentation of Mike Haag's

15   testimony.

16             THE COURT:  Say that again.

17             MR. MALONEY:  We would like to do the jury view in

18   conjunction with --

19             THE COURT:  The jury view?

20             MR. MALONEY:  Of the truck, Your Honor.

21             THE COURT:  I thought you were going out in the

22   boondocks.

23             MR. MALONEY:  Do you want to take a road trip, Judge?

24             THE COURT:  We'll have it downstairs.

25             MR. MALONEY:  That will be towards the end of the

1  government's case, just so you get an idea of when to expect

2  it.

3          THE COURT:  Fine.

4      There was another thing.  You didn't want the jury

5  fiddling around with the box.

6          MR. MALONEY:  And we do not intend to offer the box

7  as evidence in this case.  We may offer the box as a

8  demonstrative aid for Mr. Haag to demonstrate the rocker --

9          THE COURT:  That's fine.

10          MR. MALONEY:  Judge, you mentioned the possibility of

11  doing an offer of proof tomorrow morning for the presentation

12  of evidence on Count 5.

13          THE COURT:  Any time that's convenient.  I can

14  accommodate you any time this week.  We have other matters set,

15  but we can work it out.

16          MR. MALONEY:  We appreciate the Court's advice to the

17  "elbows in" approach for the prosecution.  We're going to

18  consider that.  Right now we're trying to see when the witness

19  would even be available to make the trip.  He's out of

20  Lakeview --

21          THE COURT:  I don't need him to be here.  I can take

22  him over the phone.  He can go to Kinkos, and we can take him

23  up on 16.

24          MR. MALONEY:  We may well let the Court -- not ask

25  the Court to reconsider its ruling and proceed as the counts

1    currently stand, but we want to think that through and see how

2    the rest of this case is going to shape up with the evidence

3    that we have.

4           THE COURT:  That's fine.  You've got 100 witnesses

5    and a thousand exhibits.  A lot.  Both sides should do some

6    substantial trimming.  That's just because of the -- the

7    nature.  I appreciate -- these are all contingent suggestions,

8    not what's going to happen.  So what I need is what's going to

9    happen, so --

10          MR. MALONEY:  To give the Court some idea of the

11   reasoning behind the government's case, we are calling a number

12   of witnesses only to establish the fact that they were at the

13   scene and they did not remove any shell casings, and they have

14   no knowledge of anyone removing shell casings.  So those

15   witnesses may go fairly quickly, but that's the -- there's a

16   large amount of the government's case that is about --

17          THE COURT:  Well, you can reach -- certainly, you can

18   reach a stipulation that as to these people, that they didn't

19   find anything or they didn't do anything, unless they have

20   something else to offer.

21          MR. MALONEY:  I understand.  Thank you, Judge.

22          THE COURT:  Okay.

23          MR. CARY:  Your Honor, we have a number of items left

24   to cover, and we can do them in whatever order you want, but

25   here is what we see --

1          THE COURT:  I'll abide by your order.  Whatever you

2    want.

3          MR. CARY:  All right.  The first thing, Your Honor,

4    is there are a number of stipulations in the trial brief that

5    we just wanted to make note of.  I think they're already in the

6    record.  I don't think there's a need to read them again, but

7    there are a number of stipulations we've noted in our trial

8    brief.

9          THE COURT:  We don't need to read them.  That's fine.

10         MR. CARY:  The next is jury instructions, Your Honor,

11    if you intend to address jury instructions today.

12         THE COURT:  I will read the stipulated fact

13    situation.  You want me to do that right at the beginning,

14    don't you?

15         MS. PERINI-ABBOTT:  Yes, Your Honor.

16         MR. CARY:  Yes, Your Honor.

17         MS. PERINI-ABBOTT:  Sorry.

18         MR. CARY:  No, that's yours.

19         MS. PERINI-ABBOTT:  I'm tasked with jury

20    instructions, so I jumped in to answer that question.

21         THE COURT:  Okay.

22         MS. PERINI-ABBOTT:  We're ready to address any other

23    jury instruction issues now, or we can address them, perhaps,

24    since one of the counts the government still may make an offer

25    of proof on.  The Court may want to hold off on other jury

1    instructions.

2            THE COURT:  I have your defendant's proposed jury

3    instructions.  I have the government's requested jury

4    instructions.  Let's put you to work.  Why don't we take yours.

5            MS. PERINI-ABBOTT:  Sure.  We did come to agreement

6    on the vast majority of jury instructions, the joint proposed

7    jury instructions.  The few that we did not reach agreement

8    on --

9            THE COURT:  That's the one I'm looking at.

10           MS. PERINI-ABBOTT:  So the first one we did not reach

11   agreement on is whether or not the defendant is entitled to a

12   specific unanimity instruction on the 1001 counts.

13           THE COURT:  I'm looking at the correspondence I have.

14   These are only the instructions that you were unable to reach

15   an agreement on.

16           MS. PERINI-ABBOTT:  Yes, Your Honor.  The first

17   one --

18           THE COURT:  I'm looking at page 3.

19           MS. PERINI-ABBOTT:  Yes.  The first one is that we

20   propose an "other acts of the defendant" instruction --

21           THE COURT:  Yes.

22           MS. PERINI-ABBOTT:  -- to address --

23           THE COURT:  Page 3?

24           MS. PERINI-ABBOTT:  Page 3.

25      -- to address the issue of him being seen.  Well, we don't

1    know if it's him, as we've talked about with Motion in Limine

2    1, but various HRT operatives, and the government intends to

3    suggest that at least one of them was our client being seen

4    walking around, after the fact, picking up -- possibly picking

5    up shell casings -- at a minimum, bending down.

6         We want it to be clear to the jury that he's not charged

7    with taking evidence or hiding evidence.  Particularly, in a

8    case where the issue is false statements and obstruction, we

9    think it needs to be clear that that evidence is not -- is not

10   the crime charged in this case, and that's why we propose that

11   the Court use the pattern instruction for other acts of the

12   defendant.

13            THE COURT:  Counsel?

14            MR. SUSSMAN:  This is not the pattern instruction,

15   Judge.  This has argumentative stuff.

16            THE COURT:  I can't hear you.  Speak into the mic.

17            MR. SUSSMAN:  Is that better?

18            THE COURT:  Yes.

19            MR. SUSSMAN:  This was not the pattern instruction

20   they're proposing here.  This is a lot of their interpretation

21   and their spin on the evidence.  It is argumentative.  It is

22   not a neutral and balanced statement of the law, and we think

23   there's some serious problems with it.

24         First of all, the very first paragraph says, "You have

25   heard testimony and seen evidence that the defendant, at the

1    direction of his supervising agent, searched the scene with

2    other FBI agents, looking for specific sensitive items."

3    That's their spin on the evidence.  That's their interpretation

4    of the evidence.  And that is not the inference that we're

5    going to be asking the jury to draw, and we don't think you

6    should give the Court's imprimatur to their spin on the

7    evidence.

8         If you want to give an "other acts" instruction, just give

9    the pattern instruction without inserting comments on what

10   their interpretation of the evidence is.

11        And then in the last paragraph it says here, "Remember

12   that the defendant is on trial here only for making statements

13   and obstructing justice by not making certain statements.

14        In fact, he is charged with obstructing justice by

15   engaging in misleading conduct, which is broader than not

16   making certain statements.  So that is a misstatement of the

17   law.  It is a misstatement of the charge, and we think that

18   this instruction is improper.

19             THE COURT:  I will give the standard jury

20   instruction, without the additional conduct which -- without

21   the additional language which is italicized.

22             MS. PERINI-ABBOTT:  Your Honor, just one point on

23   this.  And I apologize.  Our instruction only cites MCJI 4.3,

24   but MCJI 2.11 is the "other crimes" instruction that's given in

25   the middle of trial, and it does ask that some summary of the

1  evidence be given, which was what I inserted in italics, what

2  we expect the evidence will show with regard to this.  Of

3  course, maybe we could draft the language summarizing it once

4  the evidence comes in because the government seems to think the

5  evidence will come in differently than the defense expects.

6          THE COURT:  I will be giving the standard

7  instruction, and you can put whatever gloss you want on it.

8          MS. PERINI-ABBOTT:  There will be some summary that

9  we will have to come to agreement on.

10         THE COURT:  I try not to mix the facts with the

11 instructions.  I'll give the -- the broad scope, and then you

12 fill in the -- the rest --

13         MS. PERINI-ABBOTT:  Okay.  Thank you, Your Honor.

14         THE COURT:  -- in your arguments.

15     Go ahead.

16         MS. PERINI-ABBOTT:  The next instruction is on

17 specific unanimity for Counts 1, at which can now be removed

18 any reference to Count 2.  The pattern instruction for 1001,

19 although it's not in the text of the instruction, if you have

20 the pattern jury instruction manual, the commentary makes

21 explicit that a specific unanimity instruction is appropriate

22 in certain circumstances for 1001 charges when the exact

23 statement is not clear.

24     And here, because the indictment does not actually charge

25 exactly what was said, we are asking that the jury be required

1    to agree on what was said, what was material, and what was

2    false, which is a correct statement of the law and sanctioned

3    by the commentary of the Ninth Circuit pattern instructions.

4                THE COURT:  Well, I -- you want to comment?

5                MR. SUSSMAN:  I can do better than comment, Judge.  I

6    mean, we prepared a bench memo for the Court on specific

7    unanimity, which I would be happy to forward to the Court; but,

8    basically, the Ninth Circuit has said over and over and over

9    again that, generally speaking, a general unanimity instruction

10   is all that's required to tell the jury that they have to agree

11   unanimously.  Unless the count is so complex or so encompassing

12   that there's a real risk of confusion or a real risk that

13   they're going to convict the defendant for conduct he did not

14   engage in or that was not charged in the indictment.

15       Judge, what we're talking about with the remaining false

16   statement counts is, "Did you shoot?"

17       "No, I didn't shoot."

18       It can't get any simpler than that.

19                THE COURT:  I know.  That's what I was trying to tell

20   you earlier.

21                MR. SUSSMAN:  And that being the case --

22                THE COURT:  And not this adopted admission of --

23                MR. SUSSMAN:  That being the case, Judge --

24                THE COURT:  I know, but --

25                MR. SUSSMAN:  -- there's absolutely no need for a

1   specific unanimity instruction.

2           THE COURT:  It's now been trimmed down by the Court,

3   against your objection, to specific -- to a specific statement

4   of denial, and so that's all I'm going to give, is just that

5   they have to prove the elements of the offense to the

6   satisfaction of each one, and that's just -- I'm not going to

7   give this instruction --

8           MR. SUSSMAN:  Thank you.

9           THE COURT:  -- as such.

10       Obstruction of justice is on page 5.

11          MS. PERINI-ABBOTT:  Yes, Your Honor.  It might

12  actually be helpful to take out the government's instruction on

13  this count.  They're not that different, but there are two

14  specific differences that I want to highlight for the Court

15  which -- where I think that our instruction is more in line

16  with the Ninth Circuit pattern instructions and a little bit

17  more clear.

18          THE COURT:  Thank you.

19          MS. PERINI-ABBOTT:  So if you look at the government

20  proposed instructions on page 3 --

21          THE COURT:  Okay.  I've got it.

22          MS. PERINI-ABBOTT:  -- they're largely the same.  And

23  here are the two differences, at least, that matter to us:  In

24  element two, they state only that the defendant acted

25  knowingly.  We suggest defining "knowingly" within that element

1    of the instruction, just as the pattern instructions do for

2    18 U.S.C. 1001.  And if you want to, I can point you to where

3    in the joint instructions it does so.  But it's mostly for

4    consistency between the instructions that we define the element

5    there.

6               THE COURT:  I've got your point.  Any objection?

7               MR. SUSSMAN:  We just had knowingly in a separate

8    supplemental instruction.

9               THE COURT:  That's fine.  I'll give it as you

10   requested.

11              MS. PERINI-ABBOTT:  Okay.  So, then, the other

12   difference we don't need to point out?

13              THE COURT:  No.

14              MS. PERINI-ABBOTT:  The next instruction we propose

15   that differs from the government is in misleading conduct.

16              THE COURT:  Yes.

17              MS. PERINI-ABBOTT:  There are two differences between

18   our instruction and the government's on this.  The first

19   instruction I would believe is likely an oversight by the

20   government, but then inserting the statutory definition of

21   "misleading conduct," they leave out the final words of

22   "created a false impression."  That's where they stop the

23   sentence.  And the actual sentence goes on "by such statement."

24       I'm on the fourth line of my first paragraph in the middle

25   of the sentence.

1      So let me read the whole sentence.  "The defendant engaged

2   in misleading conduct if you find beyond a reasonable doubt

3   that he knowingly made a false statement, intentionally omitted

4   information from a statement" --

5              THE COURT:  Wait.  Wait.  Did you look at the court

6   reporter?

7              MS. PERINI-ABBOTT:  Sorry.

8              THE COURT:  She's frowning.

9              MS. PERINI-ABBOTT:  I will do better.

10             THE COURT:  Okay.  Slow down.

11             MS. PERINI-ABBOTT:  -- "intentionally omitted

12  information from a statement and thereby caused a portion of

13  such statement to be misleading, or intentionally concealed a

14  material fact and thereby created a false impression by such

15  statement."

16      The government's proposed instruction just leaves off

17  those final three words which we think need to be in there to

18  be consistent with the statute.

19      The more substantive difference is that the government

20  objected to our addition of the statement silence, i.e. making

21  no statement at all, is not misleading conduct.  The Court

22  found that that essentially is a correct statement of the law

23  in ruling on our Count 5 motion, and we think it belongs in the

24  jury instructions as a correct statement of the law.

25             MR. SUSSMAN:  Well, if you have taken Count 5 away,

1    there's no allegation that he simply remained silent during the

2    conduct giving rise to Count 4.  That being the case, there's

3    no reason to have that line in there.  If Count 5 was still in

4    there, they would have a better argument for it; but if Count 5

5    was gone, there is no issue of silence because he talked a lot

6    during the conduct giving rise to Count 4.

7                    THE COURT:  It's changed materially, so you don't

8    need that.

9                    MS. PERINI-ABBOTT:  The Court will give the remainder

10   of our instruction to ensure the complete statutory language?

11   I'm comparing it to --

12                   THE COURT:  I don't know that I understand it.

13                   MS. PERINI-ABBOTT:  If you look at page 5 of the

14   government's --

15                   THE COURT:  I'm looking at page 6 of yours.

16                   MS. PERINI-ABBOTT:  Page 6 of mine -- of ours; page 5

17   of the government's.  If you look one, two, three -- fourth

18   line down on the government's, the sentence ends at "created a

19   false impression."

20                   THE COURT:  Yes.

21                   MS. PERINI-ABBOTT:  The actual statutory language in

22   18 U.S.C. 1515, that sentence continues by saying "created a

23   false impression by such statement."

24                   THE COURT:  Okay.

25                   MS. PERINI-ABBOTT:  That was likely an oversight by

1    the government, but we ask that it be included.

2           THE COURT:  "Knowingly" is defined on page 6 of the

3    government.  I thought we've already covered "knowingly."

4           MS. PERINI-ABBOTT:  Yes.  We covered "knowingly" in

5    the element, as we requested.

6           THE COURT:  Yes.  Earlier.

7           MS. PERINI-ABBOTT:  Yes.

8           THE COURT:  Yes, that's fine.  It won't be repeated.

9       Okay.  Then the next is your --

10          MS. PERINI-ABBOTT:  Our next proposed instruction is

11   defining a false statement, and that, in fact, is also covered

12   now that you've adopted our definition of the elements, so we

13   will withdraw that one.

14          THE COURT:  That's fine.  Thank you.

15          MS. PERINI-ABBOTT:  Our final proposed instruction

16   relates to element four of 18 U.S.C. 1512.  And I think this is

17   another situation in which we need to look at the government's

18   to understand the changes that we made.

19          THE COURT:  All right.

20          MS. PERINI-ABBOTT:  So if you'd look at the

21   government's at page 12.

22          THE COURT:  All right.

23          MS. PERINI-ABBOTT:  Let me flip back to our proposed

24   instruction.  We essentially take issue with how broad of a

25   statement they were asking the Court to make at the beginning

1   of this instruction where it says, "I instruct you that an

2   alleged shooting by a law enforcement officer while acting

3   under color of law does, in fact, constitute a potential

4   federal offense."  I think that it's more appropriate to

5   actually just reference the statute where -- so the way we

6   phrased it "The United States must prove that the information

7   the defendant intended to prevent, hinder, or delay related to

8   the commission or possible commission of a federal offense,

9   specifically the use of unreasonable force under color of law."

10       The statement that any officer-involved shooting --

11            THE COURT:  Oh, wait now.  You just jumped.  I'm

12   looking at your page 8.

13            MS. PERINI-ABBOTT:  Yes.  In short, we believe our

14   page 8 is a correct and complete statement of the law and that

15   the government's version contains extraneous statements that,

16   while may be technically true, are confusing to a jury.  So in

17   defining element four, we think our instruction is a more clear

18   instruction.

19            MR. SUSSMAN:  I think just the opposite, perhaps not

20   surprisingly, because what their requested instruction number

21   six does is it requires the jury to make a finding,

22   essentially, of a civil rights violation.  What the

23   government's instruction says is that the excessive use of

24   force by a law enforcement officer can constitute a federal

25   offense.  There's no requirement that they find the underlying

crime has occurred or that the defendant committed the

underlying crime or that the defendant is guilty of committing

the underlying federal offense, only that the federal -- that

he acted with the intent to prevent the communication of the

commission of a possible federal offense to a federal law

enforcement agent, and there's just absolutely no question that

the unreasonable use of force, under Section 242, is a federal

offense, and so the jury need not -- I guess what they're

inviting the jury to do is make a finding that the defendant,

in fact, committed the underlying offense, and that is not

required by the case law.

          MS. PERINI-ABBOTT:  Your Honor, if I may be heard?  I

think our instruction is explicitly clear that they need not

make that finding.

     I also think Mr. Sussman's statements emphasized why their

first statement is confusing and perhaps a misstatement of the

law.  Their statement is, "I instruct you that an alleged

shooting by a law enforcement officer" -- they have now zoomed

out so far away from the actual crime of 18 U.S.C. 242, that it

would be the equivalent of saying, "I instruct you that making

any statement to a bank could be a federal offense."  Sure, if

it's false and it meets these other requirements.

     I think if we use the actual language that Mr. Sussman

used, some of our objection goes away.  The use of excessive

force or the unreasonable use of force, rather than just

1   instructing the jury that any alleged officer shooting could be

2   a federal offense which unfairly implies, perhaps, that

3   Special Agent Astarita is being charged or could have committed

4   some other federal offense and just dramatically oversimplifies

5   what Section 242 really charges.

6            MR. SUSSMAN:  She does make a valid point there,

7   Your Honor.  Perhaps we could work on the language of that

8   requested element instruction and come back to the Court with

9   something that the parties can agree on.

10           THE COURT:  That's fine, but I'm satisfied with the

11  defense's request.  If you want to modify it, just let me know.

12           MR. SUSSMAN:  Okay.  Thank you.

13           THE COURT:  Now --

14           MR. CARY:  Another issue on our list, Your Honor, is

15  we've had a number of discussions with the government about

16  whether witnesses will only be called one time; for example,

17  if --

18           THE COURT:  No, we'll just do it one time.

19           MR. CARY:  Thank you, Your Honor.

20      The next issue is we very much appreciate, and I think the

21  government does as well, the opportunity to use a jury

22  questionnaire, and we think that's actually, hopefully, going

23  to make jury selection go faster.

24           THE COURT:  I'm not worried about the fastness.  I'm

25  worried about getting the job done.  All right.  Go ahead.

1          MR. CARY:  I was hoping to inquire as to how jury

2     selection is going to proceed once we have the questionnaires

3     back just so we can understand logistically whether people will

4     be seated in the box, whether you'll follow up.  I want to

5     understand.

6          THE COURT:  What we do is we sit as many as we have

7     seats here.  We have the visitors move away from segments in

8     the courtroom, and then we'll call the 14, and then I -- since

9     we're using the questionnaire, it's going to cut down, that

10    will give us the opportunity to look at the options.  16

11    options.  Plus, I don't know how many peremptories you need for

12    an alternative.  I couldn't sell you on stipulating to less

13    than 12, but I didn't expect it.

14         MR. CARY:  Your Honor, we're not going to do that.

15         THE COURT:  All right.  So you'll know, so you can

16    make an intelligent choice for both sides, as to who is going

17    to be the option.  So we'll be -- we might lose people, right,

18    for cause, once they get in the jury box and start answering.

19     I will abandon my life sketch method I usually use because

20    we already know all about their background, so I will be doing

21    a minimum amount of the follow-up questions.  I'll leave it up

22    to counsel.  I don't like your proposed follow-up questions.

23    I'm not going to ask them.  I'm not going to put the Court's

24    imprimatur on questions such as, "The government charges only

25    guilty people" or things of that nature, but you will have to

1  relook at yours to see if that's what you really want to ask a

2  juror.

3        But both sides will be given the opportunity to follow up

4  with questions.  The government has the burden of proof, so the

5  government will go first.  And then we can do it with each --

6  the follow-up questions should -- they can be both general or

7  you can pick out some juror, at your option, who said something

8  that you wanted to inquire about.  So we'll have the government

9  go through with their questions of the whole panel or

10 individuals, and we'll have you do the same thing, go through

11 the whole panel of questions or follow-up questions.

12       It may be that you would prefer after the -- I'll ask you.

13 What would be your preference as follow-up questions?  Do you

14 want to -- you've signaled -- who's going to handle the voir

15 dire?

16            MR. MALONEY:  I'm going to handle voir dire for the

17 government, Judge.

18            THE COURT:  What would be your preference as to if we

19 ask for you to inquire of the jury?  Do you want to do the

20 whole thing at once, or do you want to take them one at a time?

21            MR. MALONEY:  I'm comfortable either way, Judge.  I

22 can do the whole room if that's -- if that helps move things

23 along.

24            THE COURT:  I have no preference.  I have -- do you

25 have a preference?

1          MR. ANGELI:  Our preference would be individually,

2   Your Honor.

3          THE COURT:  What?

4          MR. ANGELI:  Our preference would be individually.

5          THE COURT:  Okay.  We'll take them one at a time.

6   That's fine.

7      Now, have you had enough?  Anything further?

8          MR. MALONEY:  Just to clarify, when we say "do them

9   one at a time," I would like to voir dire the panel as a whole

10  and ask individual questions in follow-up from a general

11  question down to an individual question.  Is that permitted, or

12  do I have to question witness one and finish questioning that

13  witness or, I mean, juror -- juror two?

14         THE COURT:  I asked you, first, what was your

15  preference, and you didn't state, that I heard, and then

16  counsel said he would like to do it one at a time.  Now you've

17  asked to do it generally.  I'll grant that to you.

18         MR. MALONEY:  Thank you, Judge.

19         THE COURT:  You can do it, and then when -- if he

20  gets a response that you want to follow up on, you can do it at

21  that time, so --

22         MR. CARY:  Then, if I --

23         THE COURT:  We're going to have the general

24  statements by them, and then they're going to have

25  individual -- spot around individual questions; but once they

1   go to individual questions, you can step in at that point.

2            MR. ANGELI:  Okay.

3            THE COURT:  Will what work?

4            MR. CARY:  Your Honor, I'm sorry.  I have one other

5   question.  Mr. Angeli is actually handling this.  If he

6   understands, I guess that's good enough, but when we offer

7   for-cause challenges, when would you prefer the for-cause

8   challenges be made, Your Honor?

9            THE COURT:  Oh, the challenge -- I thought we covered

10  this.  We use both jury rooms.  We send the jury out and --

11           DEPUTY COURTROOM CLERK:  We wanted to do it like we

12  did it last time and just leave them all in here in order.

13           THE COURT:  Whatever.  They'll spot the jury away.

14  We never exercise challenges in front of the jury.  And then if

15  you get a challenge for cause, just hold that until -- let's

16  figure out what we're going to do with our -- after we impanel

17  the whole jury.  You might change your mind.

18           MR. CARY:  Okay.

19           THE COURT:  The challenges for cause are always done

20  outside the presence of the jury.

21           MR. CARY:  Right.

22           THE COURT:  So what we'll be doing is that we'll send

23  them all out there.  If you have a question -- a challenge for

24  cause, I'll take it up at that time.  That will give you

25  additional peremptories, so it's -- it will work out.

1          The other thing is how do you want to handle it on your

2     challenges?  Of course, I would take the challenges for cause

3     first, and then we clear those for both sides.  But then when

4     we get to the peremptories, do you want to do that by handing

5     in your peremptories simultaneously, or do you want to do them

6     you go first, they go, you go, they go, et cetera?

7               MR. MALONEY:  We would prefer to take turns,

8     Your Honor.

9               THE COURT:  That's fine.  I don't care.

10              MR. ANGELI:  That's fine with us, Judge.

11              THE COURT:  That's fine.  This really is no problem.

12    It's just that we never embarrass jurors.  When we tell them

13    the rest of them can go, we don't even tell them who's been

14    challenged.  We just thank them for their service and go from

15    there.

16              MR. MALONEY:  Just so I'm clear, understanding the

17    mode of the challenges, the government would challenge first

18    with one challenge, defense would challenge next with two

19    challenges on the peremptories, and then we would take turns

20    back and forth until we are either out of peremptories or we're

21    satisfied?

22              THE COURT:  Yeah.  Please don't be out of

23    peremptories.  You're getting too many anyway.  Especially the

24    defense.

25         All right.  What else have you got?

1          MR. CARY:  Your Honor, I have one more issue, which

2    is openings.  We have had some discussions about what we're

3    going to use in opening, but I don't think we have a common

4    understanding of some ground rules in terms of what we can use.

5          THE COURT:  You can use any -- have a seat.  I have

6    watched all sorts of openings, and it's essentially recognizing

7    this is not a time for argument.  This is a time for you as to

8    what you expect the evidence to be.  I don't put a time limit

9    on your opening statements.

10        The next issue is to what statements you want -- what

11   evidence you want to use to supplement your opening statements.

12   That's an individual advocate's point of view.  Who's going to

13   make the opening statement for the government?

14          MR. SUSSMAN:  I am, Your Honor.

15          THE COURT:  All right.  What would be your position

16   on using exhibits in your opening statement?

17          MR. SUSSMAN:  I typically don't.

18          THE COURT:  What?

19          MR. SUSSMAN:  I typically do not.

20          THE COURT:  Okay.  What is your position?

21          MR. CARY:  And we're willing to live by those same

22   rules, as long as it's the same for both of us.

23          THE COURT:  All right.  We won't use the exhibits

24   during the opening statement.  That's fine.

25          MR. SUSSMAN:  Thank you, Your Honor.

```
 1              THE COURT:  Again, this is your opportunity to state
 2   what you want.  I will have given the preliminary instructions
 3   so they'll have it.  I'll also give them the statement of the
 4   case.  Do you want me to give them a copy of it or just read
 5   it?
 6              MR. CARY:  Just read it, Your Honor, would be our
 7   preference.
 8              MR. SUSSMAN:  That's fine, Your Honor.  Thank you.
 9              THE COURT:  I'll just read it.
10              MR. CARY:  I'm out of issues, Your Honor.
11              THE COURT:  All right.
12        Well, it's 7:00 your time.  Close.
13        Mr. Sussman, you're just getting started.
14              MR. SUSSMAN:  Well, it's about that time, Your Honor.
15              THE COURT:  Yes.
16              MR. SUSSMAN:  We're good.
17              THE COURT:  Thank you.  See you then.
18              MR. MALONEY:  We haven't heard back from the witness,
19   Your Honor, so we'll be in --
20              THE COURT:  I tell you what.  I'm just going to use
21   the opening statement -- I mean, the offer of proof that I got.
22   Anything you want to do, you just submit it to me as an offer
23   of proof.
24              MR. MALONEY:  Thank you, Judge.
25              THE COURT:  Thank you.  So I'll see you next week.
```

1          If you have any questions, please, please call me.  Just

2     have Becky set up a conference call, and so -- then also

3     whether you need a reporter; but, just, let's not have a lot of

4     new issues come at the last -- see you next week.

5                         (Hearing concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3        United States of America v. W. Joseph Astarita

4                    3:17-cr-00226-JO

5                   PRETRIAL CONFERENCE

6                     July 16, 2018

7

8           I certify, by signing below, that the foregoing is a

9   true and correct transcript of the record, taken by

10  stenographic means, of the proceedings in the above-entitled

11  cause.  A transcript without an original signature, conformed

12  signature, or digitally signed signature is not certified.

13

14  /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
    _____
15
    Official Court Reporter      Signature Date: 7/20/18
16  Oregon CSR No. 98-0346       CSR Expiration Date:  9/30/20

17

18

19

20

21

22

23

24

25